ESTATE OF JONATHAN HOLDEEN, DECEASED, RANDAL HOLDEN and JANET ADAMS, Co-executors, and ESTATE OF STELLA H. HOLDEN, DECEASED, RANDAL HOLDEN, Executor, et al., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Estate of Holdeen v. Commissioner
Docket Nos. 65867, 65869, 71972, 71997, 82081, 82946, 87569, 89076, 94066, 94080, 94081, 94084, 94085, 94107, 94186, 95138, 95143, 5376-65 and 5382-65.
United States Tax Court
T.C. Memo 1975-29; 1975 Tax Ct. Memo LEXIS 343; 34 T.C.M. (CCH) 129; T.C.M. (RIA) 750029; February 19, 1975, Filed. Jonathan Holdeen during his life entered into some 186 agreements with his adult daughters or friends to create trusts. About 50 of these agreements are here involved. In some of these he named his grandchildren or his brother's grandchildren as income beneficiaries for life, with income thereafter to be paid in part to a charity and in part to be accumulated. In others he named an exempt organization as beneficiary as to part of the income, with part to be accumulated. All provided for a term of 500 or 1,000 years with the principal and accumulated income then to be paid to the State of Pennsylvania. Holdeen's wife was a co-grantor in some agreements. The original assets of each trust were of appreciated securities transferred irrevocably with reservation of payment of grantor's cost. Later some trusts purchased improved real properties. Certain early trusts were involved in litigation in U.S. courts over taxability to Holdeen of trust income for 1945 and 1946 in which income of some trusts was held taxable to him and income of others was held not so taxable. Holdeen and his wife made certain other contributions to the fully charitable trusts in the years *344 1951-1957. Trusts I, II and III were created in 1936, MS and NS Trusts in 1940 and others in 1944 and later years. Trust II provided for payment of its income to family members during the lives of two daughters of Holdeen, the income thereafter to be paid to Hartwick College and at the end of 1,000 years the principal to be paid to the State of Pennsylvania. It was modified in 1943 to be deemed made under and with reference to Pennsylvania law, and to provide that capital gains would not be treated as income. In the fiscal years ended in 1955 and 1956 the ordinary income was paid to family beneficiaries and the capital gains were permanently set aside by the trustee pursuant to the trust deed for the educational or public purposes of the trust. The amounts set aside were reinvested within a reasonable time in property held for the production of investment income. The amounts set aside were not unreasonable in amount or duration, were not used to a substantial degree for noncharitable purposes and were not invested in such a manner as to jeopardize the interests of Hartwick College or the State of Pennsylvania. Trust 45-10, a fully charitable trust, provides for payment of a part of *345 its income to the American Unitarian Association (AUA), an exempt organization, and accumulation of the remainder of its income. The trust is subject to Pennsylvania law and regulation. The amounts to be paid to the AUA are one 500th of the income for the year times the number of years elapsed since 1944, and all other net income not lawfully subject to accumulation. After 500 years the corpus and accumulated income is payable to the State of Pennsylvania. Trust 55-10 is a split trust. A part consists of units of 200 or 500 shares of stock the income to be paid to family members for life with the remainder returned to the corpus of the trust after such lives. The other part is a fully charitable trust with part of the income payable for charitable purposes or to the AUA, and corpus and accumulated income to the State of Pennsylvania after 1,000 years. The trust is subject to Pennsylvania law and regulation. The payments are one 1000th of the income for the year times the number of years since 1950. The remainder of the income is to be accumulated, except that any part of such income for which accumulation is unlawful shall be paid to Trust 45-10. Held, Holdeen and his wife intended *346 to and did create valid and genuine trusts. Held further, In the taxable years 1951-1957 Holdeen, with the exceptions noted infra, did not retain or exercise ownership or control of the corpus or income of any of such trusts and the income of the trusts was not taxable to him. The exceptions referred to above are: (1) Income of Trusts II and III was taxable to Holdeen until June 30, 1954, and not thereafter. (2) Income of a portion of Trust 45-10 was taxable to Holdeen until September 30, 1956, and not thereafter. (3) Income of portions of MS and NS Trusts was taxable to Holdeen until September 30, 1955 and not thereafter. Held further, Contributions made by Holdeen and his wife to the fully charitable trusts in the years 1951-1957 are deductible as claimed. Held further, Trust II is entitled to deduct its capital gains as amounts permanently set aside for educational or public purposes pursuant to section 642(c), I.R.C. 1954 in the fiscal years ended in 1955 and 1956. Held further, The accumulation provisions of Trusts 45-10 and 55-10 are unreasonable and void as contrary to public policy and the entire income of the trusts is payable to the income beneficiary, the AUA, now the UUA, *347 on a current basis. In re Estate of Frank James,199 A.2d 275 (Sup. Ct. Pa. 1964). There is therefore no accumulation subject to the provisions of sec. 681(c), I.R.C. 1954 or sec. 162(g)(4), I.R.C. 1939, and these trusts have no taxable income. Held further, The portions of Trust 55-10 applied to the payment of current income to family members with remainder to the principal of the trust are charitable remainder trusts and have no taxable income. Louis Bender and Allan Rappleyea for the petitioner Estates. Allan Rappleyea and Henry C. Clark, for the petitioner Trusts. Dorrance R. Belin and F. Patrick Matthews, III, for the respondent. Frank G. Opton filed briefs for the Unitarian Universalist Association as Amicus Curiae. FORRESTER, Judge: Respondent determined deficiencies in income tax in these consolidated cases as follows: Estate of Jonathan Holdeen, Deceased, Randal Holden and Janet Adams, Co-executors, and Estate of Stella H. Holden, Deceased, Randal Holden, Executor. Docket No.
Taxable Year
Deficiency
82081
1951
$ 162,116.81
82081
1952
160,835.28
82081
1953
198,406.06
82946
1954
390,027.57
89076
1955
267,438.63
87569
1956
397,464.25
94186
1957
441,714.94
Also an addition to tax for the year 1951 *348 for deliquency in the amount of $ 15,449.90 in Docket No. 82081 under section 291 of the Internal Revenue Code of 1939. Holdeen Trust II, Janet Adams, Trustee
Docket No.
Taxable Period
Deficiency
Additions to Tax *
65867
1948
$ 5,212.10
$ 1,303.02
65867
1949
1,685.67
None
65867
1950
2,436.86
609.21
71972
1951
1,947.77
486.94
71972
1/1-6/30/1952
2,249.47
112.47
71972
FY 6/30/1953
2,457.64
122.88
71972
FY 6/30/1954
12,575.64
None
Janet Adams Trust II, Janet Adams, Trustee
94085
FY 6/30/1955
$ 12,074.75
None
94081
FY 6/30/1956
20,420.51
None
Holdeen Trust 45-10, Janet Adams,
Trustee
65869
1949
$ 4,839.62
None
65869
1950
18,805.46
$ 4,701.36
71997
1951
18,174.13
4,543.53
71997
1952
23,158.02
None
71997
1953
26,822.44
6,705.61
94080
1954
6 7,619.94
None
94084
1955
32,986.27
1,649.31
94107
1956
33,708.35
None
95138
1957
42,294.74
None
5376-65
1958
87,744.39
None
5376-65
1959
28,437.83
None
5376-65
1960
28,789.43
None
5376-65
1961
30,045.53
None
5376-65
1962
27,612.70
None
5376-65
1963
33,319.72
None
5376-65
1964
45,486.34
None
Holdeen Trust 55-10, Janet Adams, Trustee
94066
1956
$ 34,125.63
95143
1957
44,961.46
5382-65
1958
88,906.31
5382-65
1959
30,363.69
5382- 65
1960
30,768.82
5382-65
1961
34,354.98
5382-65
1962
31,299.04
5382-65
1963
36,326.02
5382-65
1964
48,649.28
HISTORY *349 OF THE CASES Jonathan Holdeen (sometimes hereinafter referred to as Holdeen) entered into a large number of written agreements, as settlor or trustor, with one or more members of his family or a friend, as trustee, in which he created, or purported to create, trusts, some for the benefit of members of his family with remainders to a college or charitable organization, some for the benefit of a charitable organization, and all with a remainder for public purposes, the trusts to have a duration of 500 or 1,000 years. In some of these agreements his wife, Stella, was also settlor or trustor. Respondent has determined deficiencies against Holdeen and Stella and alternatively against some 50 of the trusts under such agreements. Holdeen and his wife have died while their case was pending and their estates have been substituted as petitioners. By agreement between the parties, three of the trusts so created have been selected as test cases in the present proceeding for decision as to the liabilities of the trusts. Holdeen filed individual Federal income tax returns for the years 1945, 1946 and 1947. Holdeen and his wife filed joint income tax returns for the calendar years 1948, 1949 and *350 1950. On November 28, 1956, the respondent mailed notices determining deficiencies as to each of the foregoing years. Holdeen paid the deficiencies determined and brought action against the district director of internal revenue at Albany, New York, seeking a refund of the tax paid with respect to the year 1945. The deficiencies were based primarily upon including in Holdeen's income income accrued to trusts known as Trust I, Trust II, Naylor-Sanford, MacPherson-Sanford, Trust 44-10 and Trust 45-10. The case was tried in May 1958 before a jury. The jury held for Holdeen as to Trust 45-10 but for the district director as to the income of all the other trusts. The District Court set aside the jury's findings as to Trust 45-10. [166 F. Supp. 694]
On appeal the Court of Appeals for the Second Circuit [270. F.2d 701] concluded that Holdeen was not taxable on the income of Trust 45-10 but upheld the District Court's conclusion as to the other trusts. The case was remanded to determine the effect of a merger of Trust 44-10 and Trust 45-10 under the terms of the latter trust. Upon the remand the district court in 190 F. Supp. 752 concluded that the income of Trust 44-10 after June 2, 1945, *351 the date of Trust 45-10, was part of the income of Trust 45-10 but the court also concluded that the accumulation under Trust 45-10 was unlawful. On appeal, the court of appeals reversed the holding that the accumulation was unlawful. [292 F.2d 338]
Holdeen also brought an action in the District Court for the Southern District of New York to recover the taxes paid for 1946 upon income of Trusts I, II, 45-10, 46-10, MacPherson-Sanford and Naylor-Sanford. The case was tried in December 1960. The jury returned a verdict for the Government. On appeal, the Court of Appeals for the Second Circuit reversed the lower court as to income attributable to Trusts 45-10 and 46-10 but sustained the lower court as to income from Trusts I, II, Naylor-Sanford and MacPherson-Sanford. [297 F.2d 886]
Holdeen and his wife brought a further action in the District Court for the Southern District of New York to recover taxes paid for the years 1947, 1948, 1949 and 1950 which action is still pending. Trial was begun in April 1965 but was suspended. Also on November 28, 1956, notices of deficiency were sent to Holdeen Trust II, under the title Janet Adams Trust II, with reference to the taxable years 1948, 1949, *352 and 1950 and to Holdeen Trust 45-10 with reference to the years 1949 and 1950. Notices were sent to several other Holdeen Trusts at that time or in the following years. Petitions were filed with this Court by such trusts. On May 5, 1959, a notice of deficiency was sent to Jonathan Holdeen and Stella with respect to the years 1951, 1952 and 1953. They filed a petition with this Court for a redetermination of the deficiencies. Subsequent notices were sent with respect to the years 1954 through 1957 and petitions were filed with this Court with respect thereto. In 1967 respondent moved to disqualify Henry C. Clark, one of the attorneys of record for a number of the trusts, and who was formerly an employee of the Internal Revenue Service. The motion was denied. See MacPherson-Sanford Trust,52 T.C. 580, filed June 30, 1969. At a conference on December 22, 1969, in the Chambers of the Chief Judge of this Court, the parties agreed that instead of attempting to try all pending individual and trust cases, certain cases would be selected for trial as test cases. In March 1970 there were 92 docket numbers involved and pending before this Court. We ordered on April 10, 1970, that 19 cases be *353 consolidated in four groups for purposes of trial, briefing and opinion as follows: The Court having considered respondent's MOTION TO CONSOLIDATE filed herein on March 18, 1970, and having considered petitioners' RESPONSE thereto filed herein on April 6, 1970, and being fully advised in the premises, it is hereby ORDERED, that the 19 docket numbers which are listed first in the caption hereto are designated for trial in the Tax Court Courtroom, Room 208, Federal Building, 26 Federal Plaza, New York, New York, commencing at 10:00 o'clock a.m. on Monday, June 1, 1970, and that the said 19 cases be and they are hereby consolidated into the following four groups for purposes of trial, briefing, and opinion: Group
Petitioner
Docket Nos.
I
Jonathan Holdeen
82081, 82946, 87569
89076 and 94186
II
Holdeen Trust II
65867, 71972, 94081,
and 94085
III
Holdeen Fund 45-10
65869, 71997, 94080,
94084, 94107, 95138
and 5376-65
IV
Holdeen Fund 55-10
94066, 95143 and
5382-65 IT IS FURTHER ORDERED, that in accordance with the agreement of the parties, the above 19 cases hereby grouped and designated for trial shall be considered as "test cases", insofar as the remaining 73 related cases in the caption hereto are concerned, *354 and the Court will consider what action should be taken as to the said remaining 73 related cases on June 1, 1970. These cases were tried in New York, February 16 to March 2, 1971, and in Washington, D.C., March 10 to 17, 1971. In February 1971 the Unitarian Universalist Association, which is successor in interest to the American Unitarian Association, filed a complaint in the Supreme Court of the State of New York, County of Westchester, against Janet Adams, Randal Holden, and the Commonwealth of Pennsylvania, alleging that the plaintiff is an income beneficiary of certain express trusts for charitable purposes created by certain written agreements made by Jonathan Holdeen, including Holdeen Trusts 45-10, 46-10, 54-120, 47-10, and 55-10 and seeking judgment directing the trustees of these trusts to account for all income received from the inception of the trusts to date and to pay the same over to plaintiff with interest and directing the trustees to pay to plaintiff all future income of such trusts currently. POST TRIAL On October 17, 1971, the Commonwealth of Pennsylvania filed a motion in this Court in these proceedings to hold the record open and to withhold decision pending a *355 determination by the Supreme Court of Pennsylvania. The motion states that on September 3, 1971, upon the petition of the Trustees of Holdeen Fund 45-10, the Court of Common Pleas of Philadelphia County, Orphans Division, awarded a citation, directed to the United States of America, the Commissioner of Internal Revenue, the Unitarian Universalist Association, the Commonwealth of Pennsylvania and the Attorney General of the Commonwealth of Pennsylvania - to show cause why that Court should not grant a declaratory judgment on the validity of the provisions for the accumulation of income in Holdeen Fund 45-10. The motion further states that it is brought in the interest of the sound administration of justice, that the relief sought will avoid the possibility of inconsistent judicial determinations in the Federal and state courts, assure that the determinations of this Court as to the law of Pennsylvania is in accord with that of the highest court of the state and avoid future needless litigation concerning the same question of Pennsylvania law as it applies to taxable years not covered in the present proceedings, that in view of the holding by the Supreme Court of the United States in *356 Commissioner v. Estate of Bosch,387 U.S. 456 (1967) that only a decision of the highest court of the state whose law governs the underlying issue before a Federal tribunal shall be controlling on that tribunal, it is the intention of the Attorney General of the Commonwealth of Pennsylvania to obtain, as expeditiously as possible, a final review and determination by the Supreme Court of the State of Pennsylvania on the question of the validity of accumulation of income provisions presented in the aforesaid declaratory judgment actions now pending before the Court of Common Pleas of Philadelphia County and that no previous application for this relief has been made. We denied the motion on October 26, 1971. In the Orphans' Court Division of the Court of Common Pleas of Philadelphia, Janet Adams and Randal Holden, as trustees of Holdeen Trusts, including five in which the American Unitarian Association was named as income beneficiary, filed five petitions in September 1971 for declaratory judgment. The relief prayed for was that the income accumulation provisions of these trusts be declared valid. On December 31, 1971, the trustees filed petitions for 17 trusts, including the five above *357 mentioned, seeking reformation or other relief appropriate under the Tax Reform Act of 1969 and the Pennsylvania Charitable Instruments Act of 1971. In an opinion filed November 20, 1972, The Orphans' Court Division held that it had jurisdiction and venue despite prior administration of the trusts in New York and prior pending action in New York to question the validity of the accumulation provisions of such trusts. The trustees have deposited a substantial amount of trust assets, $ 7,000,000, in the Girard Trust Company in Philadelphia subject to the jurisdiction of the Pennsylvania courts. ISSUES The principal issue in the case of the Estates of Jonathan Holdeen and Stella H. Holden is whether the income realized by some or all of approximately 50 trusts or purported trusts created by Holdeen or by Holdeen and his wife is taxable to the grantors of such trusts in the years 1951 through 1957. A second and related issue is whether contributions made to such trusts in such taxable years by Holdeen and his wife are deductible as claimed upon their income tax returns. If the trust income is not taxable to Holdeen and his wife, respondent in the alternative determined that such income *358 is taxable to the trusts. The issues in each of the cases of Trust II, Trust 45-10 and Trust 55-10 are: Whether the doctrine of intergovernmental immunity bars the deficiencies, Whether amounts of petitioner's gross income were permanently set aside for charity, Whether such amounts for years subsequent to 1950 were unreasonable in amount or duration, were used for non-charitable purposes, or were so invested as to jeopardize the interests of the charity. In the cases of Trust II and Trust 45-10, whether petitioner is liable for additions to the tax for late filing. In the case of Trust 45-10, whether petitioner is entitled to an exemption of $ 300 or of $ 100. The petitioner Estates concede that an addition to tax for late filing for the year 1951 is in order. They also concede additional capital gains for 1954, 1955 and 1956 and some additional interest, dividends and rents for 1956. FINDINGS OF FACT
JONATHAN HOLDEEN
Jonathan Holdeen was born in Sherburne, Chenango County, New York, in 1881, as Jonathan Holden. He graduated from Colgate University in 1901, read law in his father's law office, and in 1903 was admitted to the New York State Bar. He worked for several years with the *359 Title Guaranty & Trust Company in New York City examining land titles. In 1910 he married. He opened a law office in Pleasantville, New York and engaged more in business than in law. In 1931 he published a pamphlet referring to the family name Holden and suggested the variant from Holden to Holdeen to identify the Northern Westchester branch of the family. Apparently he adopted this name from that time forward although other members of his family refused to do so. In 1932 he moved to Pine Plains, a small town near Poughkeepsie, established a law office in Poughkeepsie, and considered himself a resident of Pine Plains from then until 1961. In 1936 he executed three trust agreements hereinafter referred to as Holdeen Trusts I, II, and III, with his daughter, Janet Holden, as trustee, which trust agreements are hereinafter described. In 1940 he was in business for several months at Buckhannon, West Virginia, with his son-in-law, Maxwell MacPherson. In September of 1940 he executed a trust agreement with Maxwell MacPherson and a similar agreement with his daughter, Audrey Naylor, who resided at Oakland, Maryland. These trust agreements are hereinafter described as the MacPherson-Sanford *360 and Naylor-Sanford Trusts. Shortly thereafter, he returned to reside at Pine Plains but spent the major part of his time in business in New York City and vicinity. Between 1944 and 1956 he executed a number of trust agreements with his daughters, or son, Randal, or a friend, as trustees, as hereinafter described. In 1961 his wife, Stella H. Holden, died. Following this Holdeen moved to Sherburne, New York. In 1964 he purchased the Onondaga Hotel at Syracuse and lived there until the time of his death, June 14, 1967. As of December 31, 1957, Jonathan Holdeen had ten children and 25 grandchildren. Their names and the names of the other great grandchildren of Jonathan Holdeen's father, Stephen Holden, are as follows: Stephen Holden
Jonathan Holdeen
Elizabeth Holden
Stella Hamblen
Janet Holden
Jon H. Adams
Charles F. Adams
Carol Adams
Arthur G. Adams
Daniel H. Adams
Andrew Adams
Haldis Adams
Randal Holden
Ann Leslie Holden
Dorothy Meyers
Roger J. Holden
Tyler B. Holden
Sherley Holden
Jonathan A.
Macpherson
Maxwell Macpherson
Maxwell Macpherson
II
Audrey Holden
Alonzo D. Naylor
Howard Naylor
Gail H. Naylor
Michael Naylor
Elizabeth H.
Naylor
Bartlett Naylor
Hildred Holden
James R.
Cushing-Murray
James
Geoffrey
Cushing-Murray
Cushing-Murray
Bentley
Cushing-Murray
Kathryn
Cushing-Murray
Haldis Holden
Dermott A.
Macpherson
Forest Macpherson
Neil F. Macpherson
Laird H.
Macpherson
Roger Holden
Randal C. Holden
Rosemary
Angela M. Holden
Cyrus Denton Holden
Pamela J. Holden
Stephen Holden
Stephen Holden, Jr.
Stephen Holden III
Cesidia
Randal Holden
James Holden
James Holden, Jr.
Martha
Samuel C. Holden
Charles R. Holden
Martha C. Holden
Adeline Holden
Jonathan Wheeler
Henry Wheeler
Phebe Wheeler
Timothy Wheeler
Phebe Holden
Susan G. Washburn
Arthur Washburn
Arthur H. Washburn
Mary Jane Washburn
Alfred Washburn
*361 Holdeen signed a will in 1913 which will, with a codicil, signed in 1964, was admitted to probate in 1967. In this will he gave to certain nominated trustees a portion of his estate in trust to cause a corporation to be formed under the laws of Pennsylvania under the corporate name "Holden Foundation." The corporation was to be organized for and devoted to the following purposes: First; By the example of the accumulation of the funds of said "Holden Foundation", to call to the attention of the various governments of the world, the advisability of the adoption of said governments of a system under which they shall create or receive funds which shall be invested in productive investments and the income of which funds shall be wholly or partly accumulated until the amount of such funds shall be large enough so that the income thereof will pay all governmental expenses, general and local, to the end that taxation may be discontinued, * * *. I direct that the property hereby devised and bequeathed for the purposes of said "Holden Foundation" shall be invested in productive investments, and that that part which equals 1/2000 or.0005 multiplied by the number of years which shall have elapsed *362 since the establishment of said "Holden Foundation", of the net income of said investments shall annually be expended for the foregoing purposes, which part of said income is herein termed the "expendable income". The remainder of said income shall be accumulated and annually added to the principal for two thousand years and thereafter the entire income shall be used for the second of said two purposes unless the amount of such income shall be excessive therefor, in which case the excess income shall be applied by the political subdivisions for other governmental expenses of said subdivisions. * * * * * If a compound interest table is consulted, it will be observed that one dollar, kept invested at four per cent for a century becomes 50 dollars and in 235 years becomes 10000 dollars. A short computation will demonstrate that if a single cent could be kept invested at four per cent interest for 1000 years it would become a thousand trillion dollars. The market value of all the real and personal property in the world is less than one trillion dollars. It has been suggested that Peter Minuet did not make a good investment when he bought Manhattan Island from the Indians in 1626 for twenty *363 four dollars for interest rates were then very high and if that amount of money had been kept invested at an average rate of seven per cent, it would have amounted in 1912 to five billion dollars which was more than the value in 1912 of all the land and buildings on the island. Holdeen in 1912 wrote an article entitled, "Should Thrift be Nationalized." He published this article, with others, in a book in 1932. In the article he stated, in part: However desirable a policy of national thrift may be, its adoption by collective society is doubtless far in the future, but any individual to whom its possibilities appeal, has it in his power to set in train, a process which will contribute more forcefully to that end than exhortion. One of the first American statesmen performed an act which is suggestive of possibilities. When Benjamin Franklin died, it was found that besides providing for his children, he had made a number of philanthropic bequests out of his modest estate, two of which were unusual. He gave two funds of five thousand dollars each, one for Philadelphia where most of his life was passed and the other for Boston which was his native city. These funds were directed to be invested *364 by being loaned to apprentices, starting in business for themselves, at 5% interest. The income was to be accumulated for one hundred years when the greater part of each fund was to be expended in providing some building or public work for the betterment of each city. As might be expected from the character of the investments, there were some losses. Nevertheless at the end of the century, Franklin's Philadelphia fund is said to have increased from $ 5,000 to $ 450,000. There was a delay of some years while the citizens debated what to build with the fund. Meanwhile it increased to something like $ 650,000. The Boston fund has a similar history. If some citizen of the present day felt disposed to carry the "Franklin Plan" still farther, suppose that he were to give or bequeath a like sum of $ 10,000 in trust, providing that there should annually be expended 1/2000 or.0005 times the number of years since the foundation of the trust of the income, toward the support and improvement of public schools or some other educational, philanthropic or governmental purpose, and that the remainder of the income should be accumulated for two thousand years. If the interest averaged 3% for the first *365 two centuries and then progressively declined to 1%, the portion of the income accumulated would reach 180 trillion dollars. * * * * * It may be objected that the history of the past, with its records of invasions and revolutions proves that it is impossible for any aggregation of capital permanently to avoid destruction. If an accumulative endowment had been created two thousand years ago it would not survive today. Apparently, however, we have now reached a stage of civilization when vested property rights will be unmolested even in case of conquest, unless they unjustly conflict with the common welfare. There are endowments existing, which have weathered all storms for half a thousand years, for example Winchester College, England, which was endowed by William of Wickham in 1393. In most jurisdictions no accumulations are allowed by law except during a minority, but in Massachusetts where Franklin was born and in Pennsylvania where he died they are permitted, when for public or philanthropic purposes. It has been decided by the highest court of New York ( Hope v. Brunner, 136 N.Y. 126) that where the will of a resident of the State of New York bequeaths a fund to be accumulated *366 for the benefit of an educational or philanthropic corporation of Pennsylvania, such bequest will be upheld by the New York courts, providing the fund is to be transmitted to, and administered under the laws of Pennsylvania. RESIDENCE The legal residence of Jonathan Holdeen and Stella H. Holden was Pine Plains, New York, at the time they filed their petitions in these cases. The legal residence of Janet Adams, trustee of Trusts II, 45-10 and 55-10, and the legal residence of the trusts was Pine Plains, New York, at the time the petitions were filed by these trusts. During the years 1951 to 1957, inclusive, Janet Adams, Stella H. Holden and Sherley MacPherson resided at Pine Plains. Phebe Washburn, James Holden and Hildred Cushing-Murray resided at Pleasantville, New York. Haldis MacPherson resided at Millbrook, New York. Audrey Naylor resided at Oakland, Maryland and Elizabeth Holden in Washington, D.C. Randal Holden resided in New York City for a time and moved to Queen's Village, New York. Albert Kreulen resided in New York City until 1955 and thereafter in Brooklyn, New York. CHARITABLE BENEFICIARIES Trusts 45-10, 46-10, 47-10, 54-120 and 55-10 distributed expendable income as described *367 in the trusts to the American Unitarian Association and its successor the Unitarian Universalist Association. These are organizations to which contributions made are deductible by the donor under the Internal Revenue Codes of 1939 and 1954. These are sometimes hereinafter referred to as the AUA and the UUA. Hartwick College, West Virginia Wesleyan College, and Telladega College are organizations to which contributions made are deductible by the donor under such Codes. THE TRUST AGREEMENTS In October and November, 1936, Holdeen entered into three written agreements with Janet Holden, his daughter, then aged 24 years. These trusts are hereinafter referred to as Holdeen Trusts I, II, and III. Janet Holden had attended Hartwick College for 2 years of a 4-year course and had worked in a law office in Pleasantville, New York, as a legal secretary. She had a law clerkship certificate. Since 1932, she had resided in Pine Plains, New York. In each trust, Holdeen is referred to as the "settlor" and Janet as the "trustee." In each case Holdeen transferred to her certain shares of stock subject to a lien in his favor of an amount of cash representing the cost thereof. The stocks at the time were *368 of a fair market value in excess of his cost. Under the Trust I agreement, the trustee was to hold the stocks and any other assets added to the trust and to invest and reinvest in such securities as the trustee may elect. The trustee was to pay the income annually in equal shares to Stella H. Holden and to any great-grandchildren of settlor's father, Stephen Holden, who may be living during any income year until the death of Haldis and Hildred Holden. Upon the death of such survivor, the trustee was to transfer the principal to the First National Bank and Trust Co. of Easton, Pennsylvania, and the trust estate was to be thereafter administered in Pennsylvania. The successor trustee was to pay over one-tenth of 1 percent of the income of the trust multiplied by the number of years elapsed since 1936, but not to exceed $ 200,000 in any year, to Hartwick College. The remainder of the income was to be added to the principal until the year 2936 when the entire estate was to be paid over to the Treasurer of Pennsylvania. The trustee was to have the right to appoint a substituted trustee and the settlor reserved the right until the death of Haldis and Hildred Holden to appoint a substituted *369 trustee. The provisions of Trust II are similar except that the income is first to be applied to the support and education of Hildred Holden until she attains the age of 21 years, and that the settlor reserves the right to modify the proportionate share in which any of the income beneficiaries except Stella H. Holden shall be entitled to share in the income. Trust II provides: TRUST AGREEMENT made this 20th day of November 1936 between Jonathan Holden herein referred to as the settlor and Janet Holden, herein referred to as the trustee WITNESSETH that the parties hereto in consideration of the mutual covenants, promises and transfers herein set forth do mutually covenant and agree as follows: FIRST: That the settlor transfers and assigns to said trustee 200 shares of capital stock of New York Central Railroad Company, certificates number 209180 and 208702 subject to a lien thereon in favor of settlor for the sum of $ 4000, it is being understood that the said stock is now subject to a collateral loan, the release of which is contemplated, wholly or partly by said lien reserved. SECOND: Such other assets as the settlor shall transfer to the trust estate established under this instrument *370 shall be added to the principal of said trust estate and be subject to all the provisions herein set forth. THIRD: Said stocks and all other assets of said trust estate shall be held and invested and reinvested in such securities as said trustee until the year 1955 may elect without any restriction until 1955 to such investments as are prescribed by law for trust investments and said trustee is authorized and empowered to loan the funds of said trust estate at interest with or without collateral security and after 1955 to continue to hold any investment then held. FOURTH: During the minority of Hildred Holden said trustee shall apply the income thereof to the support, maintenance and education of said Hildred Holden until she attains the age of twenty-one years and thereafter subject to the right reserved to settlor to modify the proportionate shares in which any of the income beneficiaries except Stella H. Holden shall respectively be entitled to share in income accrueing [sic] under this instrument. Said trustee shall pay the income of said trust estate, annually in equal shares to Stella H. Holden and to any great grandchildren of settlor's father Stephen Holden who may be living *371 during any income year until the death of the survivor of Haldis and Hildred Holden except that if any person who would be entitled to share in such income be a minor, the share to which said minor would be entitled except for such minority shall be paid to such minor's mother. The beneficiaries hereunder are advised to dispose of the amounts received under this instrument as the installments of principal to be added to the capital funds of such beneficiary. [sic] FIFTH: Upon the death of the survivor of said Haldis and Hildred Holden said trustee shall transfer the principal of said trust estate to First National Bank and Trust Co. of Easton, Pennsylvania as successor trustee and such trust estate shall thereafter be administered in Pennsylvania and be domiciled therein and subject to the laws thereof. SIXTH: Said successor trustee shall thereafter pay over yearly in Pennsylvania one-tenth of one percent of the income of said trust estate multiplied by the number of years which have elapsed since the year 1936, but not to exceed $ 200,000, in any year to Hartwick College, Oneonta, to be added to the permanent capital funds, property and plant of said college and accumulate and add *372 to the principal the remainder of said income until the year 2936 when said entire trust estate and its accumulation shall be paid over to the treasurer of the state of Pennsylvania to be used as a permanent capital fund for the support of public education in said state or if such funds cannot be used advantageously for such support then for the other expenses of said state. SEVENTH: Said trustee shall have the right to delegate until the death of Haldis and Hildred Holden the duties of trustee hereunder by appointing a substituted trustee who shall succeed to the office of trustee hereunder with a like power of appointment. EIGHTH: Said settlor shall until the death of Haldis and Hildred Holden have a paramount right to appoint a substituted trustee hereunder who shall thereupon be vested with and entitled to receive and administer said trust estates. IN WITNESS WHEREOF settlor and trustee have hereunto set their hands and seals. STATE OF NEW YORK /s/ Jonathan Holdeen / Jonathan Holden SS: COUNTY OF DUTCHESS /s/ Janet Holden / Janet Holden Haldis and Hildred Holden were twin daughters of Holdeen, born in 1920. Trust III is similar to Trust I except that settlor reserved the right *373 to modify the proportion in which the great-grandchildren of Stephen Holden shall share in benefits or to exclude any such great-grandchildren or to cause to be included among the beneficiaries any descendants of such great-grandchildren and to substitute as residuary beneficiaries any other educational or philanthropic corporation of any state, county, or any governmental entity. In November 1940, Holdeen entered into a written agreement with his daughter, Audrey Naylor, then residing in Oakland, Maryland, in which he is referred to as the donor and she as trustee, and at the same time a similar agreement with his son-in-law, Maxwell MacPherson, of Pine Plains, New York, in which Holdeen is referred to as the donor and MacPherson as the trustee. In each case there was transferred by donor to trustee one-half of the right, title, and interest of Donor in certain property and estate of which Henry Sanford of Bridgeport, Connecticut, died the owner. The will of Henry Sanford was admitted to probate by the Probate Court of Bridgeport. Holdeen was owner of an interest in the Sanford estate. Each trustee was to pay forthwith out of the principal of the trust corpus to Holdeen the sum of *374 $ 3,000. Each trustee was, during the lives of Cyrus and Pamela Holden and of any unborn grandchildren of donor then in being, at the end of each calendar year, to divide the net income of the trust into as many shares as there then be living persons under 21 years of age who shall be descendants, but other than sons and daughters of donor, and pay each such share of income for the benefit of such descendants. When there are no beneficiaries under these provisions, the principal was to be transferred to Somerset Trust Company, Somerset, Pennsylvania, and the trust created by the instrument was to be carried on in Pennsylvania, subject to regulation and control by the courts of that State. It was further provided that when no person shall be entitled to income under the provisions thereof, one 1/1000 part of the income of the trust multiplied by the number of years since the date thereof shall be deemed "expendable income." The "expendable income" was to be paid to a specified college until the year 2340 and thereafter 1/10 of such expendable income. The remainder of the income was to be paid to the Treasurer of the State of Pennsylvania and in the year 2940 the principal was to be *375 paid to such Treasurer. These trusts are hereinafter referred to as the Naylor-Sanford and MacPherson-Sanford Trusts, or NS and MS. Donor reserved the right to modify provisions for income beneficiaries, provided no such beneficiary be donor, his wife, or a dependent of donor, and the right to substitute any new trustee, also the right to modify the provision with respect to beneficiaries provided that such modification be for the benefit of philanthropic, charitable or educational corporations or public purposes. In September 1942, Maxwell MacPherson was about to enlist in the Naval Forces of the United States and an agreement was made substituting Sherley MacPherson, Maxwell's wife and Holdeen's daughter, as trustee of the MacPherson-Sanford Trust. In October 1945, Holdeen entered into an agreement with Audrey Naylor to modify the Naylor-Sanford Trust to eliminate the powers he had previously reserved and to extend the powers of the trustee or trustees to modify the provisions with respect to benefits after the deaths of Cyrus and Pamela. He executed a similar agreement with Sherley MacPherson relinquishing his powers with respect to the MacPherson Trust. Sherley did not sign this *376 document. Janet Holden married Charles F. Adams in 1942. In August 1943, Holdeen executed an agreement with Janet Adams concerning Trusts I, II, and III which provides: THIS AGREEMENT made this second day of August, 1943, between JONATHAN HOLDEEN, herein referred to as the Settlor, and JANET ADAMS, herein referred to as the Trustee, WITNESSETH that the parties hereto, in consideration of the mutual covenants, promises and transfers herein set forth, do mutually covenant and agree as follows: The several Trust Agreements entered into in the year 1936 between the parties hereto for the benefit during the life times of Haldis and Hildred Holden, of the great grandchildren of Settlor's father and of Stella H. Holden and which contain the reservation by Settlor of the right to modify the proportionate shares in which any of the income beneficiary other than Stella H. Holden should benefit, shall be deemed merged in this instrument and the shares of income to which any person is entitled under said agreements, shall on and after January 1, 1944, be as follows: Said Trustee shall pay the income of said trust estate, annually, in equal shares to Stella H. Holden and to any great grandchildren *377 of Settlor's father, Stephen Holden, born after the year 1940, who may be living during any income year until the death of the survivor of Settlor's daughters Haldis and Hildred except that if any person who would be entitled to share in such income be a minor, the share to which said minor would be entitled except for such minority shall be paid to such minor's mother. Upon the death of the survivor of said Haldis and Hildred and at any prior time when no person shall be entitled to income under the previous provisions hereof, Donor directs that said principal and share be transferred to Somerset Trust Company, Somerset, Pennsylvania, and the administration of the uses and trusts created by this instrument shall be carried on in Pennsylvania and shall be subject to regulation and control by its courts, and this instrument shall be deemed made under and with reference to the laws of that State. When no person shall be entitled to income under said previous provisions herein, one one-thousandths part of the income of said trust estate multiplied by the number of years which shall have elapsed since the date hereof shall be deemed expendable income. The remainder of said income shall, *378 at the end of each year, be added to the principal and accumulated. Donor reserved the right by written notice to modify and substitute provisions for income beneficiaries during said lives provided no such beneficiary be Donor or his wife or a dependent of Donor, and to substitute any new trustee named by him for the trustee named herein. Trustee shall at the end of each year pay over to Hartwick College, at Oneonta, New York, until the year 2340, said expendable income and thereafter one-tenth (1/10) of said expendable income toward its endowment, and pay the remainder thereof and in the year 2940, the principal of said estate to the Treasurer of the State of Pennsylvania for educational endowment. Should the principal of the trust estate be reduced by capital losses, then the entire income shall be accumulated until said capital shall have been restored. Donor reserves the right by written declaration to modify the provisions hereof with respect to beneficiaries after said deaths, provided such modification be for the benefit of philanthropic, charitable or educational corporations or public purposes. Should the Trustee named hereunder to act, prior to said deaths, cease to act, *379 Somerset Trust Company of Somerset, Pennsylvania, is appointed such Trustee. The Trustees named hereunder shall be entitled to commissions only upon income and not upon principal. Trustees may retain any investments which are included in the trust estate and, with the written consent of Donor, make new investments, regardless of whether they are of the character authorized by law for investment by trustees. Increases in value of capital assets upon sales and exchanges shall not be considered income. No bond shall be required of a trustee. The assets hereinafter mentioned now held by said trustee, individually or as Trustee, shall include the following to the extent that they are now held by her: Koelsch
$ 475.00
Woodbury
4,000.00
Woodbury
3,000.00
Mortgage certificates issued by City
Bank Farmers Trust Co. Formerly of
Knapp Estate
Campbell
17,500.00
Globert
3,000.00
Walsh
2,800.00
Park Central bonds (57M)
19,250.00
Textile bonds (27-1/2)
7,291.25
IN WITNESS WHEREOF the parties hereto have hereunto set their hands and seals the day and year first above written. /s/ Jonathan Holdeen / Jonathan Holdeen (SEAL) Janet Adams (SEAL) /s/ Janet Adams In 1944, Holdeen, as trustor, and his daughter, Janet Adams, *380 Randal Holden and Jonathan Holdeen, as trustees, executed Holdeen Trust Agreement (44-10). Holdeen transferred to the trustees $ 100,000 of first mortgage bonds of Broadway-Exchange Corporation; $ 8,000 of 870-7th Avenue Corporation; 700 shares preferred stock of Bowman Biltmore Hotel Corporation and 100 shares preferred stock of General Realty and Utilities Corporation. The trustees were to pay him money equal to the cost of these assets amounting to $ 29,820. The instrument was to be deemed made under and with reference to the laws of Pennsylvania. There were no individual beneficiaries. One five-hundredths part of the income multiplied by the number of years elapsed since July, 1944 was to be deemed "expendable income." It was provided that the trustees shall annually pay the expendable income and all other net income not lawfully subject to accumulation to the American Unitarian Association of Boston, Massachusetts, for endowment or other charitable use or to such other religious, charitable, scientific or educational corporations as the trustees might designate, subject to the right reserved by the trustor to make such designation. The trustor reserved the right by written declaration *381 to modify the terms of the instrument but not so as to change beneficiaries unless to donees and purposes which are educational or public. In 1945, Holdeen as trustee and Janet Adams and Randal Holden as trustees entered into Trust Agreement 45-10 which reads as follows: THIS HOLDEEN FUND TRUST AGREEMENT (45-10) made this 2nd day of June, 1945 between JONATHAN HOLDEEN, as Trustor, and JANET ADAMS and RANDAL HOLDEN as Trustees, WITNESSETH, that the parties hereto, in consideration of the transfer and covenants herein contained, do covenant and agree as follows: FIRST: That there be transferred by said Trustor to said Trustees, Forty-Three Thousand Dollars principal amount of the first mortgage bonds of 61 Broadway Corporation numbers 3114 to 5153 inclusive, and 3187 to 3189 inclusive. SECOND: That all property and assets received by the Trustees hereunder shall be held by them for the uses and purposes stated herein. THIRD: Said Trustees shall pay to Trustor in consideration of the transfer to them the sum of Eleven Thousand Seven Hundred Forty-three and 75/100 ($ 11,743.75) Dollars. FOURTH: The property and assets subject to this agreement shall be held by the Trustees hereunder at *382 Easton or elsewhere in the State of Pennsylvania or in the Commonwealth of Massachusetts and the trust estate hereby created shall there be administered. This instrument shall be deemed made under and with reference to and shall be subject to the laws of Pennsylvania and to regulation and control by it. FIFTH: When assets and property subject to this agreement shall be in Pennsylvania or in Massachusetts and to the extent that the Trust estate hereby created is subject to and controlled by the laws of Pennsylvania, one five hundredths part of the income of said estate, multiplied by the number of years which shall have elapsed since July 5, 1944, shall be deemed "expendable" income. The remainder of the said income shall be accumulated in Pennsylvania and added to the principal until the year 2444 when said principal, including accumulated income, shall be paid to the State of Pennsylvania for educational endowment or other public purposes. Said Trustor does hereby transfer, assign and convey said bonds and assets to said Trustees and they shall be held pursuant to the provisions hereof but of record may stand in the name of one or more of the Trustees hereunder as individuals. SIXTH: *383 Said Trustees shall annually pay over said expendable income and all other net income hereunder which is not lawfully subject to accumulation under the terms hereof, to the American Unitarian Association, of 25 Beacon Street, Boston, Massachusetts, for endowment or other use in aid of maternity, child welfare and maintenance and migration expenses of natives of India and their descendants, or to such other corporations, funds or foundations organized and operated exclusively for religious, charitable, scientific, literary or educational purposes as said American Unitarian Association or its successor may designate and said Janet Adams and Randal Holden as Trustee may increase that portion of said income which is to be deemed expendable hereunder to any amount not exceeding half of said income. The property and assets held in trust under "Holdeen Trust Agreement" (44-10) dated July 5, 1944 between Jonathan Holdeen, as Trustor and Janet Adams and others as Trustees, shall from the date hereof be held subject to the provisions of this agreement (45-10) and said former agreement shall be deemed modified so as to be converted into the trust created hereunder and to be consolidated therewith. *384 SEVENTH: Said Trustees are authorized and advised to cause the "Holdeen Fund" at Easton, to be incorporated under the nonprofit Corporation Law, being public law 289 of the Pennsylvania Statutes of 1932, and to convey and transfer to it all the assets held by Trustees hereunder, such assets to be held by said "Holdeen Fund" for the same uses and purposes as those for which said Trustees are directed to hold same by said terms hereof. EIGHTH: During the life time of said named trustees and until the year 1965, bonds and all other assets of said trust estate shall be held and invested and reinvested in such securities and investments as said Trustees may elect without any restriction to such investments as are prescribed by law for trust investment then held. No bond shall be required of any Trustee named herein. Increases in value of capital assets upon sales or exchanges shall not be considered income. Said Trustees may appoint additional or substituted Trustees to act hereunder and any trustee may appoint any agent to whom may be delegated by such Trustee the right to perform any act which said Trustee is authorized to perform. Should there be no Trustees acting hereunder, then Easton *385 Trust Company shall be such Trustee. In Witness Whereof, Trustor, and Trustees have hereunto set their hands and seals. IN PRESENCE OF: /S/ Jonathan Holdeen / Jonathan Holdeen /s/ George C. Will 101 Church St. Pine Plains, N.Y. /s/ Janet Adams / Janet Adams /s/ Randal Holden / Randal Holden In 1946, Holdeen, as trustor, and Janet Adams as trustee entered into Holdeen Trust Agreement 46-10. The principal was 100 shares of stock of Commodore Hotel, Inc., and such other stocks as trustor might thereafter contribute. There were no individual beneficiaries of this trust. Expendable income was defined as 1/500 part of the income multiplied by the number of years since the date of the trust. Expendable income and all other net income which is not lawfully subject to accumulation was to be paid to the American Unitarian Association for purposes similar to those specified in Trust 45-10. The trustor appointed as directors of the trust Alphonse V. Brisson, Albert H. Kreulen and Gabriel Elias. The trustees were given authority to modify the provisions as to payment of expendable income except that it was to be applied only to charitable, educational or public purposes. In 1947, Holdeen entered *386 into Trust Agreement 47-10 with Albert H. Kreulen as trustee. It was therein specified that trustor should transfer 100 shares of Commodore Hotel, Inc., to be held by trustee and that the instrument was subject to the laws of Pennsylvania. There were no individual beneficiaries to this trust. One-five hundredths of the income multiplied by the number of years elapsed since the date thereof was to be deemed "expendable income". The expendable income and other net income not lawfully subject to accumulation was to be paid to the American Unitarian Association; the principal together with accumulated income was to be paid to the State of Pennsylvania in the year 2947. The trustor appointed Alphonse V. Brisson, Janet Adams and Gabriel Elias as directors of the trust with authority to appoint a substituted trustee or trustees in place of any trustee or trustees thereunder, and to modify the provisions as to payments of expendable income under certain situations. Albert H. Kreulen was born in 1910, attended Columbia University in 1929 to 1931, was employed by the Home Insurance Company from 1928 to 1964 except during military service from 1943 to 1945. He became employed by Holdeen in 1945 *387 on a part time basis and scouted real estate under Holdeen's direction for possible investments. Holdeen appointed him one of the directors of Trust 46-10 and also Trustee of Trust 47-10. Alphonse V. Brisson was an attorney, a resident of Pleasantville, New York and a long time associate of Holdeen. Gabriel Elias was an associate of Holdeen and a coowner of certain real properties in later years. In the years 1944 to 1948, inclusive, Holdeen made certain gifts of approximately $ 3,000 each for the benefit of his grandchildren. Some were direct gifts and others were in trust form. The record indicates that there were 18 such gifts in 1944, 20 in 1945, 24 in 1946, 32 in 1947, and 18 in 1948. No such gifts were made in 1949. In Trusts 44-10, 45-10, 46-10 and 47-10, the trustees or directors were authorized to incorporate the trusts under the non-profit corporation laws of Pennsylvania. Similar provisions were incorporated in a number of the subsequent trusts. In 1950, Holdeen, as trustor, and Janet Holden Adams, as trustee, entered into Trust 50-10. The corpus was 1,800 shares of capital stock of Lincoln Building Corporation subject to a lien of $ 24,000. The trustee was to hold 50 shares *388 of such stock or the proceeds thereof, for the benefit of each grandchild of trustor for life. The remainder of the property and the 50 share units when the life estate ended was to be administered by the trustee in the State of Pennsylvania subject to the laws of Pennsylvania. One-thousandth part of the income multiplied by the number of years elapsed since the date of the trust was to be deemed "expendable" income which was to be paid for endowment or other use in the aid of maternity, child welfare, educational migration expenses of Asians, except as otherwise provided. The remainder of the income was to be added to the principal until the year 2950 when the principal, including the accumulated income, was to be paid to the State of Pennsylvania for educational endowment or other public purposes. The trustor appointed Alphonse Brisson, Janet Adams and James Holden as directors of the trust with authority to modify the provisions as to payment of "expendable" income in certain respects or to modify the charitable and educational purposes of expenditures. The trustees were to have broad powers of investment and authority to loan funds unrestricted by any law as to the trust investments *389 with or without collateral security until 1987. Holdeen and Janet devised a system of numbering trusts, the first number showing the year and the second number or two numbers, or letters identifying the individual beneficiary or beneficiaries. In some trusts the original number was not in accordance with the system and the correct number was substituted later. Holdeen entered into Trust 50-16 (correct number 50-32 & 33), with Audrey Naylor providing income from certain bonds for the benefit of Audrey's children with the provision that after their lives the bonds or their proceeds should be transferred to the trustee under Trust 50-10. On April 2, 1951, Holdeen and Janet Adams entered into Trust Agreement 51-10. The corpus was 400 shares of 50 Broadway, Inc. The trustee was to hold such stock or the proceeds thereof for the same purposes, with the powers, and upon the same terms as provided in Trust 50-10. On the same date Holdeen and his wife entered into 19 other trust agreements with one of his daughters or a niece as trustee of each. The income was to be used for the benefit of specified grandchildren of Holdeen or members of the family of the trustees. The trustee was to have the *390 same powers as the trustees under Trust 51-10. After the lives of the beneficiaries, the corpus was to be transferred to the trustee of Trust 51-10. The following is a list of these trustees and trusts: Janet Adams
Haldis MacPherson
51-5
51-20
51-14
51-25
51-17
51- (Correct #26)
51-22
51-30
51-29
51-35
51-14 (Correct #33)
51-34 (Correct #36)
Phebe Washburn
Audrey Naylor
51-34
51-28
51-34a
51-32
Elizabeth Holden
Sherley MacPherson
51-2
51-2M
51-21
On copy of Trust 51-32 was signed by Audrey Naylor. A counterpart was signed by Holdeen and by Stella H. Holden. The corpus in each trust was 400 shares of 50 Broadway, Inc., of a stipulated value of $ 5,600. Later in 1951 Holdeen entered into Trust Agreement 51-37, and 38 with Janet Adams. In the years 1952 through 1956 Holdeen or Holdeen and his wife entered into a number of other trust agreements with relatives as trustees, as follows: Year
Trust No.
Grantor
Trustee
1952
52-1 & 4
Holdeen and wife
Haldis MacPherson
52-10
Jonathan Holdeen
Janet Adams
1953 53-10
Holdeen and wife
Janet Adams
53-10A
Holdeen and wife
Janet Adams
53-10B
Jonathan Holdeen
Janet Adams
53-40
Jonathan Holdeen
Phebe Washburn
1954
54-50
Jonathan Holdeen
Janet Adams
54-18
Jonathan Holdeen
James Holden
54-LIH
Holdeen and wife
Janet Adams and
Stella H. Holden
54-50A
Jonathan Holdeen
Janet Adams
54-120
Holdeen and wife
Janet Adams
54-33a & 21a
Jonathan Holdeen
Janet Adams
54-32 & 33
Holdeen and wife
Elizabeth Holden
1956
56-10
Jonathan Holdeen
Janet Adams
56-4
Jonathan Holdeen
Janet Adams
56-4
Jonathan Holdeen
Janet Adams
56-15
Jonathan Holdeen
Janet Adams
In *391 some of these trusts the first beneficiaries were specific grandchildren of Holdeen or his brother. In some the ultimate remainder was to be paid to the State of Pennsylvania after 500 or 1,000 years. In others the principal was to be paid over to a preceding trust such as 51-10 or 54-50. In 54-50 and 54-120 the expendable income was to be paid to the American Unitarian Association, hereinafter referred to as the AUA. In some trusts Alphonse V. Brisson, James Holden and Janet Adams were appointed directors. The second copy of Trust 56-4 was signed to correct an omission in the original. On December 2, 1953, Holdeen signed a statement concerning certain prior trusts, as follows: WHEREAS the Undersigned Trustor, Jonathan Holdeen, residing at 152 Bangal Road, Pine Plains, New York, executed certain trust instruments, including the following: Recorded
Date of
Beneficiary or
Liber & Page -
Trustee
Agreement
Remainderman
Dutchess Co.
Sherley MacPherson
11/23/40
Talladega College; 5 Misc 167
grandchildren of Jona-
than Holdeen
Audrey Naylor
11/23/40
West Virginia Wesleyan 5 Misc 108
grandchildren of Jona-
than Holdeen
Janet Adams
10/18/36
Hartwick College; great 5 Misc 94
grandchildren of
Stephen Holden
Janet Adams
8/2/43
" 5 Misc 97
45-10 Janet Adams
7/2/45
American Unitarian Asso. 5 Misc 154
46-10
9/10/46
"
47-10 Albert Kreulen
4/22/48
"
New York County
50-10 Janet Adams
4/6/50
New York County 41 Misc 268
*392 and other trust instruments under all of which property has been held for the income benefit of certain incomees with remainders applicable to certain charitable, educational and/or public purposes therein specified, and said Trustor has heretofore executed certain instruments renouncing and revoking certain powers with respect to the direction of the administration of certain of said trusts and substitution of trustees thereof, NOW THEREFORE said Jonathan Holdeen does hereby renounce, revoke, release and annul every power which he reserved or might be deemed to have reserved to modify any provision or direction in any such trust instrument, including those hereinbefore mentioned and all other trust instruments and grants executed by said Trustor, and Trustor ratifies and confirms all previous specific or general renunciations of power reserved in trust instruments heretofore executed by him. On June 3, 1955, Holdeen as trustor and Janet Holden Adams as trustee executed Trust Agreement 55-10, providing: THIS HOLDEEN FUND TRUST INSTRUMENT 55-10 dated this third day of June, 1955, between JONATHAN HOLDEEN, residing at 152 Bangal Road, Pine Plains, New York, as Trustor, and JANET HOLDEN-ADAMS, *393 residing at 101 Church Street, Pine Plains, New York, as Trustee, WITNESSETH FIRST: Trustor, in consideration of the execution of this instrument by said Trustee and her acceptance of the duties and obligations resulting therefrom, agrees to transfer and hereby assigns to trustee 37,764 shares of capital stock of Commodore Hotel, Inc., subject to trustor's lien thereon for the cost thereof to him amounting to $ 154,394.00. SECOND: Said trustee shall hold units of 200 shares each of said stock or the proceeds thereof for the life use of each great grandchild, under ten years of age, of trustor's father, Stephen Holden, now living even tho unborn, and apply the income thereof toward the maintenance of each such great-grandchild until it reaches the age of 21 years, and thereafter, pay such income to it yearly during its life. THIRD: Trustee shall hold 500 shares of said stock or the proceeds thereof for the life use of Stella H. Holden and pay the net income thereof to her yearly during her life. FOURTH: The remainder of said property and assets and each of said 200 shares units and said 500 share unit and said 1000 share unit, when said life estates end, shall be held and administered *394 by the trustee and said trustee's successors hereunder at Easton, Pennsylvania, or elsewhere in the State of Pennsylvania and the trust estate hereby created shall be there administered. This instrument shall be deemed made under and with reference to and shall be subject to the laws of Pennsylvania and to regulation and control by it, except that, until the year 1999, they may be held and administered at Sheffield or elsewhere in Massachusetts if trustee so elects. FIFTH: One thousandth part of the income of said Trust Estate, except as to said life estate income, multiplied by the number of years which shall have elapsed since April 6, 1950, shall be deemed "expendable" income. The remainder of said income shall be accumulated in Pennsylvania or, until 1999, in Massachusetts, and, added to the principal until the year 2950 when said principal, including accumulated income, shall be paid to the State of Pennsylvania for Educational endowment or other public purposes. WHEREVER said stock and assets shall be on deposit, they shall be held pursuant to the provisions hereof, but of record may stand in the name of one or more of the trustees hereunder, as individuals, until the year 1987. *395 SIXTH: Trustees shall annually pay or apply said expendable income for endowment or other use, in aid of maternity, child welfare, educational and or migration expenses of Asians except that trustees may pay all or part of said expendable income to American Unitarian Association for intended but not Mandatory use by it for said purpose or to Pennsylvania, and, except as aforesaid as to life estates. SEVENTH: Said trustees are authorized to cause this trust to be incorporated under the non-profit Corporation Law, being public law 39 of the Pennsylvania statutes of 1932, and to convey and transfer to it all the assets held by trustees hereunder, such assets to be held for the same uses and purposes as those for which said trustees are directed to hold same by said terms hereof. EIGHTH: During the life time of said trustees, and until the year 1987, said stock and all other assets of said trust estate shall be held and invested and reinvested in such securities as Trustees may elect, without any restrictions as to whether such investments are real, personal, tangible or intangible property or any other assets, and trustees shall, until 1997, not be subject to the statutory or other usual *396 investment restrictions upon trustees, and said trustees are authorized and empowered to make and deliver any and all assignments, deeds or transfers, mortgages or hypothecations of real and personal property which trustees may elect, and to borrow money and contract debts. NINTH: Trustor appoints Alphonse V. Brisson, of 194 Battle Avenue, White Plains, New York, Janet Adams, of Pine Plains, New York, and James Holden, Sr. of Hoanjova Lane, Pleasantville, New York, as Directors of the trust hereby created. Said Directors, by written declaration made by a majority of the survivors of such directors, may appoint substituted trustees or directors in place of any trustee or director acting hereunder, and/or may appoint additional trustees or directors, and may modify the provisions herein as to the payment of the expendable income hereunder by increasing the portion of income in any year which shall be deemed expendable income to an amount not exceeding 80% thereof prior to the year 1960 and 50% prior to 1957, and by directing the payment of any of the expendable income toward the expenses of promotion of education by research, experiment, publications and publicity relative to improved *397 alphabets and phonetic and graphic symbols for the visible protrayal of language and ideas. TENTH: Said trustee and directors and their successors may modify the charitable and educational purposes to which said expendable income shall be applied, by joining prior to 1960, in a written modification of this instrument as to such purposes. ELEVENTH: The non-expendable income of any period during which the provision herein for accumulation shall be unlawful shall be paid to Holdeen Fund 45-10 dated the 2 day of June, 1945, between Jonathan Holdeen as trustor and Janet Adams and Randal Holden as trustees and recorded in the Dutchess County Clerk's Office in Liber 5 of miscellaneous volumns, [sic] page 154, such moneys to be added to the capital account or corpus of said trust. TWELFTH: Except for the life estates hereinbefore provided for, no income shall be paid or used for any purpose not charitable, educational or public, except when accumulated. In the event that there shall cease to be any acting trustee otherwise appointed by the terms hereof or by said Directors, Lafayette Trust Company of Easton, Pennsylvania, shall be the trustee of the trust hereby created. No bond shall be required *398 by any trustee appointed hereunder. Increases in value of capital assets upon sales or exchanges are not to be considered income. The trustees are empowered to co-mingle the shares or proceeds thereof and assets to be held for each great-grandchild for investment. In presence of /s/ Jonathan Holdeen /s/ Janet Adams
GENERAL FACTS CONCERNING THE TRUSTS
In his lifetime, Holdeen entered into approximately 186 trust agreements. Prior to 1950, there were fairly large trusts designated as I, II, III, 45-10, 46-10, 47-10, MS and NS. In addition, during the years 1944 through 1948, he made gifts, some in trust form and others as outright gifts, approximating $ 3,000 each for the benefit of individual grandchildren of himself or his brother and without a charitable remainder. The number of these approximated 112, and these are not involved in the cases pending in this Court. The trust agreements entered into from 1950 through 1956 as heretofore described are approximately 50 in number. Stella H. Holden was a joint grantor in some of these. Janet Holden Adams was a trustee or a co-trustee in a number of the agreements made during the years 1950 to 1956. She was trustee or co-trustee of some *399 28 to 30 of the trusts not counting the pre-1950 non-charitable trusts. The original assets of all the trusts consisted of stocks, bonds or cash. In a number of cases the trustees subsequently purchased rental properties or real estate mortgages as additional assets. Holdeen advised Janet, Sherley and Audrey if any rental property did not earn 20 percent on the investment the trustee could transfer the property to him at her option, so that the trust would not lose. This occurred in several instances. In some cases when such property was improved by Holdeen, he transferred it back to the trust in order that it might be sold at a profit by the trust. Some of the trust agreements provided that assets should be held and administered in Pennsylvania or that non-expendable income should be accumulated in Pennsylvania or Massachusetts. No trust created by Jonathan Holdeen was administered in Pennsylvania or Massachusetts prior to 1971. None of the income of any trust was accumulated in Pennsylvania prior to 1971, and none of the trusts were incorporated in Pennsylvania under that state's non-profit corporation law. The following banks were designated as successor-trustees in some of the *400 trusts: First National Bank and Trust Co.
Easton, Pa.
Somerset Trust Company
Somerset, Pa.
Easton Trust Co.
Easton, Pa.
Lafayette Trust Company
Easton, Pa.
None of the trustees was specifically authorized to trade on margin. In some cases the assets of the trust were not in Holdeen's possession at the time of the execution of the trust agreement. They were deposited with a bank or brokerage firm as security for obligations of Holdeen. The trustees secured the release of such assets by paying to the bank or broker the amount retained by Holdeen under the agreement. Jonathan Holdeen reserved the following powers in the following trust deeds: Power
Trust Deed
a. Power to substitute
Trusts I, II, III, Naylor-
trustees
Sanford, MacPherson-Sanford
b. Power to change the
Trusts II, III, Naylor-Sanford,
shares of the bene-
MacPherson-Sanford
ficiaries
c. Power to change
Trust III, Naylor-Sanford,
beneficiaries
MacPherson-Sanford
d. Power to allocate
Trust III, Naylor Sanford,
among charitable
MacPherson-Sanford
beneficiaries or sub-
stitute charitable
beneficiaries
e. Power to accumulate
Naylor-Sanford, MacPherson-
income for benefit
Sanford
of minor beneficiaries The trust deed for Trust 44-10 was not signed by Randal Holden, *401 one of the co-trustees. The agreement signed by Holdeen in 1945 amending the MacPherson-Sanford Trust was not signed by Sherley MacPherson. In Trust 51-32 one copy was signed by Audrey Naylor and another copy by Holdeen and his wife. Many of the trust deeds, either directly or by incorporating by reference, authorize the trustee to loan the trust assets "at interest with or without collateral security." The trust deeds for Trusts 51-1, 51-4, 52-1 and 4, and 53-40 authorize the trust to loan principal of the trust estate upon any collateral security or personal obligation approved by the trustee. The trust deeds for Trusts 55-10, 56-4, and 56-15 authorize the trustee to "contract debts." None of the following trust deeds contain a lending power: Naylor-Sanford
50-32 and 33
MacPherson-Sanford
54-LIH
At the time of the creation of trusts 52-10 and 53-10, they were merged into Trust 50-10 pursuant to express powers in such documents. Some of the trusts did not specifically provide a power to lend trust assets. In the creation of Trusts 46-10, 47-10, 50-10, and 51-36, the assets designated as trust corpus in the trust deeds were not transferred by Holdeen to the trustees. Other securities were *402 substituted as follows: Number of
Trust
Shares
Stock
Substitution
46-10
100
Commodore
$ 79,325 of 15 Park Row Bonds
Hotel, Inc.
47-10
100
Commodore
($ 40,000 Lower Broadway Bonds
Hotel, Inc.
($ 253,000 50 Broadway Bonds
($ 67,500 80 John St. Bonds
51-36
400
50 Broadway
100 shares Duplan
In Trust 50-10, 1,800 shares of Lincoln Building were transferred to the wrong account and later recovered. Title to real property owned by a trust was never held in the name of the trust or trustee. It was usually in the name of the trustee as an individual, without any fiduciary designation. Sometimes a nominee or a dummy corporation was used. The following trust deeds provide for the following distributions: Trust Deed
Distribution
Trust I
a. 1) Net income to family members for term of
Trust II
years, or life
Trust III
Naylor-Sanford
2) Thereafter, expendable income (or fraction
MacPherson-Sanford
thereof) for 1,000 years from date of trust
creation payable to a designated college
3) Nonexpendable income accumulated for 1,000
years from date of creation
4) Remainder to Pennsylvania after 1,000 years
44-10
b. 1) Expendable income to charity
45-10
46-10
2) Nonexpendable income accumulated for stated
47-10
period of 500-1,000 years
52-10
53-10B
54-50
3) Remainder to Pennsylvania after stated
period
50-10
c. 1) Portion of net income to family members
51-10
53-10
53-10A
2) Expendable portion of remaining income to
54-120
charity
55-10
56-10
3) Nonexpendable portion accumulated for
stated period of 500-1,000 years
4) Remainder to Pennsylvania after stated
period
32 other trusts
d. 1) Net income to family members for term
of years, or life
2) Remainder to 50-10, 51-10, 54-50, 54-120
or 55-10
*403 AGES OF HOLDEEN AND HIS FAMILY DURING YEARS INVOLVED Year
Born
1936
1945
1951
1957
Holdeen
1881
55
64
70
76
Janet
1912
24
33
39
45
Randall
1915
21
30
36
42
Sherley
1916
20
29
35
41
Audrey
1918
18
27
33
39
*Haldis &
Hildred
1920
16
25
31
37
Roger
1921
15
24
30
36
ADMINISTRATION OF THE TRUSTS
Janet Adams In 1936, Janet Holden agreed with her father to serve as trustee under the trust agreements identified as I, II, and III. She received the securities designated as the corpus of these trusts, sold portions of them to pay her father the amounts reserved in the agreements, opened a checking account in the name of each trust, kept a record of purchases and sales, paid amounts due the beneficiaries under the terms of the agreements, notified the State of Pennsylvania and the colleges of their remainder interests, filed tax returns for each trust and guarded the assets. She had bank accounts with the Stissing National Bank in Pine Plains and later with Grace National Bank and Bankers Trust Company in New York City. Trust III acquired an interest in an estate and was inactive for 5 years. She treated Trust II and Trust III as a single unit from an early date. In 1942, she married Charles F. Adams who was in the U.S. Air Force. She *404 followed him when his station was changed. In August 1943, she entered into an agreement with her father amending the trust agreements of 1936 tending to modify powers he had reserved in such agreements. In 1944 she accepted an appointment as co-trustee in Trust 44-10 and in 1945 she accepted appointment as a co-trustee in Trust 45-10. In 1945, her husband returned from the service and they settled in Pine Plains occupying a house a few doors away from her parents' residence. She established an office on the premises for handling the business of the trusts under which she was trustee. In succeeding years she accepted appointment as trustee or co-trustee or director of a number of other Holdeen trusts. Lester E. Palmer, Jr., of Poughkeepsie, New York, was attorney for Janet Adams and for Holdeen. He was unrelated to the Holden family. He died in 1958. In September 1947, when her father's bank account was overdrawn, Janet deposited $ 6,500 from Trust II funds to cover the overdraft. The loan was made without Holdeen's knowledge and he repaid it several days later. During the years 1951-1957, Janet spent 95 percent of her time in Pine Plains, New York, which is 100 miles from New York *405 City. Some of the trusts of which Janet served as trustee acquired rental property in or near New York City. Some of this was managed by Janet's brothers, Randal or Roger, or by her brother-in-law, James Cushing-Murray, and other properties were managed by employed managers. In the first few years of her administration as trustee, her father advised her on purchases. Later she handled such purchases and sales on her own initiative and consulted with her brother Randal or the brokers. Janet regularly reported to Hartwick College as beneficiary under Trusts I and II showing the income, expenses and assets of those trusts. She reported to the American Unitarian Association as beneficiary under Trusts 45-10 and 46-10, and others showing the income, expenses, and assets of those trusts and remitting the expendable income as computed under the terms of the trusts. Prior to 1945 Holdeen and Gabriel Elias occupied office space at 170 Broadway, New York City. When Randal Holden returned from the service he joined them there. Later, Holdeen and Elias moved to a building they owned at 205 E. 40th Street, New York City, and established offices there with Randal Holden and later with James Cushing-Murray *406 and Roger Holden. At this address Randal and Elias engaged in the management of real properties including properties owned by some of the trusts. Albert H. Kreulen occupied a room in this building from about 1945 to 1955. Holdeen and Elias sold this building in 1951. In June 1949 Trust 47-10 acquired the Astral Building at 180 Franklin Street in Brooklyn. Kreulen, as trustee of Trust 47-10, managed the property. In 1951 Randal established an office there. In addition to his law business he assisted Kreulen in managing the building and collecting rents. Holdeen occupied a room there at a rental of $ 3 per week. In the years 1951 to 1957 Holdeen sometimes used Randal's office before 9 a.m. and Randal used it during the rest of the day. Kreulen used this office on Saturdays or evenings for the collection of rents. Holdeen sometimes used a room near Randal's office and near the plumber's shop as a place for meeting people. His records were usually kept by Stella H. Holden at Pine Plains. Janet Adams, Audrey Naylor and Sherley MacPherson did business with the brokerage firm of Baker, Weeks & Harden, later Baker, Weeks & Co., and hereinafter sometimes referred to as "Baker." This firm was *407 located at One Wall Street, New York. The representative dealing with Janet was Frank Smythe. Holdeen also did business with this firm. Janet also made investments with Walter Murphy & Co., whose representative was William Mellin, Murphy and Mellin later became associated with H. C. Wainwright & Co., at 30 Pine Street, New York, New York. Mellin saw or telephoned Randal almost daily and was in touch with Janet weekly. Holdeen also did business with this firm and sometimes was accorded the use of the firm's secretarial services. Mellin's dealings with Janet were principally in connection with over-the-counter real estate securities. Mellin was aware of the fact that some of Janet's accounts were trustee accounts although not so identified. She had approximately 10 accounts with this firm. At one time she signed a statement that all her accounts with the firm were personal. The brokers usually communicated with Randal Holden to propose the purchase of certain securities and if Randal was satisfied with the merits of the purchase he might buy for Janet Adam's account or communicate a proposal to her. During the years 1951 to 1957, the decision on purchases of securities for the trusts *408 in which Janet Adams was trustee were made by Janet. On occasion Holdeen would advise concerning sales of securities from the trust accounts or concerning real estate investments. Audrey Naylor gave Randal a power of attorney over her New York checking account for the Naylor-Sanford Trust. Randal made purchases and sales of securities for Audrey according to his best judgment. Randal also acted as agent for Sherley MacPherson in purchasing and sale of investments for the MacPherson-Sanford Trust. Holdeen had no authority over the brokerage accounts or checking accounts of any of the trustees. In December 1953 Janet Adams wrote Sherley, Audrey and other family members suggesting that they send funds available for investment to Walter Murphy & Co., to keep on account and awaiting investment, saying "Randal and Murphy will buy you the things you prefer. If by chance you have changed your mind after you have received the confirmation, you notify Randal or me and we arrange to get the thing sold to another family member." Later the trustees left funds on deposit with the brokers awaiting investment. Holdeen informally agreed with the brokers, Wainwright and Baker, that he would personally *409 take and pay for any security not accepted by a family member or trust after being ordered by Randal or Janet. This rarely occurred in the later years. In 1954, Janet opened a brokerage account with Thomas E. Logan of Wappingers Falls, New York, a representative of Merrill Lynch, Pierce, Fenner and Beane. She made purchases and sales through him for trust accounts and personal accounts as well. He was aware that she was trustee of at least 10 trusts. Also he was acquainted with Randal and had met Holdeen. He dealt only with Janet. While no regulation prevented the brokers from dealing with trust accounts, the need for documentary evidence or authority created complications in dealing with a trust. For convenience the accounts were carried in the name of Janet Adams followed by a number. In the years 1951-1957, Janet frequently wrote to Audrey and consulted with Sherley in arranging for investments or asked for information on funds available for investment by the NS and MS Trusts. Janet received copies of some of the brokerage statements sent to her sisters and some of the records of the NS Trust. Janet's children were beneficiaries of those trusts. During the years 1951-1957, Janet *410 operated a "liability pool." Holdeen, family members, and the trusts contributed to this pool, which was used instead of real estate liability insurance. Janet considered the cost of such insurance excessive. In the course of her administration of the trusts of which she was trustee and in assisting the trustees of other Holdeen Trusts, Janet from time to time transmitted checks between Holdeen and other persons, rounded up funds for investment, prepared lists of interfamily debts, informed members of the family about investments and prepared annual asset summaries. Janet prepared lists of interfamily loans sometimes as often as once a month. These lists were sent to members of the family including Holdeen. She also maintained a file dealing with these loans. In about 1954, Janet established an escrow account for the use of paying her office employees and superintendents of buildings employed in New York City which account she referred to as "Empire Employees." This account was used to cover Social Security taxes and income taxes withheld and workmen's compensation premiums relating to such employees. It was also used to cover office employees in Randal's office in Brooklyn. Approximately *411 15 employees were listed. Assets belonging to certain trusts were sometimes commingled. Assets belonging in both family members and trusts were sometimes in the same checking or brokerage account. In certain of the trusts of which Janet Adams was trustee were provisions for specified income to be paid to grandchildren of Holdeen for life and the remaining portion of the income to be divided into expendable income and accumulated income. The expendable income and all other income not lawfully subject to accumulation was to be paid to the American Unitarian Association or for some charitable purposes and the accumulated income and the principal was to be held for the State of Pennsylvania until a remote date. Janet divided trust assets under some of these agreements into two portions. One portion was to be held for the life estates and the remainder to be treated as a separate trust. For example Trust 50-10 was so divided, a part being treated as the Adams-Lincoln Trust, the remainder as Trust 50-10, and Trust 55-10 was similarly divided into Adams-Commodore and 55-10. During the years 1955-1957, Janet, on the advice of Lester Palmer and Randal, created joint arrangements of some of *412 the trusts of which she was trustee, which she referred to as "partnerships." "Big A 15" was a group composed of Adams-Lincoln, Adams-Commodore, Adams-Graybar and Adams-50 Broadway. Another was "Adams 4-4-4," her children's accounts, personal as well as trusts. "Ten Funds" was a group comprised of 45-10, 46-10, 54-50, 54-120 and 55-10, with no individual beneficiaries. There were other groups. The purpose of this was to simplfy record keeping. The assets of the group were retained as a unit and each individual trust was assigned a percentage of the whole based upon the value of its assets at the time of the merger. Janet filed partnership returns for the group as well as individual returns for each trust in some of these cases. Prior to buying real property from or selling real property to their father, or acquiring mortgages on such property, Janet, Sherley, and Audrey, as trustees, did not either physically inspect or obtain an independent appraisal of such property. They relied upon Randal or Roger or upon the rental experience of the property. Janet visited and personally evaluated some of the properties. When family members or trusts acquired property from Holdeen, they paid *413 him in cash or property that could be used to secure his loans with banks or brokers. He preferred property that was acceptable as security. James Cushing-Murray, the husband of Hildred Holden, was a Canadian. In about 1946 Janet invited him to come to New York to manage some of the real properties owned by the trusts. He also managed properties owned by Holdeen. While in New York he invested some of Hildred's funds in parcels of real estate and in constructing a shopping center. He encountered difficulties through underestimating costs and bad financing. Janet had some correspondence with him in an effort to collect income due the trusts from the property he was managing. In 1950 Janet received a check from James Cushing-Murray for income from buildings he managed. Janet paid a portion of this to Holdeen as his share of income from a building he owned. In September 1951, Janet negotiated with Cushing-Murray concerning a claim for reimbursement for income lost on account of rental losses in 1949. She wrote as follows: Dear Jim Re check exchange Your solution to the problem is simple and quite satisfactory to me. As I understand it with this method we postpone the 1949 rental losses *414 until 1952. I'm sure I can get Dad & Randal to agree to this. I will undoubtedly be able to repair the schedule with the use of your answers to my questions. Perhaps it will help you understand part of my bookkeeping problem re 1949 rental losses if you ignore the Fed income tax return and take that particular problem up in 1952. I believe that we had agreed that an additional fee would be added to the "1952" management fee. Whatever plan we finally agree upon (and I think we have already agreed and Randal and Dad will fall in line) I intend to carry out in a logical fashion, spreading on a percentage of the rent roll. * * * In April 1952, Janet wrote Cushing-Murray concerning money to be paid him for managing properties owned by the trusts and by Holdeen, "I will send the money after I get it initialed as okay by Dad." In October 1953, Janet wrote Cushing-Murray concerning certain transactions in which he was involved while managing buildings owned by some of the trusts or by Holdeen. She commented, "Why don't you address your next question directly to Dad since you know I can not do much without his advice." In March 1954, Janet wrote Cushing-Murray recommending that a friend she *415 knew in or near Pine Plains, Werner Mueller, might be able to assist in the problems Cushing-Murray found in managing properties of some of the trusts and saying that Werner would phone Jim in the near future. She commented also "Dad agrees that Werner is the man for the job at the moment." Janet Adams' records were not good accounting. On some occasions Janet lost track of moneys paid or received or of securities which belonged to certain trusts. For example, one of her accounts included 1,000 shares of Commodore Hotel stock. She was unable for a time to locate the dividends paid upon this stock. In 1948 Janet purchased mortgages for Trust 45-10 on property on Bryant Avenue. She lost track of the investment, failed to collect interest due on the mortgages and considered that the trust had lost $ 80,000. In another case Janet paid $ 2,092 in taxes on property at 177th Street. The property belonged to Holdeen and Janet paid the taxes by mistake. Holdeen later repaid her. In December 1949, the Naylor-Sanford Trust loaned $ 5,000 to Holdeen. This loan was secured by a second mortgage on property he owned at 457 W. 125th Street, New York City. In 1954 Janet wrote her father: I'm about *416 to advise NS to call this mortgage. It seems a very unromantic investment. Maybe it could be assigned to a charity trust? If you are about to sell the house, we will hold off foreclosure. Holdeen repaid the principal amount of this $ 5,000 loan on October 4, 1954. In November 1954, he paid the interest on this loan for 1949-1954. In June, 1956, Janet wrote Audrey regarding this loan: Actually maybe you should have collected interest from Dad for about 36 days but since the amount is so small, I assumed you would be willing to waive it. * * * In 1949 Trust I paid Holdeen $ 2,475 for 90 shares of stock in Lincoln Building Corporation. The stock was not transferred of record at that time. In December, 1952 Janet wrote Holdeen concerning this stock asking him to transfer the stock or pay her. She said, "I enclose bill assuming I am right. * * * Or you can pay yourself. Anyhow okay the bill please. Initial and date of initial." If he did this she could take the paper to her mother and get the money. Subsequently the shares were transferred to the trust. In December 1950, Holdeen loaned $ 27,000 to Janet for use in the purchase of real property at Overlook Terrace in New York City for Trust *417 II. Janet repaid the loan from her account with Baker, Weeks in January 1951 without interest. For a time Janet forgot that Holdeen had advanced funds and believed that her payment to him amounted to a loan. She commented "The Gov. would love to catch dad at a snatch like this." In September 1951 Janet loaned $ 50,000 from Trust II to James Cushing-Murray at 18 percent on a mortgage on a shopping center constructed in Yonkers, New York. The reason for the high rate of interest was to persuade the borrower to refinance the mortgage. As of October 7, 1952, no interest had been paid. In October 1951, Holdeen and Janet agreed that he would sell and assign to her as trustee, a mortgage of $ 30,000 covering certain property in Yonkers, New York, and a mortgage of $ 15,000 covering property at Ditmars Boulevard and 47th Street, Queens, for a total price of $ 45,000 payable: $ 42,058.13
By check to Murphy and Co., in
payment for 2,250 shares of stock
bought for the account of Holdeen
and
$ 2,941.87
By check of Janet Adams to Holdeen In September, 1952, Janet wrote her father: Dear Dad: Re Ck to Murphy #542 $ 42,058.13 October 15, 1951 These loans were siphoned off my Baker margin, put thru Bankers *418 and loaned to you for a Murphy purchase. There seems to be no record of the money finding its way back to Baker. If it was an oversight, you will have to pay Baker on the interest charges. Randal cannot seem to recall what it was you bot. Are there any records in Pine Plains I can look at. Janet's payment to Murphy & Co., was for the purchase of the two mortgages referred to above. She paid $ 2,941.87 to complete the transaction. The mortgages were on Cushing-Murray properties she acquired for Trust II. In November 1951, 500 shares of stock of Commodore Hotel owned by Trust 45-10 were held in a brokerage account designated "Cash #3 (margin)" that Janet maintained at Baker. At this same time the following shares of stock in this corporation owned by the following individuals were also held in this account: Haldis MacPherson
400 shares
Janet Adams
100 shares
Ralph Dowdy
300 shares
Matthew Netter
100 shares
Howard Naylor
100 shares
All of this stock was held in the name of Janet Adams. Dowdy and Netter were friends of Janet. In March 1952, Holdeen in a note to Janet mentioned several investments which had appreciated in value and suggested the possibility of transferring them to new 1952 trusts. *419 In October 1951 Janet wrote "Have you a story made up for the closing which took place September 20, 1951, in which my Grace check was given to Jim for $ 50,000 * * *. Our understanding is that the $ 50,000 is to be returned as Jim rents the Yonkers taxpayer [shopping center] more fully or sells the building. * * * I would like the whole story to put in my trust book." In January 1952, Janet wrote Holdeen, "Should a remainderman like 50-10 (for 51-37) be put on notice that there is such a trust. * * * The chief reason for doing this would be to give 51-37, etc., a bona fide look." In 1952 Holdeen agreed to transfer certain securities from his account with Baker to Janet's account. She wrote Smythe when this transfer was delayed. In May 1952, Smythe wrote Janet: Regarding you r letter of May 6th, I spoke to your father about it on Saturday and he asked me to delay making the transfers requested by you until he had a chance to go over the matter. Again this morning, I spoke to Randal and asked him to let me know as soon as he could so that we could make the transfers without delay. As you can understand, I can do nothing until I hear from them. In January 1953, Janet wrote Randal concerning *420 a property. In the same letter she asked "where is the Westchester M.C. seal? Dad intimates that certain deeds were sort of forged with the use of this seal." In September 1953, Janet wrote Holdeen concerning certain loans saying, "I think possibly some of this money will come back in a week or so. What does not come back will be borrowed of Baker and Wain within 2 weeks or sooner if you say so." In December 1953, Holdeen gave a trust property described as: All his right, title and interest in the Corpus of the trust estate created by the last will and testament of Alice E. Burton and in a 1/9 share of the bonds and stocks held by San Diego Trust Co. as trustee for trustor and others as of July 1953. It is stipulated that the value of such property at that time was $ 15,000. On May 11, 1954, Janet wrote her father concerning this property stating "I see you declared your December gift to 45-10 at $ 15,000, but I think I picked the figure out of the blue." The property was sold in December 1954 by Trust 45-10 for $ 27,853.70. Janet, as trustee of Trusts I and II, owned real property located at 231 E. 13th Street, New York City, from March 1, 1947 to February 29, 1956. She loaned $ 15,000 *421 to Holdeen from a checking account she maintained for this property. The record does not show the date of this loan. On February 3, 1954, Holdeen repaid $ 5,000 of this $ 15,000 loan. Subsequently he repaid the balance of $ 10,000 without interest stating that he was unaware of this unpaid debt, and asking whether interest at 6 percent was due. Regarding the interest, Janet wrote "Maybe I just have to let you decide what to do rather than run the risk of your being accused of using trust funds for your own." In June 1954, Janet wrote her father commenting that some New York Central stock was transferred by him to Trust 45-10 in 1949 and sold at a loss by the trust in 1950. She wrote, "In other words, the transfers were by no means all for evasion of capital gain. (I do hope they do not look around and decide they would be a device for your dumping worthless stuff?) This has happened at other times." Holdeen noted on the memo that the sales were at the then market price because he needed the cash and that such a transaction was not subject to challenge. In this note Janet was needling her father as to the consequences of the transaction. In July 1954, Holdeen offered some Fred H. French *422 Company securities he owned for sale to members of the family or trusts. On July 28, 1954, Janet wrote him, "We have not decided who will buy all the French stuff." She explained that she was lining up the available funds. On August 1, 1954, she wrote Randal concerning a plan to buy the securities for Trust II, and noted "Dad wrote me on July 20 suggesting the move we all feel is good." In February 1955, Holdeen agreed to transfer to Janet Adams as trustee of Trust 45-10, $ 20,000 principal amount of 5 percent convertible bonds of Chicago & Eastern Illinois Railway Company subject to a lien of $ 7,000 which the trust should assume. The cost to Holdeen was $ 7,262.50. In February 1955, Janet loaned $ 23,000 to Holdeen from her No. 4 account with Baker Weeks. This account contained personal funds and funds for Janet's children pursuant to the pre-1950 non-charitable trusts. There were no funds of charitable trusts in this account. In May 1955, Holdeen repaid $ 10,000 plus interest of $ 460. In October 1955, Janet billed him for the balance of $ 13,000 plus interest for 5 months at 6 percent. She commented, "You are getting a bargain since you had the use of $ 10,000 for some months for *423 which I did not charge you." The loan was repaid. In December 1955, Holdeen wrote Janet as trustee of Trust II, recommending that she pay James Holden the sum of $ 300 as compensation for his duties as trustee of a building in Yonkers, New York, for 1954 and 1955. In some of Janet's memoranda, she refers to asking for her father's approval, or having the proposed action initialled as okay by him. In a memorandum of April 1955, Janet suggested to Audrey and Sherley that they pay Hildred her part of the trust income in quarterly installments instead of annually and recommended "what we propose to do is probably not legal but I am sure you're willing to take the chance." In February 1955 Holdeen arranged to loan $ 15,000 at 6 percent to a foundation to take up an existing mortgage. He had an assignment drawn to Janet and wrote her asking for a check for $ 15,000. He stated: "you will know best what persons or trusts should carry this mortgage for the present and how to raise the money." In October 1955 Janet wrote other trustees suggesting that payments of trust income to Hildred by withheld to restore funds which she had dissipated. Janet said "I guess we all know that I am doing this *424 at the request of the donor." In December 1955 Janet wrote concerning a proposed deed, "It is no wonder I rarely make a move without consulting Dad. He really picked this apart." Holdeen had pointed out to her that the deed was defective. In February 1956, Janet wrote concerning a mortgage owned by Trust 45-10 "Janet has decided and Dad concurs that the simplest way for the above to be handled is for NS to buy out 45-10 for $ 8,886.65." In January 1956, Janet wrote Haldis MacPherson as trustee of Trust 51-20, stating in part: The above series trust was made to you in 1951 and you appointed Hil as your successor. She sold the 800 bonds 50 Broadway which were the corpus of the trust and invested it about as above. We have decided that you should step in and act again as trustee. * * * Trust 51-20 authorized the trustee to appoint a substituted trustee. It provided that after the lives of the beneficiaries the assets shall be transferred to Trust 51-10, of which Janet was trustee. In 1956 the Grace National Bank sent Janet a check for interest on certain bonds which it represented were "hypothecated by you to secure our loan to Jonathan Holdeen." The bonds were assets which Holdeen had *425 contributed to one of the trusts after he had deposited them with the bank as security for his loans. They were subsequently released to Janet upon her payment to the bank or to her father of the amount of the loan in question. They were not deposited by Janet. By check dated March 7, 1957, Janet paid $ 1,101 to the American Unitarian Association. This payment represented the distributions for the year 1955 from the Holdeen Funds 45-10, 46-10, 50-10, 54-50 and 54-120. Janet paid $ 150,000 to Holdeen on May 23, 1957. This was a partial repayment of an amount that he had loaned Trust II. No interest was paid on this loan. On October 29, 1957, Janet repaid to Holdeen $ 30,000 of a loan that he made to the Ten Funds partnership. The balance due Holdeen on this loan was $ 79,695. From time to time one of the trusts loaned amounts to other trusts for short periods of time, some 30 to 60 days, which loans were repaid without interest. As of December 31, 1957, the Holdeen Fund 47-10 owed Janet $ 50,000. Janet had more than 10 checking accounts and more than 10 brokerage accounts in 1958. In January 1958, Janet wrote Holdeen that a trust deed that they were going to execute should be "dated *426 early in September since we want this trust to join a partnership as of October 1, 1957." In June, 1958, Janet wrote: 111th St. sale Since dad threatens to force us into a sell campaign as soon as he has time and since Janet is as anxious as he is, should we not consider forcing dad into selling this house. My thought is that a proportionately small part of the cash on closing needs to be reported. I don't know how this will compare with the amount of gain realized on the sale of securities but we may get down to the point where we will run out of low gain securities. Someday it may be possibly that JH will sell some of the PM mortgage? ? If this is to be considered, I will work up a part of the cap gain schedule that cost is based on. In September 1959, Janet sent to the American Unitarian Association a list of the assets held and income received by the trustees under trust agreements made by Holdeen and with a Holdeen Ten Fund having a remainder interest listing 35 such funds. Janet did not communicate with any Pennsylvania Bank or trust company named as a successor trustee in these trust agreements. Janet filed an application for exemption from Federal income tax in the name of *427 Holdeen Fund 45-10 on November 9, 1961. OLD BROADWAY In 1950 Holdeen made a $ 15,000 down payment toward the purchase of real property located at 48-56 Old Broadway, New York City. Subsequently in 1950, Janet, as trustee of Trust II, borrowed $ 90,000 from Trust 47-10, and repaid $ 15,000 to Holdeen. The $ 90,000 loan was secured by a mortgage on this property. Trust II loaned $ 24,000 of this $ 90,000 to Trust 50-10, which this trust transferred to Holdeen in repayment of an amount that he had loaned to it. Two days later Trust 50-10 repaid the $ 24,000 loan to Trust II without interest. Trust II loaned $ 15,500 of the $ 90,000 loan to the MS Trust. The $ 90,000 loan from Trust 47-10 is not listed as a liability on a balance sheet dated December 31, 1950, for Trust II. This shows Trust II as having a 40 percent interest in "Old Broadway house" costing $ 20,000. Randal paid closing costs of $ 20,000 when the Old Broadway property was purchased. As of January 26, 1951, he had not been reimbursed for these closing costs. On January 28, 1951, Janet considered that Trust 45-10 had "acted as agent" for the buyers of the Old Broadway property. STISSING LIME PLANT In 1953 Holdeen negotiated *428 a loan to be made to Stissing Lime Co., Inc. and offered it to Janet subject to her approval for one of her trusts. Holdeen was to guarantee the loan. At this time he was making a gift to his nephew, James Holden, who was expected to buy a part of the Stissing note and to furnish collateral for the loan. Holdeen wrote his brother, Stephen, that it "is better not to have Janet give a check to a Holden on the lime loan, as Int. Rev. might be suspicious so I suggest the loan be secured by note of Stissing Lime and that James execute a guaranty * * *." Janet decided to have Trust I make the loan. She wrote Holdeen, "Enclosed is Stissing Lime note for 5M with collateral stock of James Holden and check for 5M to Stissing, for your approval and consummation." GROVE STREET Holdeen and his wife reported rental income from property at 346 Grove Street, Jersey City, in their tax returns for 1951 through 1955. On April 20, 1955, Holdeen, Janet and Randal signed a document stating that premises known as 346 Grove Street form part of the assets held pursuant to Holdeen Fund trust instrument 45-10. Janet wrote Randal concerning Grove Street under date of October 8, 1955, "Dad decided this spring *429 that since Tr. I was already involved, it would be the owner of the house. * * *" The income tax return filed for Trusts I and II for the fiscal year ended June 30, 1956, reports that 246 [346] Grove Street was acquired June 1, 1936 and sold October 1, 1955, for a long-term capital gain. MacPHERSON-SANFORD TRUST Sherley MacPherson became trustee of the MacPherson-Sanford Trust in 1942 in place of her husband who went into the Naval service. She was living in Pine Plains, New York. Sherley attended secretarial school for 1 year, she did not go to college. Sherley had a bank account with the Stissing National Bank at Pine Plains. She found that the brokers were reluctant to accept trustee checks for the purchase of stocks, therefore she changed her account and used personal checks or checks with a numeral following her name. She maintained her records at her home. She also had an account with the Grace National Bank at New York City. Randal managed real estate in New York for her and helped with advice upon her investments. Sherley acquired a rental property in 1946 at 1707 Bathgate which she bought from her father at his cost of $ 13,000. When the property was not paying well, Holdeen *430 bought it back in 1947 at her cost. He improved it and sold it back to the trust in 1953 for the same price. Later she sold it for $ 15,000. Holdeen made no profit on this transaction. In 1951 Sherley was appointed trustee of Trusts for the benefit of her children known as Trust 51-2M and Trust 51-21. Sherley relied on advice from Janet or Randal as to securities' transactions. She paid legal fees to Randal. Holdeen looked at Sherley's books once or twice a year but otherwise did not concern himself with her trust business except for advice to keep her money working. She did not loan him money from trust funds. At times she loaned money to other trusts or to Janet or Audrey and sometimes she borrowed from them. In filing tax returns for the trusts she received help from Janet whose children were beneficiaries of MacPherson-Sanford Trust. She paid fees to Janet. Sherley's children were beneficiaries of trusts administered by Janet. In 1957 Sherley and Audrey joined the MS and NS trusts in a partnership as Holdeen-Sanford #25. This was for convenience in administration. According to Sherley's records the net assets of MS as of September 30, 1953, were over $ 80,000. The assets as of *431 March 31, 1958 were $ 246,708. In the years 1951-1957 Sherley actively administered the MS Trust, maintained its records and bought securities and real estate. In those years Holdeen did not select the securities or real estate purchased by Sherley for this trust. Sherley in her individual capacity made interestbearing loans to Holdeen at various times through 1957. In 1948 the MS Trust acquired property at 712 Fox Street. In 1952 Sherley transferred this property to her father for $ 20,000. In 1954 Holdeen transferred the property back to the trust for the same price, Sherley paying $ 15,000 in April and $ 5,000 later. NAYLOR-SANFORD TRUST When Audrey Naylor was appointed trustee of the Naylor-Sanford Trust in 1940, her father explained the nature of the trust and her responsibilities as trustee. Audrey attended West Virginia Wesleyan College for 2 years in the late 1930's. Audrey received the original trust assets in cash by a check for $ 39,000. She opened an account at the Garrett National Bank in Oakland, Maryland, and deposited the check in her name as trustee. She used the account for the purchase of assets, stocks, bonds and real estate. In about 1956 she changed the account *432 to"Audrey Naylor No. 1." She found it was awkward for the brokers to handle accounts in the name of a trustee. Her husband helped her with the affairs of the trust from 1946 when he returned from Naval service. She notified the West Virginia Wesleyan College of its interest as a beneficiary. There were subsequent gifts by Holdeen to the trust. She filed fiduciary tax returns in the name of the trust for each year from 1944. In 1945 the trust was modified by an agreement in which her father released certain rights retained in the original agreement. She did not visit New York frequently in the years 1951 to 1957. During these years she saw her father once or twice a year. He sometimes visited Oakland and she sometimes visited Pine Plains and New York City. In about 1956 Audrey's husband took over most of the responsibility of administration. Later she appointed him a co-trustee. She did not loan money to her father from trust funds during the years 1951 to 1957. On real estate investments she took the advice of Randal, Roger, Janet and her father. In 1950 and 1951 she was appointed trustee of Trusts 50-16, 51-28 and 51-32. In about 1957 Audrey and Sherley joined the MS and NS Trusts *433 in a partnership as Holdeen-Sanford 25. This was for convenience in administration. Audrey then sent some of her records to Pine Plains. Audrey took the advice of Randal as to investments in securities. She had an account with the Chemical Corn Exchange Bank in New York City. She gave Randal a power of attorney on that account for making investments. On January 1, 1949, the net assets of the trust as reported by Audrey to the West Virginia Wesleyan College were over $ 200,000. During the years 1951 through 1957, Holdeen sometimes looked at the trust records maintained by Audrey. Janet prepared schedules of real estate for her, deposited checks in her New York bank account and helped her prepare fiduciary income tax returns. Audrey was frequently represented by her brother, Randal. She paid both Janet and Randal for their services. In September 1951 the NS Trust loaned the MS trust $ 4,000. This loan was repaid on June 30, 1953, without interest. On July 26, 1952, the NS Trust loaned $ 6,000 to the MS Trust. Although this was repaid on January 12, 1953, no interest was paid, and this loan was not secured. In 1953 Holdeen loaned $ 2,000 to the NS Trust to cover an overdrawn checking *434 account. This loan was repaid on July 19, 1954, without interest. In October 1954, Holdeen agreed With Audrey Naylor to convey to her premises at 2517-2519 Amsterdam Avenue for a price equal to cost to him less depreciation, such price being computed at $ 26,602, in exchange for her transfer to him of a participating interest in a mortgage of property at 529 W. 111th Street, New York City, amounting to $ 30,000. He was to pay her any amount by which $ 30,000 exceeded the cost to him of the Amsterdam Avenue property. In November, 1955, Janet wrote her father concerning this transaction. She suggested an exchange of checks between Holdeen and the NS Trust to clear the record. She said: "Dad: Will you give your okay on above after adjusting." WOODYCREST Audrey Nylor, individually and not as trustee of the Naylor-Sanford Trust, acquired real property at 1098 Woodycrest, an apartment building. This property later was losing money. In 1953 Janet suggested to Audrey and Holdeen that he exchange his property at Mott Street with Audrey for her Woodycrest property. In 1953 Audrey sold Woodycrest to Holdeen for $ 12,000 cash. It was subject to a mortgage. Holdeen reported income or loss from *435 this property in 1953, 1954, and 1955. On December 31, 1953, Woodycrest had an estimated value of $ 76,000, subject to a mortgage of $ 30,634. In a list of interfamily loans dated November 11, 1953, prepared by Janet Adams, it is indicated that "RH" owed Audrey $ 13,000 in connection with"Woodycrest operating." In a list dated January 29, 1954, it is not clear whether JH or RH is the debtor to NS. In a list dated June 16, 1954, "JH" is shown as owing the NS Trust $ 13,000 re Woodycrest operating. The last entry was erroneous. In July 1955, Holdeen proposed to sell this property to the NS Trust, taking it back if an outside sale failed. He stated his cost as $ 48,921, subject to a mortgage of $ 23,026. In September 1955, Audrey purchased the property from Holdeen for the NS Trust. She sold the property in 1956 for $ 80,000. Holdeen was not indebted to the NS Trust or Audrey on account of these transactions. RANDAL HOLDEN Randal Holden was born in 1915; attended Hartwick College and Fordham University Law College. He graduated in 1941. He had 3 years of accounting in college. He served in the armed services during World War II. He joined his father in New York City in 1945, and was admitted *436 to the Bar of the State of New York in 1946. He was married in 1946. He assisted his sisters, Janet Adams, Sherley MacPherson and Audrey Naylor in making investments for the trusts of which they were trustees. He helped to locate rental properties and to manage rental real estate, some of which was property of the trusts. He also did research on investments. In 1951 or 1952, he moved to Queens Village on Long Island. He maintained an office in the Astral Building owned by Trust 47-10. His father had a room in the building and sometimes came in Randal's office when in the city. Randal assisted Kreulen in managing the building, and in paper work relating to rent controls, and other legal work. He paid no rent for his office space. Randal received copies of the monthly brokers' statements for his sisters' trust accounts. He received 30 to 50 such statements each month. He placed orders for purchases or sales in some cases subject to approval by the trustees. During the years 1951 to 1957 Holdeen had no part in buying or placing these orders. Sometimes Randal received fees from his sisters for these services. He had a power of attorney on the bank account of Trust 45-10 at Grace National *437 Bank and on Audrey's bank account for the NS Trust at Chemical Corn Exchange in New York City. During the years 1951 to 1957, Randal consulted his father once or twice per month on investments. Holdeen did not suggest securities purchases but suggested investments in certain real estate. TRUST 47-10 Albert H. Kreulen resided from 1945 to 1955 at 205 East 40th Street in the building where Holdeen, Elias and Randal Holden had offices. He scouted real estate for Holdeen in the years 1945 to 1949. In 1947 Kreulen agreed to serve as trustee of Trust 47-10. Upon Holdeen's suggestion he borrowed funds from Janet Adams in order to buy from Holdeen the securities which constituted the original corpus. The agreement specified 100 shares of capital stock of Commodore Hotel, Inc. However, Holdeen substituted bonds of Lower Broadway, 50 Broadway and 80 John Street. Kreulen sold some of the bonds and repaid the loan from Janet. Somewhat later Kreulen opened an account at the Grace National Bank in his own name. He learned that the brokers did not want to accept trustee checks. He took steps to inform the American Unitarian Association of his activities as trustee and paid a visit to the Boston *438 office of that Association. He ceased to scout for real estate for Holdeen. In July 1949 he purchased the Astral Building at 180 Franklin Street in Brooklyn as an asset of the trust. The cost was $ 73,240. It was an ancient building containing 110 units and having a second address, 77 Java Street. Kreulen served as manager of the Astral Building and Randal Holden assisted in this respect after moving his office to that building. Kreulen used Randal's office in the building for the collection of rents. Kreulen invested in stock and bonds consulting Frank Smythe of Baker, Weeks and Hardin on Holdeen's recommendation. He also consulted William Mellin of H. C. Wainwright & Co., on the basis of securities offered. While Holdeen advised him on investments during the first few years, he made his own decisions thereafter or upon consulting with Randal. He did research on investments in a library. He paid Randal fees for management. Kreulen carried on the business of Trust 47-10 making the decisions as to investments from 1951 until 1957 when Lester Palmer was appointed co-trustee by the directors of the trust. Palmer died in 1958 and the directors appointed Janet as co-trustee of this trust. *439 Holdeen occupied a room in the Astral Building at a rental of $ 3 per week. Kreulen did not always collect the rent from Holdeen when due as he was too embarrassed. Sometimes he billed Stella Holden in Pine Plains for this rent. After Janet was appointed co-trustee, Kreulen attended to liquidating slowly the securities held in his name as trustee and turned the proceeds over to Janet. He made no new investments. He continued to receive commissions. After the appointment of Palmer as co-trustee, most of the records of Trust 47-10 were maintained at Janet Adams' office in Pine Plains. She was one of the directors of the trust. Kreulen filed an application for exemption from Federal income tax on behalf of Trust 47-10 with the Internal Revenue Service on July 28, 1959. Kreulen did not contact the Lafayette Trust Company of Easton, Pennsylvania to see if it would serve as successor trustee of this trust. Kreulen, as trustee of Holdeen Trust 47-10 reported annually to the American Unitarian Association the income and expenses of this trust and remitted the expendable income as computed under the terms of the trust. For the year 1957, the report was made by Kreulen and Lester E. Palmer, *440 Jr., as co-trustees. The net assets were reported as valued at $ 191,903.88 on December 31, 1947, and as $ 1,061,422.12 on December 31, 1957. The amount remitted for 1947 was $ 2.09 and for 1957 was $ 1,273.36. Holdeen owned income producing property at 351 East 138th Street, referred to as Davis-Hall, in the years 1951 to 1954. He sold it to his son Roger for little or no cash but with provision for a purchase money mortgage. Roger was paying interest on about $ 50,000 of purchase price. In August 1956, Holdeen suggested selling the mortgage "perhaps coupling a gift transfer of stock at less than cost to a trust so as to rebut tax dept suspicion that I was exploiting trust by dumping on it nonmarketable vendor's lien. " The mortgage was transferred to Trust 47-10. The amount due the trust on the mortgage as of December 31, 1956 was $ 13,225. Under date of December 20, 1956, Lester E. Palmer, Jr., wrote Roger Holden, in part: Enclosed is an agreement of guarantee from you to Kreulen regarding the 351 East 138th Street mortgage. A trust which qualifies for a tax exemption as 47-10, does so on the basis that it has permanently set aside those funds normally subject to taxation for a *441 chartable use. The Courts and the Code itself hold that where a trustee jeopardizes those sums set aside by entering into business transactions with the moneys or investing them in speculative enterprises, the funds might never eventually reach the charity. Therefore, when a tax exempt trust makes such investments they automatically lose their tax exemption. The investment in this mortgage at the time - August 1, 1956 - was such a speculative investment that 47-10 would lose its exemption. However, with a guarantee of collection from you, it could not be so considered. Obviously, the amortization of this mortgage has rendered it safe now for all parties concerned BUT, nevertheless, the trust could still lose its tax exemption; just because the investment turned out all right is not material. Enclosed you will find this agreement which I would like you to sign and return for our 47-10 file. Needless to say, no obligation will ever arise as a result of this guarantee for the mortgage is perfectly good right now but the records must justify the investment. There was some hesitancy about asking you to do this but now I am sure when you understand the tax situation you will not feel offended. *442 HOLDEEN Holdeen did not reside in Pennsylvania at any time. Nor did his wife. Holdeen filed gift tax returns for the years 1953, 1954, 1955, 1957 and 1959. Stella H. Holden filed a gift tax return for 1954. Stella H. Holden maintained some of her husband's books and records during the period 1951 to 1957, inclusive. She also maintained records for real property located at 50 Overlook Terrace, New York City, which was owned by Trust II. Holdeen searched real estates title and sometimes attended closings of real estate sales or pruchases by the trusts. During the years 1951 to 1957 Holdeen recommended parcels of real estate for investments by members of his family and trusts. Sometimes he made a down payment He also told the trustee that if the trustee did not want the property he would take it. In 1955 Holdeen deducted a rental loss for 5 months on real property located at 420 East 10th Street, New York City. During the year he transferred this property to Janet as trustee of the trusts that were in the Ten Funds partnership. The transfer was made between April 22 and June 2. Holdeen conveyed to Audrey, as trustee of the Naylor-Sanford Trust, a building located at 2517-19 Amsterdam *443 Avenue, New York City. On his 1954 income tax return (Form 1040) Holdeen deducted $ 1,023.75 as 11 months' depreciation on this building and $ 605 as 11 months' depreciation of this building's boiler. The transfer was made between October 27 and December 1, 1954. Holdeen acquired real property located at 246-252 Mott Street, New York City, on January 1, 1951. He sold it on January 1, 1954, to Sherley MacPherson, as trustee of the MacPherson-Sanford Trust. During Holdeen's ownership of this property Trust 45-10 owned mortgages on 252 Mott Street. Holdeen did not pay interest or principal on these mortgages. In July 1954, interest in the amount of $ 45 and principal in the amount of $ 952.99 was paid to Janet by Stella H. Holden and Sherley MacPherson, respectively. This paid the obligation in full. On his 1957 income tax return Holdeen deducted a loss in the amount of $ 40,586 attributable to the operation of Lacey Gardens for the last 6 months of that year. The largest investment in a single concern held by members of Holdeen's family and trustees was in stock of the Commodore Hotel. The total amount of this stock so held at any time was less than 10 percent of the outstanding shares. *444 By 1955, Holdeen had transferred all his Commodore Hotel shares to various trusts. All of this stock was sold by 1958 at a substantial profit to the trusts. During the years 1951 through 1957, inclusive, Holdeen donated to the several trusts more than $ 1,000,000 with no economic benefit to himself. Holdeen did not vote any of the stocks held by Janet as trustee. These stocks were voted by Janet or by the brokers under proxies. Janet attended some of the annual meetings of the corporations involved. In 1958 when the Legislature of Massachusetts considered expropriation of Franklin's Boston Fund, Holdeen printed and sent to the members of the Legislature a protest against such action. Holdeen had theories of frugality and thrift. He did not own an automobile. He was opposed to large public debt. He was also interested in phonetics and simplified spelling. On November 8, 1944, Holdeen wrote the American Unitarian Association, as follows: I have had some correspondence with Mr. Percy W. Gardner with regard to a trust agreement naming you as an income beneficiary. Herewith I am sending signed multiple originals of trust agreement dated July 5, 1944 between Jonathan Holdeen as Trustor and *445 Janet Adams and Randal Holden and Jonathan Holdeen as Trustees under which you are income beneficiary and the State of Pennsylvania is remainderman. The assets made subject to this agreement were $ 100,000 face amount bonds of Broadway-Exchange Corporation secured by first mortgage upon 61 Broadway, New York City; $ 8,000 bonds of 870 Seventh Avenue Corp.; 700 shares first preferred stock of Bowman-Biltmore Hotel Corp and 100 shares General Realty and Utility Corporation preferred. I am also sending signed multiple copies of supplementary agreement (44-10A) dated October 7, 1944 adding certain assets to the trust estate. I would appreciate it if you would return a copy of this letter with dated notation of receipt at the foot and also one copy of each of the trust agreements with similar notation. It seems likely that under the reserved power of modification a substantial increase will be made in the amount of presently "expendible" income and it may be that at a somewhat later date American Unitarian Association will be made a substituted trustee but for the present I feel that a larger income will accrue to the trust with the present type of investments in which it would hardly be *446 practicable for you to invest. At the end of each year an accounting to you as to income of the year and assets on hand is contemplated. Any comment which you care to make on the provisions of the trust agreement will be appreciated. Yours very truly /s/ Jonathan Holdeen Holdeen wrote his daughters Haldis and Hildred on February 6, 1952, with reference to certain bonds: Herewith is sent to each of you, check of N Y Trust Co. for $ 5,585.25, received today from N Y Trust Co. in payment of your above bonds. These bonds were assigned to you in 1951 by J Holdeen to be held in trust by you for the maintenance of certain of your children as to income, subject however to a lien held by Grace Bank on said bonds for $ 3,000, and interest at the time of the assignment. This lien was purchased by Janet Adams to whom is due $ 1,500 and perhaps interest, from each of you. In November 1955 Holdeen wrote Hildred Cushing-Murray in part, as follows: If the principal of the trust funds created for the benefit of Cushing-Murray children under the terms of trusts 51-20 and 51-30 was invested in Rurmont and/or the Puerto Rican candle, etc., business, is it not reasonable that there should be an assignment *447 to the trusts of these series gifts of a participation in Rurmont and the fire insurance claim equal to the amount of the children's trust funds. As you know, the children had only the life use of these funds after which the principal became the property of the charitable trust 50-10. Had there been no such charitable remainder, a capital gain tax of perhaps 25% would have been payable so that it was beneficial to the children that there should be a charitable remainder. If the trust is not restored and the transactions are reviewed by the United States Treasury there is danger that they will claim that the remains have been disregarded and the charity is a mere fiction and the 25% will then become payable. Jonathan Holdeen Contributed by Janet BRYANT AVENUE Holdeen was the owner of houses at 1963 to 1985 Bryant Avenue In Bronx County, New York, from 1947 until 1955. The property was subject to prior mortgages. Janet, for Trust 45-10, purchased a mortgage on the property from Manufacturers' Trust Co., at a discount for approximately $ 80,000 in 1948. Sherley for MS and Audrey for NS purchased such mortgages in the amount of $ 20,000 each. On one occasion when Holdeen was visiting Audrey *448 at Oakland he examined her records and wrote on her entry for this property "Why no int. collected?" Holdeen's income tax returns show annual payments of interest on the Bryant Avenue property and report the cost of the property as $ 316,000. Interest reported as paid in 1951 included $ 6,120 shown as paid to "MS." MS records show receipt of interest on Bryant Avenue mortgage by checks from Holdeen, for 6 percent interest on $ 34,000 as follows: 4/21/48
$ 2,040
3/ 4/49
2,040
7/10/51 (3 years)
6,120
12/19/52
2,040
1/ 4/54
2,040
10/29/54
2,040
MS records also state: 12/13/54 sold interest in mortgage. received JH check $ 20,000 In 1952 Janet inquired of Randal whether Holdeen's equity in Bryant Avenue exceeded $ 85,000. Respondent valued the property as of December 31, 1953 at $ 460,000 subject to mortgages of $ 304,563, or a net value of $ 155,437. In June 1954 Janet remitted to Holdeen $ 5,648.97, representing rental income from the Bryant Avenue property for 1950 which she had collected from James Cushing-Murray who had been manager of the property in 1950. Holdeen wrote Janet on December 7, 1954, that it appeared from certain records that Janet, on February 13, 1948, advanced through Randal *449 to Manufacturer's Trust Co., toward the purchase of mortgages for 1965 and 1975 Bryant Avenue the amount of $ 61,833.13. He commented "Whether JH ever paid Janet any part of this is unknown. No book record has been found." Shortly thereafter he wrote that NS and MS trusts had advanced $ 20,000 each for an interest in these mortgages and that he proposed to purchase their interests. He concluded that Janet had advanced $ 79,000 from Trust 45-10 by a note which she paid November 22, 1948, and that there was no record of interest payments to the trust. He said consideration should be given to the question whether the 6-year statute of limitations did not bar the claim, and that any claim to a mortgage debt payable in cash may not be free from reasonable doubt. He wrote that he might through sympathy with Trust 45-10 donate perhaps $ 100,000 in stock. Janet was unable to locate records of the transaction and believed that Trust 45-10 had lost $ 80,000. In December 1954 Holdeen paid Audrey $ 20,000 for NS and Sherley $ 20,000 for MS to purchase their certificates. In February 1955 he paid Audrey $ 3,600 as interest and in July 1955 paid her $ 4,250 as interest. On September 26, 1955, Janet *450 wrote "* * * it seems to me that if the house [Bryant Avenue] were transferred to 45-10 any errors would be coated over on the theory that 45-10 would be redeeming its outlawed loan of? for which it borrowed $ 80,000." In January 1956 Holdeen transferred the Bryant Avenue property to Janet, for Trust 45-10, MS and NS Trusts. Audrey paid $ 41,000 for an interest for NS in August 1956. Janet sold the Bryant Avenue property in October 1958 for a gross price of $ 600,000. It was subject to an existing first mortgage of $ 200,000 and a purchase money mortgage of $ 360,000 to Janet for the trusts. LACEY PARK In 1957 Lester Palmer, as co-trustee of Trust 47-10, made a bid to the Federal Housing Administration for the Lacey Park property in Hatboro, Pennsylvania, which was offered for sale. The bid was in excess of $ 3,000,000. When he was successful upon the bid, he deemed it too much to handle. Janet, a director of the trust, was also apprehensive as to the investment. She asked her father to relieve the trust. Holdeen and Elias, as equal partners, agreed to take the property. They gave a mortgage and transferred stock of Chicago & Eastern Illinois Railroad Co., as security to Trust 47-10. *451 The trust participated in the purchase to the extent of a loan of $ 217,541. Other family members loaned $ 50,000 more. Title was taken by Bella Angel, the mother of Gabriel Elias, as a nominee. ON May 29, 1957, Holdeen wrote members of the family concerning recent purchases jointly with Gabriel Elias of Government housing listing properties referred to as: Wentworth Acres Portsmouth, New Hampshire
Lacey Park Hatboro, Pennsylvania
Southview HomesSpringfield, Vermont
The total prices were in excess of $ 5,000,000, but Government mortgages of 80 to 88 percent of the prices were involved. Elias subsequently moved to Hatboro, Pennsylvania, to take charge of the property at Lacey Park. Interest was paid on the mortgage to Trust 47-10 in 1958 in the amount of $ 6,328. In 1959 the outstanding loan was reduced to $ 105,977. 1958 LOANS In 1958 the Internal Revenue Service made transferee assessments against Trusts 47-10 and 55-10, among others, with respect to the tax liability determined against Holdeen for the years 1947-1950. With the consent and at the solicitation of the New York Regional Counsel of the Service, these two trusts paid over to the Government the amount of their transferee *452 assessments and Holdeen gave each trust a note for the appropriate amount bearing 6 percent interest and secured by adequate collateral. Janet loaned $ 300,000 from the Ten Funds' account. The trust received some cash and real estate the value of which more than covered the remainder of the loan and interest. The principal was repaid before September 1958. Janet did not allot any amount as interest for this loan in the tax returns for the period. Kreulen paid $ 265,717 to the Service from the funds of Trust 47-10. He treated this as a loan to Holdeen. No interest was paid during 1958. Interest was paid in 1959 in the amount of $ 22,320. Interest was paid in later years. Holdeen repaid the loan with interest in 1964. Holdeen suffered from ulcers. He was hospitalized from December 28, 1952 to January 15, 1953 at Brooklyn. He was later hospitalized for surgery at Sharon, Connecticut from January 13 to February 18, 1954. He was bedridden thereafter for the best part of a year. In the 1954 income tax return of Holdeen and his wife medical expenses of $ 2,889.19 were shown including hospital expense of $ 1,242.69. In October 1953 the Department of Health of the State of New York requested *453 the signature of Holdeen upon a certain order. In July 1954 Janet replied stating: "Due to the fact that my father was quite ill last fall and winter, we have only recently had the chance to get the order signed." The net worth of Jonathan Holdeen and Stella H. Holden as of December 31, 1953, as computed by respondent was as follows: Jonathan Holdeen
Assets
Cash
Stissing National Bank
$ 17,128.00
Corn Exchange National Bank
2,450.00
Grace National Bank
2,139.00
Bronx CountyTrust Co.
2,856.00
H. C. Wainwright & Co.
18,397.00
Baker Weeks & Co.
12,649.00
Total
$ 55,619.00
Stocks
2,068,058.38
Bonds
333,656.56
Mortgages
5,495.00
Real Estate
590,897.00
Total
$ 3,053,725.94
Liabilities
2,569,422.07
Net Worth
$ 484,303.87
Stella H. Holden
Assets
Cash
$ 9,956.00
Stocks
81,759.63
Loans and mortgages
12,423.37
Real Estate
58,938.00
Total
$ 163,077.00
Liabilities
-0-
Net Worth
$ 163,077.00
Total Net Worth
$ 647,380.87 The liabilities included bank loans amounting to $ 604,000, brokers' loans of $ 624,621.35 and income tax deficiencies and interest for the years 1945 through 1953 aggregating $ 1,302,743.22. Jonathan Holdeen made charitable gifts for the years 1951 through 1956 in the following amounts: 1951
Net Fair Market
Assets Transferred
Donee
Value of Gift
Holdeen Fund
400 shares 50 Broadway, Inc. stock
51-10
$ 5,600
5-1/2 M Bonds Master Printers Bldg. bonds
51-1)
50 shares of Master Printers Bldg. stock
51-1)
3,100
400 shares 50 Broadway Inc. stock
51-2
5,600
400 shares 50 Broadway, Inc. stock
51-2M
5,600
5-1/2 M Bonds Master Printers Bldg. bonds
51-4)
3,100
50 shares of Master Printers Bldg. stock
51-4)
400 shares 50 Broadway, Inc. stock
51-5
5,600
400 shares 50 Broadway, Inc. stock
51-14
5,600
400 shares 50 Broadway, Inc. stock
51-17
5,600
400 shares 50 Broadway, Inc. stock
51-20
5,600
400 shares 50 Broadway, Inc. stock
51-21
5,600
400 shares 50 Broadway, Inc. stock
51-22
5,600
400 shares 50 Broadway, Inc. stock
51-25
5,600
400 shares 50 Broadway, Inc. stock
51-26
5,600
400 shares 50 Broadway, Inc. stock
51-28
5,600
400 shares 50 Broadway, Inc. stock
51-29
5,600
400 shares 50 Broadway, Inc. stock
51-30
5,600
400 shares 50 Broadway, Inc. stock
51-32
5,600
400 shares 50 Broadway, Inc. stock
51-33
5,600
200 shares 50 Broadway, Inc. stock
51-34
2,800
200 shares 50 Broadway, Inc. stock
51-34A
2,800
400 shares 50 Broadway, Inc. stock
51-35
5,600
400 shares 50 Broadway, Inc. stock
51-36
5,600
13-1/2 M 18 E. 41st Building Corp. bonds
51-37
4,800
13-1/2 M 18 E. 41st Building Corp. bonds
51-38
4,800
1952
97M bonds 165 Broadway Co. Inc.
52-10
37,500
400 shares Celanese Corp. of America stock
52-1 and 4
8,000
1953
1100 shares Chicago E. I. Bonds
47-10
$ 4,502.21
800 shares Marion Power Shovel
47-10
8,145.50
1410 shares Eastern Office, Inc. stock
53-10
86,000.00
(Graybar Building)
125 M General Mortgage Bonds of 165
53-10A
78,125.00
Broadway Building, Inc.
60 General Mortgage Bonds of 165
53-10B
37,500.00
Broadway Building, Inc.
All his right, title and interest in the
53-10C
15,000.00
last will and testament of Alice E.
Burton and in a 1/9 share of the
bonds and stocks held by San Diego
Trust Co. as trustee for trustor
and others as of July 1953
1 M Park Avenue and 91st Bonds
53-39
3,000.00
200 shares Marion Power Shovel Co. stock
53-40
2,400.00
1954
800 shares B & O RR stock
47-10
600.00
8000 shares 50 Broadway Bldg. Inc. stock
54-50
104,000.00
1000 shares 50 Broadway Bldg. Inc. stock
54-50A
13,000.00
5000 shares Equitable Office Building
54-120
4,500.00
Building Corporation stock
1000 shares 50 Broadway Bldg. Inc. stock
54-LIH
13,000.00
326 shares 50 Broadway Bldg. Inc. stock
54-2M
4,238.00
700 shares 50 Broadway Bldg. Inc. stock
54-18
9,100.00
400 shares Equitable Office Building
54-21A
410.00
Inc. stock
550 shares Equitable Office Bldg. stock)
54-32
2,420.00
2 shares Textile Realty Corp.)
100.00
550 shares Equitable Office Bldg. stock)
54-33
2,420.00
2 shares Textile Realty Corp.)
100.00
400 shares Equitable Office Bldg.
54-33A
410.00
Corp. stock
400 shares Equitable Office Bldg.
54-39
410.00
Corp. stock
400 shares Equitable Office Bldg.
54-41
410.00
Corp. stock
1955
37,764 shares Commodore Hotel, Inc. stock
55-10
511,196.00
1956
99M Chicago & E. I. Bonds
56-10
$ 7,000.00
500 shares City Investing Co. stock
56-10
9,400.00
10 M Chicago, Milwaukee, St. Paul &
56-10
6,600.00
Pacific, Inc. "A" bonds
147-1/2M 165 Broadway Bldg. Inc. bonds
56-15
86,000.00
2700 shares Curtiss Publishing Co. stock
56-15A
5,962.50
900 shares Bangor & Aroostock R.R. Co. stock
56-15B
38,200.00
1200 shares Bing & Bing Inc. stock
(56-4
34,800.00
(56-8
(56-20
1 instrument
(56-30
(56-37
*454 The approximate values of the assets of certain trusts at the dates listed, in thousands of dollars, were: Year
I
II
45-10
47-10
55-10
NS
MS
1945
27 a
1946
80 b
86 c
155 d
1947
189 e
1948
142 f
278
192 g
95 i
1949
213 h
1950
1951
218 j
1952
566
1953
558 k
518 k
399 m
182 i
1954
197 m
270 m
696 m
567 m
218 i
1955
511 c
213 i
1956
840 n
834 n
252 i
1957
1,061 g
268 i
1958
750
879 i
247 i
Holdeen and his wife paid over $ 125,000 in Federal income taxes for the years 1951-1956. They claimed a loss for 1957. In May 1958 Holdeen testified in the U.S. District Court for the Northern District of New York in his action to recover income taxes paid with respect to the year 1945. In the course of his testimony he said, in recent years he could not do much investing for himself but had been investing for members of "our clan." In testimony in 1960 concerning his liability for taxes for 1946 he said he had not borrowed from the trusts. Jonathan Holdeen and Stella H. Holden filed joint Federal income tax returns on the cash basis for the calendar years 1951 to 1957 inclusive, with the collector or district director of internal *455 revenue at Albany, New York. Janet Adams helped to prepare these returns. The returns included the following amounts of income, gains and (losses): 1951
1952
1953
1954
Income Included:
Dividends
81,290.50
83,259.25
90,556.80
118,366.55
Interest 12,649.39
13,323.01
27,306.98
25,695.68
Professional
Income
(880.87)
(2,715.10)
(1,341.61)
(1,326.02)
Capital Gain,
Gross
56,963.96
10,658.79
(335.89)
9,273.42
Rents
(24,817.39)
(41,662.79)
(35,787.18)
(72,363.21)
Number of
Rental Prop-
erties
23
23
27
22
Expenses In-
cluded
Contributions
14,000.00
27,527.00
16,000.00
15,000.00
Interest Expense
22,103.08
23,874.42
34,514.37
47,876.81
Tax
20,382.15
27,117.85
8,958.96
1,497.04
1955
1956
1957
Income Included:
Dividends
125,044.00
101,344.26
102,739.85
Interest 14,423.00
15,371.46
12,070.16
Professional
Income
(5,475.32)
(5,545.60)
(1,682.73)
Capital Gain,
Gross
2,094.00
33,383.27
199.26
Rents
(6,578.00)
4,525.73
(33,715.00)
Number of
Rental Prop-
erties
14
5
6
Expenses In-
cluded
Contributions
26,711.00
26,000.00
16,000.00
Interest Expense
51,108.00
not shown
76,801.40
Tax
20,953.00
11,908.07
none The income tax returns reported the following contributions: 1951
Trust II $ 23,000; 51 series $ 78,000
1952
Trust 52-10, $ 12,527; 51-10 $ 15,000
1953
Holdeen Fund 53-10, $ 16,000
1954
Holdeen Fund 54-50, $ 15,000
1955
Holdeen Fund 55-50, $ 26.711
1956
Holdeen Fund 56-15, $ 26,000
1957
Holdeen Trust I, $ 16,000
1957
Holdeen Trust II, over $ 5,000
In *456 determining the deficiencies in the Estates cases the respondent included in the income of Holdeen and his wife the income of the trusts which had income in the taxable years. These included Trusts I, II, Naylor-Sanford, MacPherson-Sanford, 45-10, 46-10, 47-10, 50-10, and Adams-Lincoln for all years, Trusts 54-120, Adams-Graybar, and Adams-125 Broadway for the years 1954 through 1957 and Trusts 55-10, Adams 50 Broadway and Adams-Commodore for the years 1955 through 1957, and over 20 other trusts in each year. Respondent also disallowed the deductions claimed for contributions made to the trusts. The trust income determined as taxable to Holdeen and his wife was in the following amounts: Date
Amount
1951
$ 227,105.14
1952
215,652.17
1953
276,896.30
1954
588,181.75
1955
357,093.27
1956
443,500.00
1957
660,019.33 ULTIMATE FINDINGS OF FACT AS TO ESTATES CASES Jonathan Holdeen, individually, and jointly with Stella H. Holden, intended to, and did, create valid and genuine trusts. In Trust 45-10 and all later trusts Jonathan Holdeen reserved no rights or powers of ownership or control. He did not possess or exercise any powers of ownership or control in these trusts in the years 1951 through 1957. In the *457 MacPherson-Sanford and Naylor-Sanford Trusts Jonathan Holdeen released in 1945 all prior retained powers. He did not possess or exercise any powers of ownership or control in the years 1951-1957. The powers which Jonathan Holdeen retained in Trusts I, II, and III were renounced by him in December 1953. He did not possess or exercise any powers of ownership or control in these trusts after that date. Additional Findings of Fact re Trusts
Trust II filed fiduciary income tax returns (Forms 1041) for the calendar year 1949; the taxable period January 1, 1952 through June 30, 1952; and the taxable years ending June 30, 1953, 1954, and 1955. For the taxable year ending June 30, 1956, a fiduciary income tax return was filed that reported the combined income of Trust II and Trust I. All of these returns were filed with the district director in Albany, New York. The taxable years in issue are the calendar years 1948 through 1951; the period January 1 through June 30, 1952; and the fiscal years ending June 30, in 1953, 1954, 1955, and 1956. During each of these taxable years Trust II used the cash receipts and disbursements method of accounting. Janet Adams, as trustee, commingled the assets *458 of Trust II with those of Trusts I and III. Deeds to parcels of real property owned by Trust II were not usually recorded. In 1951 Holdeen transferred to Trust II certain property with a fair market value of $ 23,000. On April 15, 1957, Holdeen transferred bonds worth $ 35,275 to Trust I and II. He transferred an interest in an estate worth $ 7,400 to these two trusts on July 5, 1957. James Cushing-Murray managed several buildings owned by Trust II, including properties located on West 114th Street and West 116th Street. As of March 17, 1952, James Cushing-Murray had not paid Trust II the 1949 rental income from its properties that he managed. As of March 26, 1953, he owed Trust II the 1951 rental income from the 116th Street property in the amount of $ 6,479.80. He also had not paid Trust II the 1952 rental income from this property and the 114th Street property. Trust II loaned $ 9,000 to James Cushing-Murray in 1949. Subsequently, some principal was paid, but the balance of this loan had not been repaid as of April 1, 1952. On September 15, 1951, Trust II loaned $ 50,000 to James Cushing-Murray. This loan was secured by a mortgage on a shopping center. As of November 3, 1952, no *459 interest had been paid on this mortgage. On June 29, 1954, Trust II loaned James Cushing-Murray $ 3,000. This loan was still outstanding as of September 30, 1954. Trust II owned mortgages of which James Cushing-Murray was the mortgagor. As of September 15, 1953, no interest had been paid on some of these mortgages. Janet believed that Trust II would have to write off some of these mortgages because they were worthless. Holdeen advised the trustees of all the trusts to "keep their money working". Janet tried to keep all funds invested and to avoid having any money idle. She expressed disappointment upon learning that Audrey had money in the bank. The capital gains of the trusts were within a reasonable time reinvested in property acquired and held for the production of investment income. In August 1952 Janet entered into a stipulation with Hildred and James Cushing-Murray under which Janet received $ 50,000. She elected to apply $ 12,075 in payment of interest and the balance upon principal of certain mortgages owed by the Cushing-Murrays. In January 1953 Janet wrote Audrey Naylor: Re Trust Income outlook All trusts will be in the hole for 1952-53. Violations are very severe. We are *460 going to try to sell as fast as possible this spring (That's not very fast). Also there seems every indication for rent increase which might more than offset our hardships. However figure on it being bad. Dad also does talk of '53 series gifts. The lists of interfamily and inter-trust loans prepared by Janet show the following under the dates given. March 1953
Cushing-Murray owes Trust II 3 items aggregating about $ 9,700 November 1953
Trust II owes JH 6M Trust II owes Baker-Weeks, see statements Trust II owes 50-10 $ 4,000 NS owes Trust II $ 6,000 NS owes Trust II $ 6,028.57 Jim owes Trust II see survey January 1954
Jim owes Trust II 149 M see survey Trust II owes Baker-Weeks 127 M June 1954
Trust II owes Baker-Weeks 127M The income of Trust II as computed by respondent was as follows: Holdeen Trust II
Gross Ordi-
Distribution
Capital
Ordinary
Year
nary Income
Expenses
Deduction
Gain
Income
1948
$ 12,760.61
$ 478.00
$ 12,282.51
$ 35,182.28
0
1949
19,141.33
1,737.34
15,483.97
12,214.99
$ 1,920.02
1950
29,397.51
1,962.12
26,488.89
18,598.84
946.50
1951
36,860.34
6,521.11
22,400.00
0
7,939.23
1/1-6/30/52
6,968.75
3,435.63
4,485.51
14,421.65
0
TYE 6/30/53
28,975.05
5,883.97
19,215.35
9,825.58
3,875.73
TYE 6/30/54
31,632.76
7,044.79
24,852.70
28,335.01
0
TYE 6/30/55
26,725.12
1,262.31
20,769.21
43,591.70
4,693.60
TYE 6/30/56
30,668.27
541.20
17,082.38
66,457.16
13,044.69
Trust *461 45-10 filed fiduciary income tax returns (Form 1041) for the calendar years 1951, 1952, 1956, 1957, 1958, 1959, 1961, 1962 and 1964. The Trust filed an amended fiduciary income tax return for the calendar year 1964. All of these returns were filed with the district director in Albany, New York. Trust 45-10 filed a fiduciary income tax return for the calendar year 1954 with the district director in Upper Manhattan, New York. During each of the calendar years 1949 to 1964, inclusive, Trust 45-10 computed its taxable income by using the cash receipts and disbursements method of accounting. The amounts Trusts 45-10 and 55-10 distributed to charity were paid to the American Unitarian Association and its successor, the Unitarian Universalist Association, herein referred to as the AUA and the UUA, respectively. These are organizations contributions to which are deductible under the Internal Revenue Codes of 1939 and 1954. TRUST 45-10
Major investments as of December 31, 1952
Shares
Stock
8,816
Duplan
$ 119,445
5,670
Seatrain
57,550
547
LeTourneau
35,677
9,756
Commodore Hotel
66,163
5,900
CNV Stock
36,300
4,614
Lamston
30,684
1,600
NYC Stock
22,400
5,260
50 Broadway
21,291
Total
$ 557,535
The income of Trust 45-10 as *462 computed by respondent was as follows: Holdeen Fund 45-10
Gross Ordi-
Charitable
Capital
Ordinary
Year
nary Income
Expenses
Contributions
Gain
Income
1949
$ 17,064.67
$ 1,525.31
$ 192.80
$ 3,117.21
$ 15,346.56
1950
26,439.95
2,504.97
335.07
39,763.29
23,599.91
1951
32,770.67
1,414.60
512.96
16,999.84
30,843.13
1952
38,9 31.17
2,199.14
661.17
16,805.49
36,070.80
1953
29,697.47
2,281.97
511.05
53,619.54
26,904.45
1954
40,371.02
3 ,774.16
950.37
173,822.92
45,696.49
1955
63,903.59
7,491.63
0
11,659.28
56,411.96
1956
60,006.98
8,471.70
0
29,734.02
51,535.28
1957
56,166.82
9,375.30
1,941.00
82,730.40
44,850.52
1958
48,874.97
2,990.00
1,268.00
262, 672.06
44,616.97
1959
54,286.84
3,270.00
1,434.00
8,413.60
49,582.84
1960
44,098.35
1,999.00
0
33,782.75
42,0 99.35
1961
57,919.04
2,857.00
2,640.00
9,359.42
52,422.04
1962
49,477.61
3,626.00
1,887.00
23,980.78
43,964.61
1963
52,832.28
3,547.00
0
32,374.86
49,285.28
1964
69,616.86
3,345.00
1,228.08
47,214.32
65,043.78 Trust 55-10 filed fiduciary income tax returns (Form 1041) for the calendar years 1956, 1957, 1958, 1959, 1962 and 1964. Trust 55-10 filed an amended fiduciary income tax return for the calendar year 1964. All of these returns were filed with the district director of internal revenue in Albany, New York. During each of the calendar years *463 1956 to 1964, inclusive, Trust 55-10 computed its taxable income by using the cash receipts and disbursements method of accounting. The income of Trust 55-10 as computed by respondent was as follows: Holdeen Fund 55-10
Gross Ordi-
Charitable
Capital
Ordinary
Year
nary Income
Expenses
Contributions
Gain
Income
1955
$ 8,329.20
$ 1,163.00
0
$ 1,705.11
$ 7,165.20
1956
59,565.74
7,416.77
0
29,515.38
52,148.97
1957
55,753.83
6,917.57
85.00
82,122.08
48,751.26
195 8
48,515.60
1,493.00
129.00
260,740.66
46,893.60
1959
53,887.68
1,524.00
193.00
8,351.73
39,056.00
1960
45,76 4.52
1,241.00
0
35,059.18
44,219.00
1961
60,107.42
1,537.00
479.00
9,713.06
59,110.00
1962
51,140.70
1,881.00 420.00
24,786.83
32,536.00
1963
54,608.15
1,599.00
0
33,463.10
53,009.15
1964
71,956.95
1,599.00
1,269.36
48,801.38
69,038.59 ULTIMATE FINDINGS OF FACT IN TRUST CASES Trust II permanently set aside its capital gains for educational or public purposes in the taxable years ended June 30, 1955 and 1956. Such capital gains were reinvested within a reasonable time in property held for the production of investment income. The amounts permanently set aside by Trust II were not unreasonable in amount or duration; were not used to a substantial degree for noncharitable purposes, and were not *464 invested in such a manner as to jeopardize the interests of Hartwick College, or the Commonwealth of Pennsylvania. The income of Trusts 45-10 and 55-10 was paid in part to the American Unitarian Association, or its successor, the Unitarian Universalist Association, and the remainder of such income was retained by the trusts for the current charitable uses of these organizations. OPINION The Estates of Jonathan Holdeen and Stella H. Holden
(1) In these cases the principal issue is whether the income realized in the taxable years 1951 through 1957 by some 50 trusts created by Jonathan Holdeen or by Holdeen and his wife is taxable to the grantors. In the notices of deficiency respondent alleged (1) that the gifts in trust were void ab initio by reason of the period of accumulation and the remoteness of vesting, and (2) that the net income of the trusts was taxable to the grantors by reason of Holdeen's ownership and control of the trust corpus after the transfers. At the hearing and on brief respondent abandoned his contentions based upon the period of accumulation and remoteness of vesting, and argues (consistent with his second amended answer) that the trusts were void ab initio because *465 Holdeen and his wife had never created, nor intended to create, any valid trusts. The petitioners contend that Holdeen and his wife did intend to create valid trusts. (2) A second issue in these cases is whether certain contributions made to some of the trusts in the taxable years 1951-1957 are deductible as claimed. INTENT TO CREATE TRUSTS Respondent contends that Holdeen did not create or intend to create any valid trusts, that while these trust agreements may have been valid under state law, when the motives, the trust terms, the selection of trustees, and the administration of the funds are considered, it must be concluded that the trusts were shams for Federal tax purposes. While Holdeen's apparent motive in the peculiar provisions for 500 or 1,000-year trusts was to effectuate his plans for cumulative endowment, in actual conduct it was tax avoidance. If no taxes were paid he and his family would receive more income than if taxes were paid. Only an infinitesimal amount was paid to the American Unitarian Association or to the college beneficiaries in the early years. Therefore the charitable provisions were only window dressing. Some 51 trusts and amendments thereto are herein *466 involved. The many trusts with similar terms indicate that they are illusory. Some were captioned incorrectly; some were not executed; two documents were executed for a single trust; some assets were not transferred to the trustees, and some assets were not in the possession of Holdeen at the time the agreement was executed. Holdeen filed gift tax returns beginning with 1953 and probably filed none earlier. Such failure to file raises the question of intent to create trusts. Respondent contends that prior testimony of Holdeen indicates that he knew the terms of the trusts would not be followed and that the accumulation provisions might be invalidated. Respondent also says that Holdeen knew none of the trusts would be administered in Pennsylvania or incorporated under Pennsylvania law, that he planned to direct all the activities from New York, and in four of the trusts the corpus must be located in Pennsylvania in order to determine the expendable income. The banks and trust companies in Pennsylvania designated as successor trustees were not contacted in any case. Respondent says the trustees were not qualified for their responsibilities and all were members of the family except for *467 Kreulen and Palmer. Respondent argues that the trustees of the MacPherson-Sanford and Naylor-Sanford trusts had no power to make loans but the trustees never hesitated to provide funds on request. Sherley and Audrey received instructions from Janet Adams and Janet was controlled by Holdeen. Kreulen was not qualified since he had never held a position of responsibility before. Respondent says that Holdeen borrowed funds from the trusts. Respondent argues that other indications that the trusts were shams are that some trusts never received the assets designated as corpus, Janet Adams had 10 brokerage accounts for 100 trusts, no bank records or brokerage accounts were held in the name of the trusts and Janet executed a false document concerning ownership of brokerage accounts which her broker knew was false. The fact that Janet paid the American Unitarian Association from five trusts by a single check 15 months late indicates the trust was not operated for the benefit of the charity. The appointment of Brisson and Elias as directors of some of the trusts was solely to add substance. Furthermore, trading on margin by the trustees was not authorized in the agreements although it was always *468 done. The provisions in some trusts that the property might stand in the name of the trustee was not authority to commingle. Titles were held in the name of a dummy corporation or in the name of the trustee as an individual. This did not comply with the law of New York requiring title of trust property to be held in the name of the trust. Applications for exemptions from taxes for trusts established in 1945 and 1947 were not filed until 1959 or later. None of the trust deeds were recorded before 1951. Respondent cites Emil Morton,46 T.C. 723 (1966); Roy C. Acuff,35 T.C. 162 (1960), affirmed per curiam 296 F.2d 725 (C.A. 6, 1961) and Herman Paster,T.C. Memo. 1961-240. In these cases purported trusts were not recognized as valid and subsisting for tax purposes. In all of these cases the property designated as a trust corpus was an interest in the business operated by the grantors. The properties were not conveyed to the trusts as such and the grantors continued to hold, manage and control the properties as though the trust agreement had not been written. Also, there were no distributions made to beneficiaries who were minor children of the grantors. In Acuff, supra, we stated: Respondent *469 argues that petitioners may be taxed on the income of the trust under either section 674, relating to the power to control the beneficial enjoyment of the corpus or income, or section 675, relating to retention by the grantor of specified administrative powers. Had this trust and partnership been established other than on paper we would have to decide whether, under the entire setup as envisioned by the trust and partnership agreements and as actually conducted by the donors as partners and trustee, the grantors of the trust retained any of the powers that would permit taxation of the trust income to them under section 671 of the 1954 Code or would require taxation of the trust income to them under the Clifford regulations and cases decided under the 1939 Code. But, we think it is clear that where the trust and partnership have no substance and the grantors continue to hold, manage, and control the properties as though the trust and partnership agreements had not been written, these questions need not be answered. While we recognize that section 671 of the 1954 Code appears to limit more specifically than did the socalled Clifford regulations the taxation of income of a trust to the *470 grantor solely on the grounds of his dominion and control over the trust, we think that in these donated trust-family partnership situations, the first and basic question remains the same under the 1954 Code as it was under the 1939 Code, being whether the fiduciary partner was the real owner of the partnership interests which the parent-donors claim they gave him. Henry S. Reddig,supra; [30 T.C. 1382]Jack Smith,32 T.C. 1261. If there was no bona fide gift of a partnership interest, or of the assets which were put into the partnership under the overall plan, the trustee will not be recognized as either the owner of the partnership interest or as a partner, and the donors will be taxed on all of the partnership income. [35 T.C. 174]
The foregoing cases are readily distinguishable from the present case where the grantor was not a trustee, where property was actually transferred to the trustees, where the beneficiaries of the trusts were the donor's grandchildren, charitable organizations and the State of Pennsylvania, and where payments were made to the individual beneficiaries and the American Unitarian Association. The trustees here received, bought and sold securities, purchased *471 and managed rental properties, collected rents, interest and dividends, maintained bank and broker's accounts, filed fiduciary tax returns, accounted for the incomes, and made payments to individual and charitable beneficiaries. Though in many instances inept, there was nothing sham about their administration. The respondent did not call any witnesses and relies primarily upon a number of exhibits which are copies of memoranda from Janet Adams' files. Respondent's contention that these trusts were shams, as well as the following contention that, if real, the trusts were subject to Holdeen's ownership and control, is based in large part upon the interpretation of a number of these exhibits. In the investigation of this case the respondent's agents examined the records maintained by Janet Adams at Pine Plains. She gave them free access to all of her accounts and upon request arranged to have some of the records maintained by her sister, Audrey Naylor, at Oakland, Maryland, for the Naylor-Sanford Trust, sent to her for this examination. The agents borrowed from her files for copying approximately 600 documents and checks. In the course of preparing a stipulation of facts the respondent *472 produced copies of 153 documents and of 21 checks which were attached to a proposed stipulation. In a proceeding on October 21, 1970, under then Tax Court Rule 31(b)(5), the Court ruled that these documents marked as exhibits 71-BS to 244IJ were admitted. In the trial approximately 50 of these documents were discussed in the course of respondent's examination of witnesses and 12 others were discussed in the petitioners' examination. In the respondent's brief a considerable number of the other exhibits in this group were referred to and are made the basis of requested findings of fact. On April 12, 1972, petitioners filed a motion for clarification of the record in which it was argued that those documents not considered at the trial cannot be considered as evidence before this Court and that the decision of the Court relative to the admission of such documents was that they were admitted as part of the stipulation but were not in evidence until offered specifically. The petitioners contend that respondent is relying more extensively on those documents which were not the subject of examination at trial with the authors then present than upon testimony or documents which were considered *473 at the trial. The Court ruled on May 2, 1972, that all such documents attached to the stipulation were in evidence and that the weight, relevancy or materiality of any such document might be argued on brief. The petitioners contend that this is not due process, that it places an unfair burden on them to rebut on brief the applicability of individual documents selected by the respondent. Although marked as joint exhibits these are essentially respondent's exhibits. Respondent says that certain of these exhibits show that the purported trusts were shams. Respondent refers to a note by Janet Adams on December 10, 1954, concerning deductions for depreciation on a property after its acquisition from a former owner. She wrote "The Trust I beneficiaries were habitually robbed on this type of thing. We can only sit back and wait for the government to disallow. * * * Guess we can't do this legally but we may get away with it? Since there is no tax theoretically lets take it and get the government to disallow." On January 14, 1956, Janet wrote her sister, Audrey, "Ordinarily I would have you make a transfer from you to Dad but since this activity was supposed to have taken place before October *474 27, 1954, it would be nice if we used Garrett check #s without referring to the date on some of our stuff so as not to alarm the Treasury or others." On January 12, 1952, Janet asked her father's advice about notifying trust remaindermen saying the chief reason for doing this would be to give the trusts a bona fide look. Janet wrote her father concerning his liability for interest on a loan, "Maybe I just have to let you decide what to do rather than run the risk of your being accused of using trust funds for your own." Respondent says these quotations clearly show that Janet Adams knew the purported trusts were shams. Respondent argues that Holdeen also knew that the trusts were shams. He wrote his brother on October 12, 1953, "* * * it occurs to me that it is better not to have Janet give a check to a Holden on the lime loan as Internal Revenue might be suspicious * * *." On January 4, 1958, Holdeen wrote: "If I am to receive $ 2,800, it may look better to Internal Revenue if I receive it before imminent payment to trustee of $ 13,000 * * *." These are primarily memoranda written by persons who are continually corresponding, sometimes verbally. The single note does not tell the full *475 story, and without further evidence related to the transaction may be misunderstood. They are only a fraction of the entire correspondence. It is understandable that when Jonathan Holdeen and Janet Adams have had their records examined frequently by respondent's agents they will occasionally note concern as to the view the Internal Revenue Service may take of some of their actions. In a number of these memoranda the respondent misinterprets the facts. In 1949, Holdeen transferred New York Central stock to Trust 45-10. The trust suffered a loss on the sale of this in 1950. In 1954, Janet wrote her father about this saying: In other words, the transfers were by no means all for evasion of capital gain. (I do hope they [Internal Revenue Service] do not look around and decide they [the transfers] would be a device for your dumping worthless stuff?) This has happened at other times. Respondent says this shows that Holdeen "dumped worthless stuff" upon the trusts. It is difficult to understand why the gift of a valuable property would be deemed worthless. The specific instance involved was one in which the market price of the property fell after the transfer. Such an event was not predictable *476 and does not support the accusation. Janet testified that she was needling her father about the earlier circumstance. Respondent makes a similar point about Holdeen's remark concerning "tax dept. suspicion" that he was exploiting a trust by dumping on it a nonmarketable vendor's lien. The property transferred to the trust was a mortgage of $ 50,000 and while it might be difficult to sell this, Holdeen intended to transfer certain stock at less than cost to the trust to alleviate the hardship. This was not exploiting the trust as the note implied. Respondent refers to a memorandum by Janet stating "What we propose to do is probably not legal but I am sure you're willing to take the chance." The proposal was that the trustees pay Hildred Cushing-Murray her part of the trust income in quarterly installments instead of annually. Respondent refers to a memorandum by Janet regarding a check for $ 27,000 to Holdeen issued in January 1951: "This will have to be straightened out. The Government would love to catch Dad at a snatch like this." Janet thought that the check appeared to be a loan to her father. It was found that this was in repayment of an amount advanced by Holdeen in December *477 1950 for the purchase of Overlook Terrace for Trust II. Respondent refers to a memorandum by Janet to her father stating that in preparing his income tax return she declared his December gift to Trust 45-10 at $ 15,000 "but I think I picked the figure out of the blue." Respondent agreed that $ 15,000 was the value of the property at the time of the gift. This valuation was low. About 1 year later the property was sold for more than $ 27,000. The incidents referred to in these notes are not described in full and it is by no means certain that illegal acts or questionable acts have been committed. Even if so, that might be a matter calling for adjustments of income, but they do not amount to evidence of lack of intent to create valid trusts, or of ownership by Holdeen. Respondent refers to a note by Janet in which she asks the location of the seal of the Westchester Mortgage Co., one of the dummy corporations sometimes used by Holdeen. In this she remarked: "Dad intimates certain deeds were sort of forged with the use of this seal." Respondent considers that this is evidence of sham character of the trusts. The quoted part of the document is inadmissible hearsay. Even though under the *478 stipulation it is conceded authentic as one of Janet's business records it refers to no specific act, occurrence, transaction or event. [2] It is one person's recollection of another person's casual remark. In ruling on May 3, 1972 that this document, among others, was in evidence, we said we should be dexterous enough to give no weight to a hearsay statement. The mere fact that it was from a business file does not establish its competency. Schmeller v. United States,143 F.2d 544 (C.A. 6, 1944). The document is incompetent. Respondent is arguing that Holdeen was operating a family investment pool with the aid of his sons and daughters *479 for the benefit of himself and the family, and that the trust agreements were a device for escaping taxes on the income earned by the investments in such pool and were not intended by Holdeen to be genuine trusts for the benefit of charities or the State of Pennsylvania. We do not agree with respondent's analysis. The policy of Congress is to encourage gifts for charitable purposes. Helvering v. Bliss,293 U.S. 144, 55 S.Ct. 17, (1934); United States v. Provident Trust Co.,291 U.S. 272, 54 S.Ct. 389, (1934); and Old Colony Co. v. Commissioner,301 U.S. 379 384, 57 S.Ct. 813, 816, (1937). In this case a lawyer has drawn an agreement between himself as "the settlor" and another person as "the trustee" and has transferred property to the trustee with instructions to pay the income from such property for the benefit of third persons, including a college or a charity or a State. The law favors charitable trusts [3] *480 and is ready to uphold the validity of any such arrangement. Respondent concedes that these trusts may have been valid under state law. Respondent's attack is directed against what is deemed to be Holdeen's scheme of tax avoidance by forming a multiplicity of trusts of an illegal duration and impossible projected accumulations. A taxpayer's right to avoid tax by legal means has been sustained too often to require discussion. U.S. v. Isham,84 U.S. 728 (1873); Mary Louise Bok,46 B.T.A. 678, 680 (1942), affirmed 132 F.2d 365 (C.A. 3, 1942). We have said that a finding of tax avoidance is not enough to invalidate multiple trusts. Estelle Morris Trusts,51 T.C. 20, 44 (1968), affirmed 427 F.2d 1361 (C.A. 9, 1970). See also U.S. Trust Co. v. Commissioner,296 U.S. 481 (1936), where one trust was converted into three with intent to save taxes, and Helvering v. Achelis,112 F.2d 929 (C.A. 2, 1940). Holdeen was in possession of appreciated property. He was willing to part with this forever. He desired to provide some benefits for his and his brother's grandchildren. He desired to benefit *481 certain colleges, to promote certain charitable works undertaken by the American Unitarian Association, hereinafter the AUA, and to make deferred gifts to the State of Pennsylvania which he believed recognized and sustained long-term trusts. He desired, also, to prove his economic theories as to the accumulation of money at compound interest without diminution by taxes. By providing a charitable or public remainder interest he hoped to have the trusts tax-free. By transferring the property at his cost, it was transferred at no loss to him and he avoided tax on the capital gain which he might have realized. He expected no economic benefit to himself. In William Waller,39 T.C. 665, 676 (1963), acq. 1963-2 C.B. 5, we stated: The fact that the petitioners chose to sell their securities to the Fund at their cost and thereby avoid the payment of a tax upon the appreciation in value of such securities which would have resulted had they sold such securities to third parties, does not, in our opinion, militate against the tax-exempt status of the Fund or against the deductibility of the contributions made. As stated in Gregory v. Helvering,293 U.S. 465, the legal right of a taxpayer to decrease *482 the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted. See Rev. Rul. 69-39, 69-1 C.B. 148. While the amounts which would be paid the charitable beneficiaries in the early years were insignificant, over the long term they would amount to substantial sums, increasing more rapidly because of the large amounts added to principal in the early years. [4]
The tax avoidance arrangement was designed and intended for the benefit, not of Holdeen, but of the beneficiaries, individual, charitable and public, of the trusts. It is clear that Holdeen intended to create valid trusts. In his will written in 1913, he provided for a trust to continue for 2,000 years with income to be accumulated for public benefit purposes. In an article written by him in 1912 (before Federal income taxes) entitled "Should Thrift be Nationalized," a part of which *483 is quoted in our findings of fact, he stated that in Pennsylvania and Massachusetts accumulations are allowed by law when for public or philanthropic purposes and that the courts of New York had decided that a bequest of a fund to be accumulated for the benefit of a philanthropic corporation of Pennsylvania will be upheld, providing the fund is to be transmitted to and administered under the laws of Pennsylvania. Holdeen referred to Benjamin Franklin's trusts as having been established to continue for a period of 200 years. He went on to say "If some citizen of the present day felt disposed to carry on the 'Franklin Plan' still farther, * * *." In 1936 when he had achieved financial independence he decided to carry out his own suggestion and established Trusts I, II, and III. Believing that charitable remainder trusts could be tax exempt, he provided for remainders to colleges and to the State of Pennsylvania. Also he provided for interpretation under Pennsylvania law. That Holdeen definitely intended to create valid trusts is shown, among other ways, by his letter to his daughters, Haldis and Hildred, referring to bonds which were assigned to them in 1951 "to be held in trust by you *484 for the maintenance of certain of your children." [Emphasis supplied] This explanation and the instructions he gave to Audrey concerning her responsibilities as trustee also confirm that intention. In Holdeen's letter to the American Unitarian Association in 1944, he indicated that at a later date the Association might be made the substituted trustee but for the present a larger income would accrue to the trust with the present type of investments in which it would hardly be practicable for the Association to invest. As the trusts were managed without restricting the investments to "legals" he hoped that the increase in principal would be accelerated more than would be likely if the trust investments were so limited. The purpose was to permit investment in securities having a higher yield and corresponding higher risk than allowed by restrictive state statutes. The letter shows that he had the intention of a long range plan for the charitable purposes stated in the trust agreements. In November 1955 Holdeen wrote his daughter, Hildred, referring to Trusts 51-20 and 51-30 which had sustained some losses of principal. He explained: As you know, the children had only the life use of these *485 funds after which the principal became the property of the charitable trust 50-10. Had there been no such charitable remainder, a capital gain tax of perhaps 25% would have been payable so that it was beneficial to the children that there should be a charitable remainder. If the trust is not restored and the transactions are reviewed by the United States Treasury there is danger that they will claim that the remains [remaindermen] have been disregarded and the charity is a mere fiction and the 25% will then become payable. This letter explains his plan to have the income used for the lives of individual beneficiaries with a remainder over for charity, and his concern that the trust be administered with regard to the charities. There is further evidence supporting Holdeen's intention to create valid trusts in the more detailed provisions adopted in the latter trusts as compared with those in the early agreements. For example, in Trust II, dated in 1936, Holdeen provided in Paragraph THIRD that the assets shall be held and invested and reinvested in such securities as the trustee may elect without any restriction until 1955 and that the trustee may loan the funds at interest with or *486 without collateral security. In Trust 55-10 dated in 1955, the authority as to the administration is spelled out in greater detail including provisions that the trustee shall hold units of 200 shares of stock for the life of each beneficiary, that the assets shall be held and invested and reinvested in such securities as trustees may elect without restrictions, and that the trustee has authority to borrow money and contract debts. Also, provision was made for three directors with authority to appoint substituted trustees or directors or additional trustees or directors and to modify provisions as to payment of expendable income and as to the charitable purposes to which the income may be applied. Furthermore, it was provided that the nonexpendable income of any period during which the provisions for accumulations shall be unlawful shall be paid to Trust 45-10. It was also provided that increases in value of the capital assets upon sales or exchanges are not to be considered income, and the trustees were empowered to commingle the shares and assets held for each beneficiary. The more elaborate provisions of Trust 55-10 were developed through the experience of administration of other *487 trusts in the intervening years. In the litigation of Holdeen's liability relative to the 1945 and 1946 income of some of the trusts, the United States District Court for the Northern District of New York, the United States District Court for the Southern District of New York, and the United States Court of Appeals for the Second Circuit treated Trusts I, II, Naylor-Sanford (NS), MacPherson-Sanford (MS), 44-10, 45-10 and 46-10 as valid trusts. In those cases the income of Trusts I, II, MS and NS was held taxable to him pursuant to jury verdicts that he had retained sufficient control over them to be treated as the owner. In each case the Court of Appeals concluded that the income of Trust 45-10 was not taxable to him. The Court of Appeals stated in Holdeen v. Ratterree,292 F.2d 338 at 340-341: The three alleged grounds of invalidity are: (1) the trust violates the rule against remoteness of vesting; (2) the accumulation provisions are invalid; (3) the trust violates public policy. The first ground is clearly untenable. Aside from the fact that Pennsylvania's remainder interest appears to be vested, there is the principle that a future interest for a charitable purpose is exempt from *488 the rule against perpetuities if preceded by a present interest for a charitable purpose. See Gulliver, Cases and Materials on the Law of Future Interests 508 (1959); 4 Restatement, Property sections 396-398 (1944); Restatement, Trusts 2d section 401, comment f (1959). The second contention, that the trust provides for an unlawful accumulation, was adequately answered by the district court as follows: "He [plaintiff] made certain, however, by the terms of the instrument that the accumulations contemplated and required thereby were limited to those which were lawful. This is made clear by the provisions of paragraph Sixth--'Said Trustees shall annually pay over said expendable income and all other net income hereunder which is not lawfully subject to accumulation under the terms hereof, to the American Unitarian Association. * * *' It would seem to follow that by the terms of the instrument itself, the accumulations of income are limited to those which are lawful and the defendant's claim of unlawfulness and therefore taxability to the plaintiff cannot be sustained." D.C. N.D.N.Y., 190 F.Supp. 752, 757. As the district court noted, under the law of both Pennsylvania and New York, if *489 the direction for accumulation were invalid, the income would be paid out to the income beneficiary, and the settlor would not be entitled to any of the income under the theory of resulting trust. See Comment to subdiv. (b) (1) of tit. 20, sec. 301.8, Pa. Stat. (Purdon), summarizing Pennsylvania law at the time the 1945 trust was created; In re Hoyt, 116 App. Div. 217, 101 N.Y.S. 557, affirmed 189 N.Y. 511, 81 N.E. 1166, holding that where the direction for accumulation is void an alternative legal disposition of the income will be effective; In re Hirschhorn's Estate, 22 Misc.2d 898, 196 N.Y. S.2d 436, 438. These same considerations dispose of the third ground of asserted invalidity--that the trust violates public policy. The district court found that "The plaintiff's long time advocacy of his theory of 'cumulative endowment,' his emphasis upon unrestrictive accumulations, and his choice of the State of Pennsylvania as the ultimate beneficiary for the reason that he believed that its laws permitted such accumulations, lead to the finding that the provision for accumulation was an essential part of his scheme, which together with the unreasonably long period provided therefor, destroys *490 the charitable nature of his gift." D.C. N.D.N.Y., 190 F.Supp. 752, 758. But whether or not the 500-year accumulation provision was an essential part of his scheme, the settlor clearly indicated the purpose to which income should be put in case he could not obtain the full accumulation he desired. Thus the trust was not an attempt to achieve a concentration of wealth forbidden by public policy, but expressly contented itself with achieving only that degree of concentration which public policy will permit. Furthermore, so long as the trust property is devoted to charitable uses, the trust is "charitable," notwithstanding that the settlor's motive may have been a desire to prove his economic theories rather than to benefit humanity. "It is the purpose to which the property is to be devoted which determines whether the trust is charitable, not the motives of the testator in giving it." 4 Scott, Trusts sec 348 at 2551 (2d Ed. 1956), quoted with approval in Abel v. Girard Trust Co., 365 Pa. 34, 73 A.2d 682, 685. The American Unitarian Association is conceded to be a valid charity; and a trust for a state is charitable, although the particular method of applying the property is not provided *491 for. 4 Scott, Trusts sec. 373.1 (2d Ed. 1956). From its inception the trustees are obligated to apply the trust property only to charitable purposes, and to none other. Accordingly the trust is a valid charitable trust; and it was error to hold plaintiff taxable on its income, and to deny him a charitable deduction for the fair value of the property transferred to the trust in 1945. This decision explains Holdeen's intent and upholds the validity of the trusts. Respondent argues that Holdeen's failure to file gift tax returns indicates that he did not intend to create genuine trusts. Many of the early trusts were of small amounts which would not be subject to the gift tax and were for individual beneficiaries without a charitable remainder. There were 112 such trusts or gifts not in trust form prior to 1950. None of this group are involved in these cases. Some of the 1951 series trusts were made as joint gifts of Holdeen and his wife and were less than $ 6,000 in value. These were intended to be gifts of amounts not subject to the gift tax. Holdeen was conscious of the fact that the larger trusts were subject to gift tax. At one time he wrote that he intended to get a current copy *492 of the gift tax law as his copy was 10 years old. While Holdeen neglected to comply with the law with respect to gift tax returns, that is not sufficient to support respondent's contention. His own comment about gift tax is an indication that he did intend to create valid trusts. Although some of the assets specified in the trust agreements were not delivered to the trusts, they were replaced with other assets acceptable to the trustees. While some specified assets were not in Holdeen's possession at the time the agreement was signed, they were pledged to a bank or broker as security for loans to Holdeen and were soon redeemed by the trustees from these pledges. Respondent says that two documents at different dates with different terms were executed for a single trust, 56-4. The later document was made to correct an omission in the original. Respondent says that Trust 51-32 was not executed by Holdeen and his wife. The testimony and our finding is that a counterpart was so executed. This, together with the counterpart executed by Audrey constituted a complete document. The fact that there was no administration of the trusts in Pennsylvania in Holdeen's lifetime is not determinative. *493 In 500 years there would be ample time to transfer administration to that State. This was actually done as to some of the trusts in 1971 only 35 years after creation of the first of these trusts. We have found as a fact that Holdeen and his wife intended to create and did create valid and genuine trusts in all cases. OWNERSHIP AND CONTROL Respondent determined that if the trusts established by Holdeen are valid and existing trusts, their income is taxable to Holdeen and his wife by reason of the ownership and control of the trust corpus retained by him after such transfers in trust. According to the respondent the assets of all the trusts were administered as one investment pool vigorously controlled by Holdeen and assisted by Randal and Janet. Randal was concerned with the daily management of real estate and securities. He gave orders after conferring with Holdeen. Randal had access to the trusts' brokerage accounts and checking accounts and received all brokers' statements monthly. Randal physically managed some real estate and drew contracts, deeds and mortgages. Janet Adams' duties at Pine Plains as trustee of 100 trusts were to maintain the records of her trusts and others under *494 Holdeen's close supervision. She was the intermediary between Holdeen and the other trustees. She channeled money to the New York office for investment. She commingled the assets of several trusts. Loans were made from one trust to another so frequently that lists of such loans were made up monthly. Janet and the other trustees had no independent discretion and performed only ministerial duties. This is shown by the many instances in which she sought her father's approval on proposed transactions. Respondent contends that Holdeen controlled Janet, also Audrey and Sherley, and that Kreulen was likewise under his control. All of them received investment advice from Holdeen. Holdeen selected real estate for investment, made down payments, searched titles and attended closings. He served the trusts in any way possible, and he agreed to take real estate the trusts did not want. Respondent's contention is that the investment pool was operated for the benefit of Holdeen and his family and not for the trusts or the charitable beneficiaries of the trusts. Since Holdeen controlled all of the trustees he controlled the trusts. His two daughters Sherley and Audrey were not qualified to administer *495 large sums of money. Although Holdeen delegated to Janet the responsibility for administering the trusts of which Sherley and Audrey were trustees, he inspected their trust records twice a year. Their testimony demonstrates that they exercised no discretion in the administration of their trusts, and were controlled by their father. Respondent says it is inconceivable that Holdeen would allow a man of such limited intelligence and background as Albert Kreulen to administer a trust worth several million dollars without exerting any control, especially since Kreulen had a full time job elsewhere. The petitioners contend that during 1951 and subsequent years Holdeen did not retain or exercise ownership or control of the corpus of the trusts. It is clear from the testimony that Janet Adams was the principal executive in the administration of the trusts collectively. She made decisions upon the purchases of securities for her trusts. She wrote her sister Audrey frequently, giving advice for the administration of NS Trust. She gave advice to her sister Sherley who lived near her in Pine Plains. Janet's children were beneficiaries of NS and MS Trusts. Janet visited New York City frequently *496 to confer with her brother Randal, with the brokers there, with the managers of rental properties and with her father when he was available. Holdeen had advised Janet about investments in the early years when she was unaccustomed to the investment business but left such matters to Janet and Randal in 1951 and thereafter. When Janet formed mergers of several trusts for convenience in administration it was upon the suggestion of Randal and Lester Palmer and without consulting Holdeen. She usually depended upon Randal for appraisals of real estate investments but visited some of the properties herself to know of their condition. Randal Holden was an expert on securities for investment. He was a director of several corporations including Allerton Corporation, Maine Central Railroad Company, and 50 Broadway Building, Inc. Randal helped Kreulen with the management of the Astral Building, a property owned by Trust 47-10. He also prepared legal papers in connection with the trusts. He counselled Janet and Sherley upon investments and made investments for Audrey under a power of attorney. Holdeen had little or no part in choosing these investments. Randal, from time to time, did discuss with *497 Holdeen his attitude toward securities in general but found it was difficult to consult with his father and that Holdeen rarely gave his advice. In these years Holdeen took no interest in the transactions and said that he had retired. [5] *498 *499 Holdeen had an operation in 1954 and was bedridden for the best part of the year. That he was disabled is shown by the fact that when the State Department of Health requested his signature on a document in October 1953, Janet replied in July 1954, "Due to the fact that my father was quite ill last fall and winter, we have only recently had the chance to get the order signed." In the 1954 income tax return of Holdeen *500 and his wife medical expenses of $ 2,889.19, including hospital expense of $ 1,242.69 were shown. The evidence that Holdeen did not give orders in the administration of the trusts' securities investments is borne out by the testimony of William Mellin who said that to the best of his knowledge Holdeen had no powers over Janet's brokerage accounts with Wainwright but that Randal had some authority to do business in those accounts. Also, Thomas E. Logan, a broker at Wappingers Falls, New York, stated that neither Holdeen nor anyone else had authority over Janet's accounts with his firm. Holdeen had very little to do with Trust 47-10 in the years after 1950. At the end of the year Kruelen would show him a statement of assets and income, Holdeen would take an interest in the statement, would take it away and read it. He would show interest only in the total. Holdeen never inspected Kreulen's books and records. While Holdeen prior to 1950 had counselled Kreulen on the investments of the trust, he left the management in Kreulen's hands after 1950. Kreulen reported to Janet, as one of the directors of the trust, from time to time. He reported annually to the American Unitarian Association, *501 the income beneficiary, showing assets of the trust. Kreulen studied in the library about investments proposed by the brokers before making a choice. There is no evidence that Kreulen received instructions or advice from Holdeen in the years after 1950. In the litigation dealing with the liability of Holdeen for taxes for 1946 the court of appeals stated in Holdeen v. UnitedStates,297 F.2d 886, at 890: In order for the income to be taxed as that of the grantor there must be some economic benefit to him. The term "economic benefit" of course includes not only income, or a possibility thereof, but also loans on an advantageous basis, power to decide who shall be enriched and who shall go without, discharge of obligations of the grantor, etc. Although management alone is not sufficient, when this is coupled with the power to sprinkle the benefits among a class it would seem proper to tax the income as that of the grantor who earned it and who has substantially as much control or practical use of it as if it were entirely his own. Littel v. Commissioner, supra.
We adhere to our recent holding ( Holdeen v. Ratterree, 270 F.2d 701, 2 Cir. 1959) that proof of control of investment activities, *502 without more, is insufficient to support a finding of substantial ownership. This requires a reversal of the judgment as to trusts 46-10 and 45-10. No rights in them were retained by the taxpayer. None of the beneficiaries were members of his family. No economic benefit, direct or indirect, was received by Holdeen from these trusts. As to trusts 46-10 and 45-10, since the uncontroverted evidence established that there was no element of control in Holdeen other than the investment advice, a verdict should have been directed for the taxpayer. In Commissioner v. Betts,123 F.2d 534 (C.A. 7, 1941) the taxpayer was a securities broker, at one time Chairman of the Board of Governors of the Chicago Stock Exchange. In February 1932 he created a trust depositing certain securities with a trustee. The income was to be paid 75 percent to his mother and 25 percent to his wife, with 100 percent to be paid to the survivor of them. He could revoke if he survived the beneficiaries. Upon the deaths of the settlor, his mother and his wife, the estate was to be divided among his children or their descendants. The trustee was authorized to manage the estate and to buy, sell and exchange property and securities. *503 All purchases and sales during the settlor's lifetime were to be as he might direct. The Board of Tax Appeals held that the settlor was not taxable upon the income of the trust. The Court of Appeals affirmed observing that the reservation of power to designate what should be bought and sold evidently lay in the desirability of using his experience in the securities business for the benefit of the trust. The court said that the Clifford case [Helvering v. Clifford,309 U.S. 331], was not applicable to such a trust which is not short-term, in which the grantor has divested himself of the economic enjoyment of the property and his power of revocation was exceedingly remote. The court concluded that the grantor had not retained the fruits of ownership making him liable for tax upon the income of the trust. The situation is similar here where Holdeen's investment experience is sometimes made available to the trustees for the benefit, not of Holdeen, but of the beneficiaries of the trusts. In Commissioner v. Branch,114 F.2d 985 (C.A. 1, 1940), the taxpayer created a trust with himself and two other individuals as trustees for the benefit of his wife during her lifetime to revert to the *504 grantor if he survived her. The securities transferred to the trustees were under pledge to a trust company as collateral for an obligation of the grantor. Broad powers were given the trustees as to investments and the grantor was empowered to loan and to exercise investment authority. Since creation of the trusts, the grantor had at no time received any of the income. He continued to pay for the support of his wife who used the trust income for her own purposes. The Board of Tax Appeals held that the income of the trust was not taxable to the grantor. The court of appeals affirmed. The court stated that: (114 F.2d at 987) Where the grantor has stripped himself of all command over the income for an indefinite period, and in all probability, under the terms of the trust instrument, will never regain beneficial ownership of the corpus, there seems to be no statutory basis for treating the income as that of the grantor under Section 22(a) merely because he has made himself trustee with broad power in that capacity to manage the trust estate. The court also said no significance attaches to the fact that securities are already pledged to secure an individual debt of the grantor. He could *505 transfer to the trust only what he had--his equity in the securities. This is what Holdeen did in some cases, contributed his equity to the trusts. In Jones v. Norris,122 F.2d 6, (C.A. 10, 1941) the taxpayer created trusts for the benefit of his children naming a third person trustee but reserving to himself autocratic powers over the management of the trust estate. The trust was to last for 20 years, after which the estate was to be distributed to the beneficiaries. The grantor was to receive none of the benefits of either the corpus or the income during the term of the trust and the record did not show that the grantor ever received any economic benefit from the corpus or the income. The grantor did not record the deeds of conveyance until the the tax issue arose. The court stated: We do not understand that the power of management, however unlimited, may operate to bring the grantor within the sweeping provisions of section 22(a), if by such powers he cannot derive any economic benefit therefrom * * *. The Court held that the grantor was not taxable upon the income of the trust. See also Robert S. Bradley,1 T.C. 566 (1943), acq. 1943 C.B. 3. According to Helvering v. Stuart,317 U.S. 154 (1942), *506 economic gain, realized or realizable by the taxpayer, is necessary to produce a taxable income under our statutory scheme. Administrative irregularities committed on the part of the trustees, such as commingling trust funds, holding trust assets in the name of an individual and maintaining a margin account for trading securities, may cause the trustees to be surcharged by the beneficiaries, if the beneficiaries were harmed thereby. 2 Scott, Trusts sec. 180.2 (3d Ed. 1967). However, the trustees, not Holdeen, were responsible therefor. Such administrative irregularities on the part of the trustees will not cause the grantor to be taxed with the income of the trust. Hamiel's Estate v. Commissioner,253 F.2d 787 (C.A. 6, 1958), Litta Matthaei,4 T.C. 1132 (1945), acq. 1945 C.B. 5. Similarly, by itself, investment advice given by the grantor to the trustees will not cause the income of the trust to be taxed to grantor. Holdeen v. United States,supra;Jones v. Norris, supra.
LOANS Respondent contends that Holdeen had the power to borrow from the trusts and exercised this power during the years 1951-1957. Under the regulations relating to the 1939 Code [6] *508 *509 a grantor is taxable if he borrows *507 corpus or income and has not completely repaid the loan with interest before the beginning of the taxable year. The result is the same under the Internal Revenue Code of 1954 unless the loan provides for adequate security and adequate interest, and was made by a trustee not subservient to the grantor. Respondent refers to loans as follows: (1) A loan from NS in 1949 repaid in 1954 in the amount of $ 5,000, the interest being paid in November 1954 for the term of the loan. (2) A loan of $ 13,000 from NS outstanding in 1954 which petitioners have not shown to have been repaid. (3) A loan of $ 42,058.13, borrowed in October 1951 from Trust II secured by two mortgages totaling $ 45,000 on which no interest was paid and where there is no showing of repayment of the loan. (4) A loan of $ 15,000 from Trusts I and II of which $ 5,000 was repaid in February 1954 and the remaining $ 10,000 paid later without interest. (5) A loan of $ 23,000 in February 1955 on which Holdeen paid $ 10,000 plus interest in May 1955, where there is no showing that the balance of $ 13,000 was repaid. (6) A loan by Trust 47-10 in 1957 of $ 230,000 for the purchase of Lacey Gardens, which loan and interest was not completely repaid by the end of 1957. (7) Loans in 1958 amounting to $ 565,717 from two trusts upon which no interest was paid in 1958. Respondent says that these *510 loans show that Holdeen had the power to borrow trust funds without adequate interest or security even though he did not reserve this power in the trust deeds. Some of the foregoing items were not loans to Holdeen: (1) According to the evidence the transaction by NS in 1949 was a payment by Audrey to Janet as trustee for Cyrus to purchase a second mortgage on 457 W. 125th Street. In 1950, Cushing-Murray paid interest on this in the amount of $ 225. In 1954 Holdeen paid the mortgage in full, $ 5,000, and on November 15, 1954, paid interest for the period of the loan in the amount of $ 1,237.50. This mortgage represented perhaps 2 percent of the assets of NS. As a basis for holding Holdeen taxable on the income of this trust it is de minimis. (2) The $ 13,000 owed to NS in 1954 was owed by Randal, not Holdeen. Janet erroneously altered the entry of "RH" shown on the list of loans as of November 11, 1953, to read "JH" in the list of June 16, 1954. Audrey testifi&d that she made no loans of charitable trust funds to Holdeen. (3) The amount of $ 42,058.13 advanced by Janet to Holdeen in October 1951 from Trust II was not a loan as respondent contends. The evidence shows that Holdeen agreed *511 to sell to Janet as trustee, a mortgage of $ 30,000 covering property in Yonkers, New York, and a mortgage of $ 15,000 covering property in Queens for a price of $ 45,000 payable $ 42,058.13 to Murphy & Co., to purchase stock for Holdeen and a check of $ 2,941.87 to Holdeen directly. (4) In 1954 Holdeen paid Janet $ 10,000 as balance due on an advance of $ 15,000 being then "unaware of this unpaid debt." He had repaid $ 5,000 on February 3, 1954. He inquired whether interest was due. The record does not show whether interest was paid later, nor what was the term of the loan. This loan amounted to less than 4 percent of the assets of Trusts I and II of more than $ 450,000 at that time. This is not a sufficient basis for regarding Holdeen as taxable on the income of these trusts. (5) The loan of $ 23,000 in February 1955 was made from Janet's No. 4 account with Baker which contained funds of her children and of pre-1950 non-charitable trusts. No part of this loan was made from funds of the trusts here involved. It was repaid. (6) In 1957 the loan made by Trust 47-10 toward the purchase of Lacey Gardens was originally in the amount of $ 217,541. Holdeen and Elias, who took title to the *512 property, gave a mortgage and transferred stock as security to the trust. Interest was paid on this loan in 1958 in the amount of $ 6,328. The fact that the loan and interest were not completely repaid before the beginning of the taxable year 1958 does not make the trust income taxable to Holdeen in 1957. At most the taxable amount would be the amount of the loan, $ 217,541, and it would be taxable only after 1957. But the provisions governing taxability do not apply to a loan with adequate interest and adequate security made by trustees such as Kreulen and Palmer who were not related or subordinate trustees surservient to the grantor. Sec. 675(3), Internal Revenue Code of 1954. (7) The loans in 1958 from two trusts were made because of transferee assessments against the trusts by the Internal Revenue Service and at the solicitation of the New York Regional Counsel. Holdeen provided adequate security and paid interest upon these loans. Holdeen had no retained power to borrow. The loans made were by consent of the trustees and under investment authority in the trust agreements. The loans made furnish no sufficient basis for taxation of Holdeen upon the income of the trusts. POWERS Respondent *513 says that Holdeen exercised a prohibited administrative power without the consent of any trustee, the "power to reacquire the trust corpus by substituting other property of an equivalent value." [7] *514 The existence of this power was manifested by transferring buildings back and forth between Holdeen and the trustees. Some of these were located on Manhattan Avenue, Fox Street, Tinton Avenue, Woodycrest Avenue and Bathgate Avenue, all in New York City. Respondent contends that Holdeen reacquired these trust properties primarily for his own benefit, as the tax losses generated were valuable to him. These transfers of property were not pursuant to any powers reserved or possessed by Holdeen. They were made upon agreement with or upon the request of the trustee in each case and for the benefit of the trust. He took unprofitable houses off the hands of the trustee at her cost. If he sometimes derived a tax deduction, that was incidental and was not the purpose of the transfer. On some occasions if a profitable sale later became possible he returned *515 the property so the trust could realize the gain. Respondent says that Holdeen had the power to substitute trustees in some of the trusts. In November 1951 Holdeen worte Janet with reference to a trust in which Haldis was trustee: "I guess that Roger or Rosemary should be subs as trustee for Hald. I or you can ask Roger his preference. * * * Probably 50-10 gives trustee power to appoint a successor & such powers were by reference incorporated in 51-31?" Holdeen's note refers to a power of the trustee, not of the trustor. Apparently Roger's children were beneficiaries of the trust. The various trusts of which Haldis was named as trustee gave the trustee authority to appoint a substituted trustee. These trusts also provided that after the lives of the individual beneficiaries the assets were to become part of the assets of Trust 51-10. In that trust Janet was named as trustee and authorized to have the power and authority created in Trust 50-10. In Trust 50-10 Janet was trustee and Janet with Alphonse Brisson and James Holden were appointed directors with the authority to appoint substituted trustees or directors. If a substitution was made in this case it was made by Haldis, the trustee. *516 Respondent also says that Holdeen substituted a trustee in January 1956, in appointing Haldis MacPherson as trustee of Trusts 51-20 and 51-30 in place of Hildred Cushing-Murray. Haldis was originally the trustee of these two trusts for the benefit of the Cushing-Murray children. The trustee had authority to appoint a substituted trustee. Haldis appointed Hildred as her successor. Hildred, in Janet's opinion, did not make sound investments. Under the trust agreement the property was eventually to be transferred to the trustee of Trust 51-10. Janet, who was trustee of Trust 51-10, acted as a receiver for Hildred and wrote Haldis "we have decided that you should step in and act again as trustee." From the record it appears that Janet reappointed Haldis. Respondent says Holdeen appointed Janet as co-trustee of NS, MS and 47-10 and Lester Palmer as co-trustee of 47-10. This is not substantiated by the evidence. Trust 47-10 provided in part: Trustor appoints Alphonse V. Brisson, of 194 Battle Avenue, White Plains, New York, Janet Adams of Pine Plains, New York, and Gabriel Elias of 193 Malta Avenue, Brooklyn, New York, as directors of the trust hereby created. Said Directors, by written *517 declaration made by a majority of the survivors of such directors, may appoint a substituted trustee or trustees, director or directors, in place of any trustee or director acting hereunder * * *. The trustees of MS and NS were authorized to appoint trustees to act with the original trustees named in such trust agreements. Palmer was appointed a co-trustee of 47-10 by the directors of that trust, and after Palmer's death Janet was appointed cotrustee by the directors. Janet was appointed co-trustee of NS by Audrey and of MS by Sherley. Respondent contends that Holdeen exercised other prohibited powers that benefited him economically. He did not pay any rent for an apartment at 180 Franklin Street in Brooklyn. The property was owned by Trust 47-10. Kreulen, as trustee of the trust was sometimes too embarrassed to collect the rent of $ 3 per week charged for the rooms occupied by Holdeen. If Holdeen derived an economic benefit it was due to fault of the trustee, not to any reserved power of the grantor. The economic benefit was insignificant. Holdeen did not have an office, as such, in the building. He could use a room near the plumber's shop for meeting people and sometimes used Randal's *518 office when Randal was not present. In the years 1951 through 1953 Holdeen owned property on Mott Street. Trust 45-10 owned small mortgages on this property. Holdeen paid no interest or principal upon the mortgages. The property was transferred to MS Trust in 1954. This trust paid the principal of $ 952.99 in 1954. Janet collected from her mother the interest in the amount of $ 45. INVESTMENTS Respondent contends that the facts relating to certain investments illustrate Holdeen's control of the trusts. The first example concerns the purchase of a building located at 48-56 Old Broadway, New York City. In 1950 Holdeen made a $ 15,000 down payment on this property, and Randal paid the closing costs of $ 20,000. Subsequently Trust II borrowed $ 90,000 from Trust 47-10, giving a mortgage on this property. Trust II repaid $ 15,000 of this $ 90,000 to Holdeen. Then Trust II loaned $ 24,000 of this $ 90,000 to Trust 50-10, which this trust transferred to Holdeen in repayment of an amount that he had loaned this trust on a prior occasion. Shortly thereafter Trust 50-10 repaid this $ 24,000 to Trust II, without interest. Trust II loaned $ 15,000 of this $ 90,000 to MS Trust. Trust II stated *519 on its 1953 income tax return that it owned 40 percent of this building. Janet Adams, the trustee, considered that Trust 45-10 had "acted as agent" for the buyers of this property. As of January 1951 Janet was still proposing how the financial transactions involving the purchase of this property should be handled. According to the evidence the transactions were initiated and carried out by Janet. It does not appear that Holdeen participated except for the original advance of a downpayment. A second example concerns a loan to Stissing Lime Company. Holdeen arranged to loan $ 5,000 to the company. He offered it to Janet subject to her approval for one of the trusts as an investment. Holdeen agreed to guarantee the loan. He was making a gift to his nephew James Holden who was to invest part of this in the Stissing note. Holdeen wrote his brother Stephen that it "is better not to have Janet give a check to a Holden on the lime loan, as Int. Rev. might be suspicious * * *." Janet drew up the papers and sent her father the Lime Company's note with collateral stock of James Holden and the check to the Stissing Company. She wrote that she was sending these documents "for your approval and *520 consummation." She sought his approval as to form and expected him to close the loan he had negotiated. Another example concerns the ownership of property located at 346 Grove Street, Jersey City, New Jersey. Holdeen owned this property, and in 1955 he intended to transfer it to one of the trusts. A statement was signed to the effect that Trust 45-10 was the owner. Later Janet wrote Randal that her father had decided that Trust I would be the owner. The subsequent sale of this property was reported on the income tax return filed by Trust I. It appears that Holdeen changed his mind as to the trust to receive the gift of the property. The Grace National Bank wrote Janet referring to bonds "hypothecated by you to secure our loan to Jonathan Holdeen." The bonds were not deposited by Janet. They were assets which Holdeen had deposited with the bank as security for his loans. He later contributed them to a trust. They were subsequently released to Janet, the trustee, upon payment to the bank of the amount due it from Holdeen. In our opinion, none of these transactions evidence control of the trusts by Holdeen. JANET'S MEMORANDA In February 1952 Janet wrote Holdeen and Randal asking whether *521 the rental income to be distributed to the beneficiaries was the operating profit, the taxable profit, or whichever was the lower. She asked that Holdeen initial his reply. After several references of the memorandum back and forth, Holdeen, in July 1954, initialed the advice to distribute the lower figure. She commented that in responding to her request for advice her father was "in no hurry." Respondent refers to Janet's memorandum to Holdeen after Janet had loaned $ 50,000 to Cushing-Murray "Have you a story made up for the closing which took place September 20, 1951 * * * I would like the whole story to put in my trust book." The closing of the loan occurred in New York, apparently without her presence, and she was asking for the complete facts for her record. Another time she wrote her father, "What does come back will be borrowed of Baker and Wain within 2 weeks or sooner if you say so." Janet wrote her father, "It is not entirely clear to me as to how I should distribute the funds." Here she was asking legal or accounting advice about a distribution of stock between two trusts. In June 1955 she wrote her father: Tomorrow Werner is going to get you on the phone to see if you approve *522 * * * of the following securities earmarked for the following funds * * *. If you decide they are unsuitably lined up, we can make transfers. In this certain securities were being distributed between Trusts 45-10, 46-10, and 50-10. In April 1952 Janet negotiated a settlement with Cushing-Murray of his claim for reimbursement for losses sustained in 1949 on properties which he had then managed. She wrote: "I will send money after I get it initialed as okay by dad." Since some of the properties were her father's, she asked for his approval of the settlement. In October 1953 Janet wrote Cushing-Murray concerning problems in connection with his management of rental properties owned by the trusts or by Holdeen, she wrote" "Why don't you address your next question directly to dad since you know I cannot do much without his advice. * * *" [Emphasis supplied] In December 1952 Janet inquired of her father concerning 90 shares of Lincoln Building Corporation stock purchased by Trust I in 1949 from Holdeen which shares were transferred to Trust 50-10 apparently in error. She wrote billing him for the stock or refund of the payment. She concluded "Or you can pay yourself. Anyhow okay the bill *523 please. Initial and date of initial." She considered this necessary to get him to act. If he accepted the bill she could take the document to her mother who would pay her on that authority. Subsequently the shares were transferred to Trust I. In November 1955 Janet wrote her father in connection with a transaction whereby he conveyed to Audrey Naylor for NS Trust premises on Amsterdam Avenue in exchange for her transfer to him of an interest in a mortgage on property at West 111th Street. Janet proposed an exchange of checks between her father and Audrey to conclude the transaction and wrote: "Dad: Will you give your okay on above after adjusting." In June 1958 regarding property on 111th Street, Janet wrote: "Since dad threatens to force us into a sell campaign as soon as he has time and since Janet is as anxious as he is, should we not consider forcing dad into selling this house." Respondent says that Holdeen was in control of the investment pool, and could force the trustees to sell properties. At this time Holdeen was in need of cash and Janet believed that she could bring pressure upon her father to sell some of his properties. We do not consider these or others of Janet's memoranda *524 as evidencing control of the trusts by Holdeen. PARTNERSHIPS Respondent says that Janet Adams created a number of partnerships among the trusts for which she was trustee, that no written partnership agreements were made, the State of New York was not informed of these partnerships, and the real estate involved was not independently appraised prior to the forming of such partnerships. These were not business partnerships of the nature requiring notice to the state or to creditors. Janet was trustee or co-trustee of each trust involved and the several trusts had the same beneficiaries. She merged their assets for greater convenience in administration, assigning each a percentage of the value of the whole. No written agreement was needed. The real estate could be valued at cost except where Randal or Roger had otherwise evaluated it. There was no necessity in this situation for a professional appraisal. She filed partnership tax returns to account for the income as well as fiduciary returns for each trust. MISCELLANY Respondent refers to Janet as being the trustee of 100 trusts with only 10 brokerage accounts and 10 checking accounts. The record does not show in how many of the small *525 trusts of the 1944 to 1948 series she was named as trustee. As to the trusts involved in these proceedings, she was apparently trustee or co-trustee in some 28 to 30 trusts. The records indicate she may have had 20 brokerage accounts with three investment firms and 10 or 12 bank accounts with three banks. Respondent also says that in 1954 Holdeen deducted a year's depreciation on a building at Amsterdam Avenue that he transferred to NS on October 27, and deducted 11 months' depreciation on the building's boiler. Also, he deducted the rental loss on a building at 420 E. 10th Street for 1 month when the property was owned by a trust. The deductions claimed on the Amsterdam property were for 11 months as to each item. The excess in the deduction over that for 10 months would amount to about $ 142. The date of transfer of the property is not shown in the record and it may be that the deduction for 11 months was correct. It is not clear from the evidence whether Holdeen deducted an excessive rental loss as respondent alleges. If he did so the amount for 1 month was about $ 124. These are trivial errors which occur in making tax returns for complicated property investments. They may be *526 grounds for adjustments, but are not a sufficient basis for holding the grantor taxable on income of a trust. In portraying Holdeen as a dominating personality who controlled the trustees, respondent says that Holdeen so dominated one of the brokers that he was able to use its telephone, stationery and secretarial services. While this is immaterial to the issue, respondent misinterprets the evidence. Holdeen was a valued client of H. C. Wainwright & Co. He had a margin and cash account with this firm and at times owed the firm over $ 150,000 on his account. The firm had custody of a substantial amount of his securities. He used the firm's telephone and on some occasions he was accorded the use of secretarial services of the firm as a courtesy. We do not interpret this as domination. Respondent refers to several exhibits as showing that Janet was closely supervised by her father and rarely acted without his approval. Holdeen was a lawyer. He had 30 years more investment experience than Janet. He was willing to support her administration of the trusts with legal and investment advice to achieve the purposes he had in establishing them. According to Randal, it was sometimes difficult *527 to get Holdeen to listen to questions. Janet who was carrying on trust affairs at Pine Plains 100 miles away from Holdeen's quarters, frequently sought his advice. Sometimes he did not answer her inquiries promptly. Therefore she asked him to initial the paper to show that he had noted her questions and found no reason to object to the transaction in process. She was taking the action. He was not directing it, but was giving advice.
This practice of asking her father's advice prevented certain errors. In December 1953 she paid $ 2,092 of trust funds for taxes on a property. She wrote: "Dad should date his initials that this is okay." The property was owned by Holdeen, and when he discovered the mistake he refunded the money to her. In December 1955 Janet wrote, "It is no wonder that I rarely make a move without consultng Dad. He really picked this apart." Here she sought advice upon the sufficiency of a proposed deed and Holdeen pointed out to her that it was improperly drawn. In a few instances Holdeen made decisions as to properties. Janet wrote that her father decided that Trust I was to be the owner of the Grove Street property which he was giving to one of the trusts. In 1955 *528 when Trust 45-10 proposed to buy certain bonds from Trust 47-10, Janet wrote "It was later decided that JH should be the buyer." The respondent's exhibits show that Janet was making the administrative decisions and carrying on the business of the trusts and that Holdeen's part was the supplying of investment and legal advice at her request. She wrote "I can't do very much without Dad's advice." Holdeen wrote her recommending that she pay James Holden $ 300 for his services. She wrote "Janet has decided and dad concurs * * *." "Dad agrees Werner is the man for the job." She wrote to Holdeen "We have not decided who will buy * * *." and "I think Trust I will be the owner of this asset." Holdeen wrote Janet "You will know best what persons or trust should carry this mortgage * * *,". [Emphasis supplied] CONCLUSIONS The critical issue is whether Holdeen controlled the trustees, Janet Adams and Randal Holden, to the extent that Holdeen personally derived an economic benefit from the trusts. Respondent's contention is that Holdeen was managing an investment pool and that Janet and Randal merely carried out the detailed duties of handling investments and managing real estate under Holdeen's *529 direction and that Holdeen derived economic benefit from the entire operation. The petitioners contend that Holdeen gave only investment or legal advice, that Janet and Randal made the decisions as to the operation of the trusts, and that the trusts were administered without economic benefit to Holdeen. The evidence is overwhelming in its support for the contentions of the petitioners. It is uniformly to the effect that Holdeen did not derive personal economic benefit from the trusts. He was interested in having the trusts make money through having their investments more profitable than the conservative investments usually available to trustees. He contributed his legal advice and sometimes his investment advice from over 40 years' experience in investments. This was not for his own economic benefit. Holdeen did not "vigorously control" the administration of the trusts, and Janet was not performing only ministerial and secretarial duties under his "close supervision" as respondent contends. The evidence does show that Janet Adams administered the trusts of which she was trustee and assisted her sisters in the administration of trusts such as MS and NS, and that Holdeen served as advisor, *530 upon request, on legal and investment questions but did not exercise control over the trustees. Nor does the evidence show that Holdeen derived economic benefit from the trusts. He had no intention of doing so and except for the Bryant Avenue mortgage case which we will deal with separately, infra, he derived no economic benefits. Holdeen did not retain any of the incidents or attributes of ownership of the corpus of any of the trusts. In each case the trust income was designated for certain beneficiaries. It could not be appropriated by the grantor. The conclusions of the Court of Appeals in Holdeen v. United States with respect to Trusts 45-10 and 46-10, that the income of these trusts is not taxable to Holdeen, are also applicable to the other trusts here involved, except for Trusts I, II, and III, MS and NS. Except for these, no rights in the trusts were retained by Holdeen and no economic benefit was intended to have been realized by him in any of them. He retained no power to direct investments, to borrow, to substitute trustees, to change beneficiaries or to alter distributions. Although respondent alleges that Holdeen in fact exercised the power to control the trustees, the *531 evidence is otherwise. The "right" referred to in a tax statute refers to a legally enforceable power. United States v. Byrum,408 U.S. 125, 136 (1972). The beneficiaries, except for his wife, were his grandchildren and grandchildren of his brother, persons to whom he owed no duty of support, or charitable or public organizations. His only participation was in giving investment and legal advice. Insofar as his wife was concerned, she was fully supported by Holdeen without any of the trust income. See Commissioner v. Branch,supra.In many of the later trusts she was a co-grantor with Holdeen. Under the decisions of the Court of Appeals the income of Trust 45-10 and all the later trusts was not taxable to Holdeen in the years 1951 through 1957. If we were to accept respondent's contention that Holdeen directed the investments of the trusts in the years 1951 through 1957, that is not enough to make the income of these trusts taxable to him. In that situation his greater experience in investments is devoted to improving the trusts' income, not for his economic benefit, but for that of the beneficiaries--individual, charitable and public--of the trusts. See Betts,Branch and Norris,supra. *532 As stated by the Court of Appeals for the Second Circuit in Holdeen v. United States, 297 F.2d 886, 890, "proof of control of investment activities, without more, is insufficient to support a finding of substantial ownership." [Emphasis supplied]. Holdeen did not retain or exercise ownership or control of Trust 45-10 or any of the later trusts in the years 1951-1957. THE EARLY TRUSTS (I, II, III, NS, MS) In the two refund suits relative to Holdeen's tax liability for 1945 and 1946, the district courts found that Holdeen controlled Trusts I, II, and MS and NS and the Court of Appeals affirmed. Respondent says that since these decisions have become final and petitioners are parties in privity with Holdeen they are collaterally estopped from denying that Holdeen controlled these trusts in the years 1951 through 1957. The decisions in the district court cases were based upon jury verdicts in favor of the Government. Holdeen had not convinced the juries that he had not retained ownership and control of these trusts in 1945 and 1946. There was a time thereafter when any right of control on his part for tax purposes came to an end. We do not have the evidence presented in the district court *533 cases but the evidence here clearly shows that Holdeen in the years 1951-1957 did not exercise control over Janet, Sherley or Audrey in the administration of these trusts. If the relevant facts are distinguishable, even though the issue is the same, collateral estoppel does not govern the later case. Commissioner v. Sunnen,333 U.S. 591 (1948). The evident difference here justifies a reexamination of the issue. NS and MS Trusts
Holdeen reserved the right by written notice to modify and substitute provisions for income beneficiaries in these trusts and to substitute new trustees for the trustee named. He retained the right by written declaration to modify the provisions with respect to charitable beneficiaries, provided they be philanthropic, charitable or educational corporations. The written consent of donor was required for any new investments made by the trustees. In 1945 he signed new agreements modifying these trusts, relinquishing the powers retained and transferring such powers to the trustees. The agreement modifying the MS trust was not signed by Sherley, the trustee. Respondent contends that the failure of Sherley to sign this document casts doubt upon its effectiveness. *534 Since the document was primarily a renunciation of powers by Holdeen, the signature of Sherley was not essential. See Armstrong v. Commissioner,143 F.2d 700, 704 (C.A. 10, 1944). In Sherley's files there is a copy of the 1945 document signed by Holdeen and Audrey revising the NS trust. The terms are identical, except for the name of the trustee, with the revision signed by Holdeen relating to the MS trust. Sherley was obviously aware of and accepted the terms of the revision as she retained a copy of the NS revised agreement for reference purposes. In the taxable years 1951 to 1957 Holdeen had no reserved powers relating to the NS and MS Trusts. In the litigation over the liability of Holdeen for income taxes for 1946 the Court of Appeals for the Second Circuit commented: There was, however, evidence from which the jury could find a retention of control of the corpus of each of Trusts I, II, Naylor-Sanford and MacPherson-Sanford. As to Trusts I and II taxpayer had reserved rights to change beneficiaries; as to I he owned interests in the Textile Co. in which Trust I purchased (inferably on his advice) stock or bonds. As to Naylor-Sanford and MacPherson-Sanford he relinquished in 1945 *535 his reserved powers. However, there is evidence that he "drained their funds" in 1946 (Ex. M). The jury was not required to credit the explanation of Exhibit M made on behalf of the taxpayer. While the record of activities in connection with these trusts might be clearer, we cannot say that the conclusion of the jury that taxpayer had not borne the burden of convincing the jury of the incorrectness of the Commissioner's finding of retention of control as to these four trusts was without support in the evidence. [297 F.2d 886 (1962) at p. 890] The Court stated that Holdeen "relinquished in 1945 his reserved powers." In the foregoing the Court refers to evidence that Holdeen "drained" the funds of NS and MS Trusts. The record of NS show assets as follows: Year
Amount
January 1, 1946 about
$ 155M
January 1, 1947 about
$ 189M
January 1, 1948 about
$ 200M
The records of MS show assets as of January 1, 1948 of $ 98,000. We do not have the evidence presented in the jury case concerning the draining of funds from these trusts, but if Holdeen did this in 1946, the assets of both of them were substantially restored soon thereafter. The draining of funds in 1946 was a circumstance occurring in a single *536 year and relied upon by the courts as evidence of control in that year alone. This does not furnish a ground for assuming that the administration of these trusts was subject to Holdeen's control in the years 1951-1957. Therefore collateral estoppel is not applicable in the cases of these trusts. In the years 1951 through 1957, the assets of the NS and MS Trusts increased considerably. In 1957 these trusts were combined as Holdeen-Sanford 25. As of March 31, 1958, the assets of NS were $ 878,800 and of MS were $ 246,708. The evidence in the present case shows no control of these trusts on the part of Holdeen during the years 1951 through 1957. Except for the Bryant Avenue mortgage loan matter, discussed below, he derived no economic benefit from them. Audrey Naylor, under authority of the trust agreement, appointed her husband as co-trustee of the NS Trust. He took over some of the responsibilities for the administration of this trust. Sherley MacPherson, who lived in Pine Plains secured advice from her sister, Janet. If Holdeen possessed or exercised any control over these trusts in 1946, he did not do so in the years 1951 through 1957. The record in this case shows that Audrey frequently *537 asked advice from Janet and received instructions from her. There is no indication whatsoever that the advice or instructions originated with Holdeen. TRUSTS I, II and III Respondent contends that the trustee of Trusts, I II and III had power to invest without restriction, that this power can be used to benefit the income beneficiaries at the expense of the remainder charities and that because of this power to control beneficial enjoyment and power to substitute himself as trustee, Holdeen is taxable on the income of these trusts for all years. It is further contended that Holdeen is taxable on the income of Trusts I, II and III for the years 1951 through 1953 by his power to control investments by these trusts which is a proscribed power. Respondent concedes that this contention does not apply for the years 1954 through 1957 because the trusts did not own securities in any corporation in which the holdings of the grantor and the trust were significant from the viewpoint of voting control. Sec. 675(4) (B) I.R.C. 1954. [8] Respondent contends that the trustee's power to loan trust funds of Trusts I, II and III without collateral is attributable to Holdeen and that since he was able to *538 borrow trust funds without security, all income from these trusts is taxable to Holdeen. In Trusts I, II and III, Holdeen reserved the right to appoint a substituted trustee. In Trust II he also reserved the right "to modify the proportionate shares in which any of the income beneficiaries except Stella H. Holden shall respectively be entitled to share in income accruing under this instrument." In Trust III he *539 reserved the right: [By] written declaration to modify the proportions in which said great grandchildren of Stephen Holden shall share in benefits hereunder or to exclude any such great grandchild or to cause to be included among the income beneficiaries under subdivision FOUR hereunder any descendants of such great grandchild so as to entitle such descendant to an equal or any other specified proportion of such income and to substitute as residuary beneficiary under the SIXTH subdivision hereof any other educational or philanthropic corporation of [or] any state, county or other governmental entity. [par. 9, Tr. III] These powers would permit the grantor to substitute himself as trustee of any of these trusts and as to Trusts II or III to alter the distributions of income. These powers would enable him to control the beneficial enjoyment of income or corpus of these trusts. See Commissioner v. Buck,120 F.2d 775 (C.A. 2, 1941, and Littel v. Commissioner,154 F.2d 922 (C.A. 2, 1946). In 1943 Holdeen executed a document intended to amend the provisions of Trusts I, II and III and relinquish any powers reserved therein. Petitioners concede that this document was not effective to relinquish *540 such powers. [Reply Brief p. 74] In December 1953 Holdeen signed a document renouncing and revoking every power which he reserved or might be deemed to have reserved in any earlier trust agreements. At that time Janet was accounting for the income of Trusts I, II and III upon the basis of a fiscal year ending June 30. The renunciation as to Trusts I, II, and III would not be effective therefore until June 30, 1954. In the taxable years following June 30, 1954, Holdeen no longer possessed any powers of control over these trusts, and is not taxable on their income. With reference to the income of these trusts in the period January 1, 1951 to June 30, 1954, the taxability to Holdeen depends upon whether his power to substitute himself as trustee is sufficient to make him the "owner" of the corpus of these trusts. Respondent relies upon Warren H. Corning,24 T.C. 907, (1955) affirmed per curiam 239 F.2d 646 (C.A. 6, 1956). In that case the trustee was empowered to change the beneficial enjoyment of income or corpus. We held that this power together with the power to substitute trustees without cause gave the grantor such a degree of domination and control over the trust that its income *541 must be taxable to him under section 22(a) of the 1939 Code. In the present case the trustee had power to modify the shares of income distributable from Trusts II and III. Holdeen's reserved power to substitute trustees together with the power to modify shares of income distributable is sufficient to make him taxable as the "owner" of Trusts II and III. In Trust I there was no discretion given the trustee as to distribution and if he substituted himself as trustee of that trust he was still obligated to the beneficiaries to carry out the fixed provisions for distribution, and would be subject "to those obligations of fidelity and diligence that attach to the office of trustee." Hall v. Commissioner,150 F.2d 304 (C.A. 10, 1945) reversing 4 T.C. 506, cited by us with approval in Arthur L. Blakeslee,7 T.C. 1171 (1946). See also Anthony J. Drexel Biddle,11 T.C. 868 (1948), and Belknap v. Glenn,55 F. Supp. 631 (D. Ct. Ky., 1944). Holdeen is taxable on the income of Trusts II and III for the period January 1, 1951 to June 30, 1954. In Estate of Benjamin Lowenstein,3 T.C. 1133, (1944), acq. 1944 C.B. 18, the decedent had previously created three trusts for the benefit of his adult *542 children naming himself as trustee. Upon the death of each life beneficiary the trust was to terminate and the corpus was to be distributed to persons other than decedent. He retained no express power of revocation and had no reversionary interest. Broad powers of management and control were vested in him as trustee. The court held, under the New York law, the powers granted the trustee and the control which he could legally exercise over the trust corpus was insufficient to make the trust income taxable to the grantor during his lifetime. In that case we stated: Here Lowenstein's authority to act under the trusts was as trustee, not as grantor or donor. The trusts were created for the benefit of his children and their issue and not for any benefit that he could personally derive therefrom. The trusts irrevocably disposed of the trust income and trust corpus to his children and their descendants. The powers granted the trustees, original and successor, were designated to aid the fiduciary in the management and investment of the trust corpora for the benefit of the grantor's children. No powers were reserved by the grantor whereby he could revoke the trust or revest any part of the *543 trust corpora or income in himself. Any attempt by the trustee to use his fiduciary powers for his individual benefit, as grantor, or to mulct the trusts or waste their assets for his personal advantage, would violate the trusts and would be prohibited by New York law. * * * [3 T.C. 1138]
Holdeen's power to control investments in Trust I is dependent upon his power to substitute himself as trustee. Under the regulations applicable from 1951 to 1953 under the 1939 Code if this power is exercised by a person as trustee it is presumed that it is exercisable in a fiduciary capacity primarily in the interest of the beneficiaries, and such presumption may be rebutted only by clear and convincing proof that the power is not exercisable primarily in the interests of the beneficiaries. [9] *544 Holdeen did not substitute himself as trustee and the presumption is that had he done so he would have acted in the interests of the beneficiaries. There is no sufficient basis for taxing Holdeen upon the income of Trust I for the period prior to June 30, 1954, upon the assumption that his power to substitute himself as trustee would enable him to control investments for his own economic benefit. He did not in these years attempt at any time to exercise the powers reserved in the trust instruments. BRYANT AVENUE There *545 is an instance in which Holdeen indirectly borrowed considerable sums from some of the trusts. This was in connection with the property owned by Holdeen on Bryant Avenue which was subject to pre-existing mortgages upon which Holdeen was not personally liable. Janet invested for Trust 45-10 approximately $ 80,000 in 1948 in mortgage participation certificates on this property purchased at a discount. Sherley and Audrey each invested $ 20,000 for MS and NS. These were bought through brokers. It is clear from the entire record that Holdeen was aware that some of the securities were held by his daughters for those trusts and that the trustees knew that he was the owner of the properties. Holdeen was careless about paying his debts unless his creditors billed him. The brokers added interest charges upon his accounts. His bankers collected interest upon his loans. But he gave little attention to paying rent for his rooms at the Astral Building unless Kreulen made an effort to collect. When he paid Janet upon one loan he inquired whether interest was due. Sometimes Janet billed him for an amount due plus interest. Although at one time he asked Audrey why she did not collect interest due on *546 her Bryant Avenue investment, he took no steps to pay her at that time. Sherley collected interest on these securities from him personally. In 1951 she had to collect $ 6,120 for 3 years at one time. His tax returns show payments of interest on this property and also the payment to MS of $ 6,120 in 1951. In 1954 he became aware that Janet had invested a large amount of trust funds in these securities and that there was no record of payment. Although he mentioned the possibility that the statute of limitations might bar the claims, he proposed to buy Audrey's and Sherley's securities at their cost, and said that he might from sympathy pay $ 100,000 to Janet to save her investment from loss to the trust. He did purchase the securities from Sherley and Audrey in 1954 and paid interest on this account to Audrey. Nothing was done about Janet's investment for Trust 45-10 until Janet suggested that he transfer the property to Trust 45-10 as a means of repaying its investment. Holdeen transferred this property to Janet early in 1956. The Bryant Avenue property is reported on Holdeen's tax returns at a cost of $ 316,000 in 1947 plus $ 24,000 for a boiler and in 1955 a second boiler costing *547 $ 12,000. Respondent estimated the value of the property as of December 31, 1953 as $ 460,000 subject to a mortgage of $ 304,563, or a net of $ 155,437. Janet sold the property in October 1958 for $ 600,000 subject to a prior mortgage of $ 200,000. We find that the transfer of the property in 1956 effected a repayment of the loan plus interest to Trust 45-10. From this evidence it appears that Holdeen had indirectly borrowed $ 80,000 from Trust 45-10 in 1948 and that he did not repay this loan with interest until early in 1956. Under section 675(3)[10] *548 of the 1954 Code the grantor shall be treated as the owner of any portion of a trust in respect of which he has directly or indirectly borrowed the corpus or income and has not completely repaid the loan, including any interest, before the beginning of the taxable year. Holdeen is therefore to be treated as the owner of a portion, $ 80,000, of Trust 45-10 during 1954, 1955 and 1956, until September 30, 1956, the end of the taxable year of the trust in which repayment was made. As to the calendar years 1951, 1952 and 1953, the applicable regulations [11] *549 provide that income of a trust is taxable to the grantor, where administrative control of the trust is exercisable primarily for the benefit of the grantor rather than the beneficiaries and that administrative control is so exercisable where the grantor has directly or indirectly borrowed the corpus or income and has not completely repaid the loan, including any interest, before the beginning of the taxable year. It is clear that the loan, including interest, was not completely repaid before the beginning of the taxable year 1951 or 1952 or 1953. The question remains whether under the regulations the entire income of Trust 45-10 or only the income from $ 80,000 of the assets of Trust 45-10 is taxable to Holdeen. The regulations do not specifically limit the taxable amount to the income of the "portion" of the trust, as do the provisions of the 1954 Code, section 675(3), supra, which are inparimateria.A court may properly look to subsequent legislation as an aid to statutory construction. Joy Floral Co. v. Commissioner,29 F.2d 865, 868 (C.A.D.C. 1928), Sheaffer Pen Company v. Lucas,41 F.2d 117 (C.A.D.C. 1930), and Cummins-Collins Foundation,15 T.C. 613, 624 (1950). The administrative control referred to in the *550 regulations was exercised primarily for the benefit of the grantor only with respect to the $ 80,000 loan and not with respect to the total assets of the trust, which amounted to $ 278,000 in 1948 and $ 696,000 in 1954. We hold that the income from $ 80,000 of the trust's assets is taxable to Holdeen rather than the entire income of Trust 45-10 in the years 1951, 1952 and 1953. It appears that the MS and NS Trusts were being administered in 1955 upon the basis of a fiscal year ending September 30. The indirect loans upon the Bryant Avenue property amounting to $ 20,000 by each of these trusts to Holdeen were completely repaid with interest before September 30, 1955. Upon the basis of the statutes and regulations referred to above, Holdeen is taxable upon the income from $ 20,000 of each of these trusts during the period January 1, 1951 to September 30, 1955, the end of the taxable year of the trusts within which repayment was made. The second issue is whether Holdeen's charitable contributions claimed as deductions in the taxable years 1951 to 1957, inclusive, are allowable as deductions. These were contributions to the fully charitable trusts only. These deductions are clearly allowable *551 under the decision of the Court of Appeals for the Second Circuit in Holdeen v. Ratterree,292 F.2d 338, 341 (1961) concerning liabilities for 1945. The Court said as to Trust 45-10: From its inception the trustees are obligated to apply the trust property only to charitable purposes, and to none other. Accordingly the trust is a valid charitable trust; and it was error to hold plaintiff taxable on its income, and to deny him a charitable deduction for the fair value of the property transferred to the trust in 1945. ESTATES CASES--CONCLUSIONS In summary we hold as to the estates cases: (1) Holdeen and his wife intended to and did create valid and genuine trusts. (2) In the years 1951 through 1957 Holdeen did not retain or exercise ownership or control of the corpus or income of any of such trusts and their income was not taxable to him, with the following exceptions: (a) Income of Trusts II and III was taxable to Holdeen until June 30, 1954, and not thereafter. (b) Income of a portion of Trust 45-10 was taxable to Holdeen until September 30, 1956, and not thereafter, and (c) Income of portions of MS and NS Trusts was taxable to Holdeen until September 30, 1955, and not thereafter. *552 (3) Contributions made by Holdeen and his wife to the fully charitable trusts in the years 1951-1957 are deductible as claimed. THE TRUST CASES IN GENERAL Respondent determined in the alternative that if the income of the trusts was not taxable to Holdeen such income was taxable to the trusts, individually. INTERGOVERNMENTAL IMMUNITY The petitioner trusts contend that since the State of Pennsylvania is the ultimate remainderman of the trusts, the respondent's determination is an attempt to tax the property of that State and is invalid. Petitioners cite Metcalf and Eddy v. Mitchell,269 U.S. 514, 522 (1926), which states: [Those] agencies through which either government immediately and directly exercises its sovereign powers, are immune from the taxing power of the other. Petitioners also cite Indian Motorcycle Co. v. United States,283 U.S. 570 (1931), holding that a sale of motorcycles to a city for police service is not subject to tax by the United States. Also First Agricultural National Bank of Berkshire County v. State Tax Commission,392 U.S. 339 (1968), where the imposition of a state sales tax on purchases by national banks was barred, and First National Bank of Homestead v. Dickinson,291 F. Supp. 855 (1968), *553 affd. 393 U.S. 409 (1969), which held that the State of Florida was not allowed to tax national banks. Petitioners also cite United States v. Nevada Tax Commission,291 F. Supp. 530 (1968), prohibiting collection of a state sales tax on property of a contractor with the Atomic Energy Commission, title to which property passed to the United States. United States v. Alleghany County,322 U.S. 174 (1944), barred collection of a county tax on Federal property used as part of a mill by a contractor working for the United States. In Holdeen v. Ratterree,292 F.2d 338 at 340 (C.A. 2, 1961), the Court of Appeals said as to Trust 45-10 that Pennsylvania's remainder interest appears to be vested. Respondent ruled in Rev. Rul. 71-589, 1971-2 C.B. 94: An individual provided in his last will and testament that a portion of his property be held in trust by a city and that it constitute a fund to be used by the city for certain charitable purposes. The legacy was accepted by the city and the trust income was used by its board of commissioners for the designated charitable purposes. This trust fund is similar to the trust funds held by a great many cities and towns throughout the United States. *554 Money is given to a city or town in trust to use the income therefrom for charitable purposes, the support of a hospital, schools, maintenance of a park, or for some other purposes ordinarily recognized as a municipal function. Held, the trust income in the instant case is not subject to Federal income tax, and the city in its capacity as trustee of the fund is not required to file a Federal income tax return with respect thereto. Respondent argues that the doctrine of intergovernmental immunity should be narrowly construed. Graves v. New York ex rel O'Keefe,306 U.S. 466 (1939), and that the burden of the tax must be real and substantial to bar the tax. Willcuts v. Bunn,282 U.S. 216 (1931) and Helvering v. Gerhardt,304 U.S. 405 (1938). Respondent says that the supposed burden of the State of Pennsylvania in this case is so speculative and uncertain that the doctrine does not apply, citing Snyder v. Bettman,190 U.S. 249 (1903), which held that a Federal tax on a bequest to a municipality for public purposes was valid. Since it was collected from the executor it was not regarded as a tax upon the municipality, although it operated to reduce the bequest. In the view we take of *555 the liability of the trusts it becomes unnecessary to resolve the question of intergovernmental immunity. THE JAMES CASE
The Supreme Court of Pennsylvania has decided a case concerning a trust intended to have a duration of 400 years. In re Estate of Frank James, Deceased,414 Pa. 80, 199 A.2d 275 (1964). In this case the will of the decedent created a life estate in trust following which the remaining proceeds of the assets were to be added to the principal of the residuary trust. The residuary trust was for the benefit of the Grand Lodge of Masons of Pennsylvania for the use of Masonic Homes at Elizabethtown, Pennsylvania. The trust provided that at 20-year intervals one-half of the net income was to be paid to the beneficiary and one-half to be added to the principal. After 220 years 75 percent of the income was to be paid and 25 percent added to the principal. At the end of 400 years the principal and accumulated income was to be paid to the beneficiary. The corpus was approximately $ 40,000 to $ 50,000, the value after 400 years was estimated to be over $ 14,000,000. The lower court ordered distribution in compliance with the provisions of the will. It observed that "[charitable] *556 trusts are favorites of the law because they are in relief of the public burden", and "[the] principal of charitable trusts may be held for any period of time even in perpetuity." Reference was made to the will of Benjamin Franklin which had been sustained both in Pennsylvania and in Massachusetts. The Supreme Court in holding that the testator had established a charitable trust, stated (199 A.2d 279-280): The will of Frank James supplies no indication of purpose for the 400 year accumulation provision, nor does it, either by express language or by implication, reveal any particular plan or need for retaining accumulations over such an extended period of time. We are satisfied, however, that the settlor intended to benefit the charity rather than to demonstrate by the device of a lengthy charitable accumulation the effect of accumulation of income and the compound interest tables. In reality, were we to sustain the accumulation of wealth in the amount and manner contemplated, we would demonstrate the latter effect rather than implement the settlor's primary charitable intention. We are reluctant to ascribe to testator the paramount desire merely to turn an approximately $ 50,000 trust *557 fund into a final gift of almost $ 15,000,000, at the expense of immediate social needs. No case has been cited to us, nor have we been able to locate any authority, which appears to recognize the validity of a proposed gift whose enjoyment is delayed for a period of four centuries without apparent reason. We hold, therefore, that the provisions for accumulation of income are unreasonable and void as being unnecessary, charitably purposeless and contrary to public policy as well as to testator's primary charitable intention. We turn now to the issue of what is to be done with the income. We are unable to agree with the conclusion of the concurring and dissenting opinion that all the income be accumulated for twenty successive periods of twenty years and that the income accumulated during such periods be distributed at the end of each period. Although this distribution pattern would follow that established in testator's will, on this record, such an accumulation of income for 20 twenty-year periods has no apparent practical or reasonable purpose. Had the will provided some guide as to testator's plan or purpose, there might be some basis for that scheme of distribution. But testator *558 did not point to capital improvements or to any other needs of the charitable institution which ordinarily could not be met by drawing on current funds, nor did he indicate any other motivation for his plan. The projected scheme of delayed distribution prevents practical, effective use of the funds in question, and, as such, is unreasonable. It is, however, clear that testator's plan of accumulation was merely incidental to his primary charitable intention to create a source, perhaps in the nature of an endowment fund, which would provide continuing income over the 400 year term for the maintenance of the Masonic Homes. The result we reach is in harmony with his primary and controlling charitable objective. We are not without some guide as to the proper disposition of the income. Section 7 of the Estates Act of 1947, April 24, P.L. 100, § 7, added Feb. 17, 1956, P.L. (1955) 1073, § 3, 20 P.S. § 301.7 (Supp. 1963), requires, in those situations controlled by it, that "[income] subject to a void direction or authorization to accumulate shall be distributed to the person or proportionately to the persons in whom the right to such income has vested by the terms of the instrument or by *559 operation of law." While this charitable trust is not governed specifically by this provision, it is pertinent to observe that in Section 7, the Legislature has approved immediate distribution. Even though our laws favor the accumulation of income and wealth for philanthropy, nevertheless, gifts and the accumulation of income for unreasonably long periods offer many opportunities for disservice to immediate charitable needs as well as to those of remotely future generations. It has been prophetically observed that no human being, no matter how wise or experienced, is able to foresee the special needs of society, even one or two generations away, let alone 400 years hence. Shifting and advanced social concepts, programs and concerns emphasize the hazards of seeking to correct or alleviate social problems so distantly removed from testator's generation. We conclude, therefore, that the testator's primary charitable intention is best attained by making available to the beneficiary the income of the trust on a current basis. [Footnotes omitted.] We note that the court did not terminate the trust or prohibit its continuance. AMOUNTS PERMANENTLY SET ASIDE The trusts in their tax returns *560 claimed deductions for amounts paid, or permanently set aside, for charitable purposes, within the provisions of section 642(c) of the 1954 Code or section 162(a) of the 1939 Code. [12] *561 Respondent allowed as deductions the amounts actually paid to the charitable beneficiaries, but disallowed the amounts claimed as permanently set aside for charitable or public beneficiaries. The petitioner trusts allege error in respondent's action. Section 642(c) of the Internal Revenue Code of 1954 and section 162(a) of the 1939 Code allow a deduction to a trust for any amount of the gross income which by the terms of the trust instrument is during the taxable year "paid or permanently set aside" for charitable or other exempt purposes. Under the terms of all the trusts a portion of the income is to be paid to specified beneficiaries, individual or charitable. The remainder is to be accumulated. The accumulated income and principal is ultimately to go to the State of Pennsylvania. It is conceded that the *562 AUA, the colleges named as beneficiaries and the State of Pennsylvania qualify as charitable, educational or public entities. Whether the income has been set aside for charity depends on the language of the trust instrument. The action or inaction of the trustees has no bearing on this. Bowers v. Slocum,20 F.2d 350 (C.A. 2, 1927). In Slocum, the decedent by will and codicil left her entire residuary estate outright to charitable and religious organizations. During 1919 while the decedent's estate was in the process of administration, the executors failed to pay or credit any income to the residuary legatees. The Commissioner disallowed the income tax deduction claimed by the estate for 1919 on the ground that there had been no "permanent setting aside" of income for charitable purposes during the taxable year. The Court of Appeals stated: The intention of the testatrix plainly appears from her will that all of her residuary estate shall go to corporations of the character described in section 219(b), and the residuary estate includes the income in question. This appears from the care she exercised to prevent intestacy as to any part of the residuary estate. The government * * * *563 argues that the income in question might have been allowed as a deduction, if it had been paid by the executors or credited on their books. This would make the imposition of the tax depend upon some act of the executors, which had no result in law upon the rights of the parties, and is not in accordance with what we have found to be the expressed intent of the Congress, which was to tax the income received by the estate, which would pass to any person subject to taxation, but relieve from taxation the income set aside by the terms of the will for corporations of the character described. [Emphasis supplied] [20 F.2d 350, 352]
Accordingly, the Court of Appeals held that the income attributable to the residuary estate was "permanently set aside" for charitable purposes by the trust instrument and that the deduction should be allowed. Respondent argues that the Slocum case should not be followed here. This Court has consistently followed it. Estate of J. B. Whitehead,3 T.C. 40 (1944) affd. 147 F.2d 977 (C.A. 5, 1945); Lydia Hopkins,13 T.C. 952, 957 (1949); Leon A. Beeghly Fund,35 T.C. 490, 525 (1960) affd. 310 F.2d 756, 760 (C.A. 6, 1962). Respondent asserts that the trusts were *564 created to satisfy Holdeen's selfish motives. Holdeen's motives in establishing these trusts are immaterial. It is the effect of the trust agreement, not the motive of the grantor, that is significant. The Second Circuit Court of Appeals in Holdeen v. Ratterree,292 F.2d 338, 341 (1961) with reference to Trust 45-10 stated: Furthermore, so long as the trust property is devoted to charitable uses, the trust is "charitable," notwithstanding that the settlor's motive may have been a desire to prove his economic theories rather than to benefit humanity. "It is the purpose to which the property is to be devoted which determines whether the trust is charitable, not the motives of the testator in giving it." 4 Scott, Trusts § 348 at 2551 (2d Ed. 1956), quoted with approval in Abel v. Girard Trust Co., 365 Pa. 34, 73 A.2d 682, 685. The American Unitarian Association is conceded to be a valid charity; and a trust for a state is charitable, although the particular method of applying the property is not provided for. 4 Scott, Trusts § 373.1 (2d Ed. 1956). From its inception the trustees are obligated to apply the trust property only to charitable purposes, and to none other. Accordingly, the *565 trust is a valid charitable trust * * *. [Emphasis supplied] The First Circuit Court of Appeals, in Fabreeka Products Co. v. Commissioner,294 F.2d 876, 878 (C. A. 1, 1961) has stated: Nevertheless, unless Congress makes it abundantly clear, we do not think tax consequences should be dependent upon the discovery of a purpose, or a state of mind, whether it be elaborate or simple. The limitation which the government asks us to read into the statute, even if appealing in the particular instance, might readily * * * "create difficulties and uncertainties more objectionable in their results than any seeming inequities which would be eliminated or prevented." [Emphasis supplied.] THE TEST CASES The parties, as stated above, have chosen three of the trust cases as test cases for the determination of the liabilities of all the trusts. These are Trust II, Trust 45-10 and Trust 55-10. The liabilities with respect to years after 1950 depend in part upon the interpretation of sections 642(c) and 681(c) of the 1954 Code and the corresponding provisions, sections 162(a) and 162(g)(4) of the 1939 Code. For convenience we will refer to the 1954 Code provisions. Section 642(c) states that "In the *566 case of a trust, the deduction allowed by this subsection shall be subject to section 681 (relating to unrelated business income and prohibited transactions). " There is no contention that any of the trusts had unrelated business income or engaged in prohibited transactions, but respondent contends that one or more of the paragraphs of section 681(c)[13] *567 are applicable. These provisions limit the deduction under certain circumstances. Trust II This is one of the early trusts, created in 1936. It has been referred to as Holdeen Trust II or as Janet Adams Trust II. It is a charitable remainder trust. The income is to be paid to certain family members during the lives of Hildred and Haldis and thereafter certain income is to be paid to Hartwick College and the remainder of the income to be accumulated. The State of Pennsylvania is to receive the principal and accumulated income after 1,000 years. We have held above that by reason of Holdeen's reserved powers the income of this trust was taxable to him until June 30, 1954. In the fiscal years of the trust ended June 30 in 1955 *568 and 1956, Janet Adams, the trustee, paid the ordinary income to the individual beneficiaries and treated the capital gains as held for the charitable or public remainder interests pursuant to section 642(c), Internal Revenue Code of 1954, supra. Respondent contends that the amounts claimed as deductions by Trust II were not set aside "pursuant to the terms of the governing instrument" of that trust, as required under section 642(c). The original trust deed did not mention capital gains. It provided that the trustee shall pay the income to Stella H. Holden and the great grandchildren of settlor's father until the death of the survivor of Haldis and Hildred, and thereafter the principal was to be transferred to a successor trustee in Pennsylvania and the trust estate was thereafter to be administered in Pennsylvania, domiciled there and subject to the laws thereof. In 1943 Holdeen and Janet agreed to a modification of Trusts I, II and III. The agreement as modified provided: Upon the death of the survivor of Haldis and Hildred and at any prior time when no person shall be entitled to income under the previous provisions hereof, Donor directs that said principal and share be transferred *569 to Somerset Trust Company, Somerset, Pennsylvania, and the administration of the uses and trusts created by this instrument shall be carried on in Pennsylvania and shall be subject to regulation and control by its courts, and this instrument shall be deemed made under and with reference to the laws of that State. The modified agreement also provided that increases in value of capital assets upon sales and exchanges shall not be considered income. Under the laws of Pennsylvania capital gains accrue to principal. Purdon's Pennsylvania Statutes, Title 20, section 3470.3. Although the petitioners in the Estates cases regard the 1943 amendment as not effective to relinquish Holdeen's reserved powers, we consider the agreement between grantor and trustee as clarifying the provisions of the trusts in other respects, since the amendment is not to the detriment of any of the beneficiaries. The last clause of the quoted provision is not entirely clear, but we interpret it as meaning that the laws of Pennsylvania are to apply to the construction of the trust immediately, rather than only after the death of the survivor of Haldis and Hildred. Section 642(c) allows deduction of "any amount of *570 gross income" (emphasis supplied) which is permanently set aside for charitable or similar purposes. It further provides "* * * to the extent that such amount consists of gain from the sale or exchange of capital assets * * *." (emphasis supplied) This contemplates inclusion of capital gains in the amount set aside. Section 681(c)(1) refers to the amounts set aside for the purposes described in section 642(c). Respondent has held that capital gains realized by a charitable remainder trust will be deductible by the trust pursuant to section 642(c) where the trust agreement allocated such gains to principal. Rev. Rul. 64-253, 1964-2 C.B. 166. In Old Colony Trust Co. v. Commissioner,301 U.S. 379 (1937), section 162 of the Revenue Act of 1928, a provision similar to section 642(c) of the 1954 Code was involved. The question was whether payments made to charities by the trustee under discretionary authority in the deed were made "pursuant to the terms" of the deed. It was argued that the deed must definitely direct the payments. The Court defined "pursuant to" as "acting or done in consequence or in prosecution [of anything]; hence, agreeable; conformable; following; according." The Court *571 said "the words of the statute are plain and should be accorded their usual significance in the absence of some dominant reason to the contrary." It was held that the questioned donations were made in pursuance of the trust deed. The facts are, as to Trust II, that under the trust agreement as amended capital gains are not to be considered income and the law of Pennsylvania is invoked and under the State law the capital gains accrue to principal, hence the trustee was required to set aside any such capital gains permanently for the ultimate remainderman, the State of Pennsylvania. This was done "in consequence" of the terms of the trust, agreeable to, or according to, such terms and therefore "pursuant to" such terms. Respondent contends that if any amounts were permanently set aside by Trust II in the fiscal years ended in 1955 or 1956, the accumulations of such amounts were unreasonable in amount or duration, were used for non-charitable purposes or were so invested as to jeopardize the charitable interests, within the provisions of section 681(c) of the 1954 Code. The trustee distributed all the ordinary income to the individual beneficiaries and retained, or "set aside" all the *572 capital gains. In effect, capital gains which are reinvested within a reasonable time are not counted in determining whether a trust's accumulation is unreasonable. Regs. § 1.681(c)-1(c). [14] *573 Respondent says the trust has not shown that the capital gains were reinvested within a reasonable time. The trustees of all the trusts testified that Holdeen's advice to them was to keep their money working and avoid having funds lie idle. Janet at one time expressed disappointment that Audrey had money in her bank account. Janet frequently asked other trustees whether they had money available for investment. When securities were sold the proceeds appeared on the broker's account and Randal and Janet promptly considered the broker's offers of new securities. In 1954 Trust II, far from having uninvested funds, had borrowed up to $ 127,000 from one of the brokers. We have found that the capital gains of Trust II were permanently set aside for exempt purposes and were reinvested within a reasonable time in property held for the production of investment income. They were not unreasonable in amount in order to carry out the charitable purposes of the trust. At the time of the trial herein Haldis and Hildred were both living. Various charitable remainder trusts provide for charitable or similar benefits after lives in being, including provisions for future income to educational institutions. Such a trust is not unreasonable in duration to carry out its beneficial purposes because of the postponement of the charitable benefit. The accumulations of capital gains of Trust II are not unreasonable in duration within the meaning of section 681(c)(1) in the fiscal years ended in 1955 or 1956. The deduction allowable is also limited if the amounts set aside are used to a substantial degree for purposes other than those prescribed in section 642(c), that is, charitable or other exempt purposes. Respondent contends that the amounts permanently set aside were used for non-charitable purposes being *574 loaned to members of the family and commingled with assets belonging to other trusts and individuals; that Holdeen maintained and supervised an investment pool of family and trust investments; that Holdeen vigorously controlled this pool and he and his family frequently borrowed and loaned money as trusts and as individuals, the lists of interfamily loans being prepared as often as once a month; that the loans were usually interest free and unsecured and no financial institution would have made loans to family members on such terms; and that thus the trusts were primarily a banking device for Holdeen and his family. In our opinion in the Estates cases, supra, we have rejected the contention that Holdeen controlled the trusts and the trustees. There were no substantial loans to Holdeen. The loans to other family members were usually for short periods and small amounts in comparison with the assets of the trusts. The lending of capital funds by a trust to a noncharity does not, of itself, constitute use of trust income for noncharitable purposes. Income set aside may be invested in income producing property. It is not necessary that it be devoted to charitable purposes presently if it *575 is destined for charitable uses in the future. The requirement that it be not used to a substantial degree for noncharitable purposes does not prohibit ordinary investments for the production of income. See Reg. § 1.681(c)-1(c). supra.
On January 1, 1951, the principal investments of Trust II were in stocks, bonds, mortgages and rental properties. The net assets were $ 218,000. It appears that the accumulations in subsequent years were invested in similar securities and properties and that there was no substantial diversion of such accumulations to noncharitable purposes. According to the lists of interfamily loans, in March, 1953, Cushing-Murray owed Trust II three items amounting to about $ 9,700. In November, 1953, the NS Trust owed Trust II about $ 12,000 and Cushing-Murray owed $ 8,000 plus an amount not shown. In January, 1954, Cushing-Murray owed Trust II $ 149,000. By June 16, 1954, there were no amounts owing to Trust II. In June, 1954, Cushing-Murray borrowed $ 3,000 from Trust II. The loans made by Trust II to NS Trust were to another entity having a charitable beneficiary. The large loan to Cushing-Murray was apparently for a short term and was settled before the fiscal *576 year beginning July 1, 1954. The amounts set aside by Trust II were not used to a substantial degree for noncharitable purposes in the fiscal years ended in 1955 or 1956. Respondent contends that the amounts accumulated were invested in such a manner as to jeopardize the charitable interests. Under the statute, the charitable deduction is limited if the amounts set aside are so invested. Respondent says that petitioner's investments were so risky and speculative that it is doubtful petitioner would be able to pay any amount to Pennsylvania under the terms of the trust in 2936. He argues that the bulk of petitioner's assets was invested in real estate located in New York City and securities of corporations owning such real estate; that some of the buildings could not be insured against liability because they were high risks. Janet referred to real estate owned by the trusts as "junk", extensive violations of the housing code show that the buildings had deteriorated and were speculative investments. Janet wrote that all the trusts "* * * will be in the hole for 1952-1953, violations are very severe." Also Cushing-Murray failed to turn over receipts collected on property managed by him *577 or to pay interest on trust loans to him. Since property was held in the name of Janet Adams or a dummy corporation it was not clearly identified as trust property and the interests of the charitable beneficiaries were jeopardized. Failure to record deeds or to have property appraised, commingling trust assets, and keeping broker's accounts in Janet's name, as well as trading on margin are said to jeopardize the charitable interests. In the case of William Waller,39 T.C. 665 (1963), Acq. 1963-2 C.B. 5, the trustees of a fund were permitted to hold securities in their own names without indicating their trust character. We said it should not be assumed that the trustees would act in violation of their fiduciary obligation. Janet and Randal became sufficiently able from experience to evaluate properties without formal appraisals. The respondent mistakes the evidence as to the insurability of the real properties owned by the trusts. The buildings were insurable but Janet Adams apparently chose to take the risks of a self-insurer rather than pay the premiums which she regarded as excessive. The properties owned by the several trusts were sufficiently numerous to spread the risks. Janet *578 effected a settlement with Cushing-Murray in 1952 and apparently concluded a termination of his loans in early 1954. In Samuel Friedland Foundation v. United States,144 F. Supp. 74 (D. N.J., 1956) there were investments in second and third mortgages on a Miami Beach Hotel property, and a $ 1,100,000 investment in common stock of a company on a loan from the organization's founder at a time when the Foundation's net worth was only about $ 110,000. The district court observed [pp. 93-94] "The test * * * seems to be not whether any one or two investments made with accumulated income were likely to founder, but whether whatever loss was apt to occur would imperil the capability of the organization to carry out its charitable purposes." The court held that these investments did not destroy the tax-exempt status of the Foundation. The return of Trust II for the fiscal year ended in 1955 shows small losses from two rental properties and larger gains from two others. The return for the fiscal year ended in 1956 for Trust I and II combined shows a net loss of $ 1,558 on rental properties, but two of them were sold in that year. These properties were sold at substantial gains. The principal *579 income was from dividends. The bulk of the trust's assets was invested in intangible securities. The assets of Trust II amounted to $ 218,000 on January 1, 1951. In 1954 the record indicates that its assets amounted to $ 270,000. This trust's ordinary income averaged nearly $ 30,000 per year in the 4 fiscal years ended June 30, 1956. The capital gain fluctuated, but according to respondent's computation amounted to $ 162,000 in the 5 and 1/2 years ending June 30, 1956. There was a gift to the trust of $ 23,000 in 1951. With the accumulation of capital gains it appears that the assets approximated $ 400,000 at June 30, 1956. There were other gifts in 1957 amounting to $ 42,675 to Trusts I and II combined. The successful growth of the principal of Trust II contradicts the respondent's view that the interests of the charitable beneficiaries were jeopardized. Respondent has conceded that Trust II is entitled to a $ 300 deduction for personal exemption under section 642(b), Internal Revenue Code of 1954 for the taxable years ended June 30, in 1955 and 1956. Since the trust did not plead that respondent erred in reducing this deduction it is not in issue as to earlier years. Trust II has *580 not shown that the late filing of some of its tax returns was due to reasonable cause and not to willful neglect. However, no addition to tax for delinquency was determined for the fiscal years ended in 1955 or 1956. TRUST 45-10 This trust was created by an agreement dated June 2, 1945 between Jonathan Holdeen as trustor and Janet Adams and Randal Holden as trustees. Certain bonds were transferred to the trustees who paid Holdeen an amount representing his cost. The assets of a prior trust, Trust 44-10, were converted into this trust and consolidated therewith. The expendable income as described in the agreement has been paid over to the AUA for specified charitable purposes. In the year 2444 the principal and accumulated income is to be paid to the State of Pennsylvania. This is a fully charitable trust. There are no individual beneficiaries and the designated beneficiaries are concededly exempt. Respondent determined deficiencies against this trust for the years 1949-1964 stating that none of the income was permanently set aside for charitable or other exempt purposes. Respondent argues that even if a charitable trust is valid when executed a court may later determine that it is *581 not benefitting the community, citing Green v. Connally,330 F. Supp. 1150 (D. D.C. 1971). This case stated at p. 1163: The indulgence of individual whim or preference has values but like all principles it cannot be pushed beyond sound limits to extremes that cannot be approved. The individual philanthropist cannot be indulged in his own vagaries as to what is charitable; he must conform to some kind of norm, else he cannot obtain subsidy or tax exemption. The cited case held, interalia, that a charitable trust is subject to the requirement that its purpose may not be contrary to public policy. Respondent contends that the accumulation provisions of this trust are contrary to public policy, that there is no present benefit to society or to the State of Pennsylvania from the trust and that the trust was part of a scheme that catered to Holdeen's whim concerning the accumulation of moneys. The Court of Appeals for the Second Circuit in Holdeen v. Ratteree,292 F. 2d 338 at 341, held that Trust 45-10 is a valid charitable trust, and at p. 340 said that "Pennsylvania's remainder interest appears to be vested." The Court also stated that "the trust was not an attempt to achieve a concentration *582 of wealth forbidden by public policy, but expressly contented itself with achieving only that degree of concentration which public policy will permit." p. 340 Under New York law in the years here involved, accumulations were illegal except for certain educational purposes not present here. McKinney's Consolidated Laws of New York, anno., 1949 Ed. Book 40, Personal Property Law, Future Estates, etc., Sec. 16. Under Pennsylvania law accumulations for charitable purposes are valid. Purdon's Pennsylvania Statutes, Tit. 20, sec. 301.6. Holdeen anticipated the possibility that the accumulations directed in the trust instrument might be held illegal. He stipulated that "all other net income hereunder which is not lawfully subject to accumulation" was to be paid to the income beneficiaries. In Trust 55-10 it was provided that income for any period when accumulation was unlawful should be paid to Trust 45-10. His evident intention was that if the accumulation as directed was illegal it was not to be carried out. Respondent suggests, on brief, that the Pennsylvania courts would declare the accumulation provisions of the Holdeen trusts invalid, based upon the James case, supra.
The UUA takes *583 the position that the accumulation provisions of Trusts 45-10, 55-10, and similar trusts are invalid, and that since the trust instruments expressly provide that income not subject to lawful accumulation is distributable to the income beneficiary, all income from inception of the trusts must be paid to the UUA. Pennsylvania law supports this position. [15]
In Holdeen v. Ratterree,supra,292 F.2d 338, 340 (C.A. 2, 1961), the Court of Appeals stated: As the district court noted, under the law of both Pennsylvania and New York, if the *584 direction for accumulation were invalid, the income would be paid out to the income beneficiary, and the settlor would not be entitled to any of the income under the theory of resulting trust. See Comment to subdiv. (b)(1) of tit. 20, sec. 301.8 Pa. Stat. (Purdon), summarizing Pennsylvania law at the time the 1945 trust was created * * *. In the James Estate case, supra, the trustees were to accumulate the income for 400 years and at 20-year intervals pay a part of the amount of income received in the preceding 20-year period to the beneficiary and add the remainder to the principal. The Supreme Court of Pennsylvania held that the provisions for accumulation were unreasonable and void as being unnecessary, charitably purposeless and contrary to public policy. It ordered that the entire income be made available to the beneficiary on a current basis. The cases of Trusts 45-10 and 55-10 are not distinguishable from the James Estate case. Under that decision, and under Pennsylvania law, the accumulations directed in these trusts are unreasonable and void, the income should be distributed to the UUA currently in full rather than in the small amounts defined as "expendable income", and all *585 presently retained income should be paid to the UUA. The income of these trusts has at all times been held for the present use of this charitable beneficiary. Holdeen's safeguard provision "all other net income * * * not lawfully subject to accumulation, etc." should have been followed. Under the principle of the Slocum case, supra, the retained income has actually become the property of the UUA for its charitable uses as described in the trust deeds. While the trustees have retained possession of this income erroneously, although innocently, they have had mere custody. Therefore there was no trust income which was permanently set aside pursuant to the trust deeds for the charitable purposes of the trusts, as distinguished from the charitable purposes of the beneficiary. Section 681(c) has the effect of limiting the deduction available to trusts when the amounts of income permanently set aside by such trusts are unreasonable in amount or duration. This section applies only to amounts permanently set aside by a trust for its own charitable purposes. It has no application here since there is no accumulation subject to its provisions. We conclude that Trusts 45-10 and 55-10 have no taxable *586 income in the years here involved. TRUST 55-10 This is what was called a split trust. One part of the trust assets in units of 200 shares or 500 shares of Commodore Hotel stock was to be devoted to paying income for life to Stella and to each great grandchild of Holdeen's father Stephen. Janet Adams, the trustee, treated this part separately and designated it as Adams-Commodore. The other part, retaining the title of Trust 55-10, was held for accumulation of income for the State of Pennsylvania as remanderman after 1,000 years, with the expendable income, one-thousandth part of the income multiplied by the number of years since April 6, 1950, being paid to the AUA for intended but not mandatory use for such purposes. As the life estates come to an end the assets devoted to paying the income will revert to the principal Trust 55-10. The non-expendable income of any period during which the provision for accumulation is unlawful is to be paid to Trust 45-10. The trust is to be subject to the laws of Pennsylvania and to regulation by that State. As to Adams-Commodore, each unit of shares providing current income to the individual beneficiary is in the nature of a charitable remainder *587 trust. The entire income of each unit of 200 shares or 500 shares was payable to the individual beneficiary with the principal retained until the end of the life of the beneficiary and thereupon transferred to Trust 55-10 for charitable uses of the income and principal. Since there is no accumulation the provisions of section 681(c) are not applicable. As to Trust 55-10, proper, respondent contends that all the conditions of section 681(c) apply. What we have said in connection with Trust 45-10 is applicable here. There is no accumulation subject to the provisions of section 681(c) because all income from the principal not in Adams-Commodore is held for present charitable uses or payable to the UUA through Trust 45-10 for such uses. CONCLUSIONS We conclude that Trust II is entitled to deductions for the capital gains realized in the fiscal years ended in 1955 and 1956, which gains were permanently set aside for charitable, educational or public purposes, and that Trusts 45-10 and 55-10 held all the retained income for the account of the income beneficiary, the UUA, for its current use, and that such retained income was not an accumulation of income subject to the provisions of section 681(c) *588 of the 1954 Code or section 162(a) of the 1939 Code. We hold that these trusts had no taxable income in the years involved. Decision will be entered under Rule 155 in Docket Nos. 82081, 82946, 87569 and 89076.
Decision will be entered for the petitioners in Docket Nos. 65867, 65869, 71972, 71997, 94066, 94080, 94081, 94084, 94085, 94107, 94186, 95138, 95143, 5376-65, and 5382-65. Footnotes
1. Cases of the following petitioners are consolidated herewith; Holdeen Trust II, Janet Adams, Trustee, docket Nos. 65867, 71972; Janet Adams Trust II, Janet Adams Trustee, docket Nos. 94081, 94085; Holdeen Trust 45-10, Janet Adams, Trustee, docket Nos. 65869, 71997, 94080, 94084, 94107, 95138, 5376-65; Holdeen Trust 55-10, Janet Adams, Trustee, docket Nos. 94066, 95143, 5382-65.↩
*. Under sec. 291(a), I.R.C. of 1939 or sec. 6651(a)(1), I.R.C. of 1954↩.
*. Twins↩
a. 190 F.Supp. 752, 757↩
b. Ex. 276 ↩
c. Ex. 255 ↩
d. Ex. 344 ↩
e. Ex. 343 ↩
f. Ex. 277 ↩
g. Ex. 356 ↩
i. Ex. 299 ↩
h. Ex. 345 ↩
j. Ex. 278 ↩
k. Ex. IT ↩
m. Ex. IU ↩
n. Ex. 14↩
2. 28 USCA sec. 1732(a)↩ In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible as evidence of such act, transaction, occurrence or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence or event or within a reasonable time thereafter.
3. Gray on Perpetuities, sec. 607, p. 581 (4th Edition 1942) states that: If the Court, however, can see an intention to make an unconditional gift to charity (and the Court is very keensighted to discover this intention), then the gift will be regarded as immediate, not subject to any condition precedent, and therefore not within the scope of the Rule against Perpetuities. * * *
4. Trust 47-10 paid the charitable beneficiary $ 2.09 [Ex. 356] for 1947 and $ 1,273.36 for 1957. Trust 45-10 paid the charitable beneficiary $ 12,700 for the period 1945-1962 and $ 56,000 for the period 1964-1970, according to the amicus curiae brief for the Unitarian Universalist Association.↩
5. Randal testified: Q. To what extent did your father direct any of these activities in which you were engaged between 1951 and 1957? A. When you say direct what do you mean? Q. I mean in what way did he have any hand in this operation where you were buying or placing orders for any of your sisters, like Audrey and Sherley? A. He didn't have any hand in the buying and placing of the orders at all. Q. This was done independently by you? A. The placing of the orders sure. Q. And the selection of securities? A. At any given time we would -- I would discuss with him his attitude toward securities in general, particularly to see what his attitude was and he didn't take much of an interest in those days. Claimed he'd retired. Q. This is between 1951 and 1957? A. Yes. Q. What was his health between 1951 and 1953 and '4 and up to '7? A. He was suffering from ulcers and I guess in the winter of 1953 and 1954, he had to go to the hospital and have part of his stomach removed and I guess he was bedridden for the best part of the year. Q. Did your father in any way attempt to review any of the activities of yours in connection with your purchases of securities for the trusts? A. I don't know that he knew much about my activities. Q. Did your father have any knowledge that you know of as to what accounts you were handling or advising or placing orders for? A. I don't know that he knew what the accounts were, aside perhaps from my sister -- if he had looked. My sister Audrey, I don't think had but one account at Baker-Weeks, but I am not sure, but the other sisters, like Janet, had a number of accounts for her children, for herself, but I doubt very much if he knew one account from another, plus the fact I don't think he ever looked at the broker's statements that I had. ON CROSS EXAMINATION: Q. Now you testified about recommending securities to your sisters during the period '51 to '57. Did you ever discuss any of these recommendations with your father? A. You mean the stocks? Q. Yes. A. Sure. Q. And how frequently would you do that? A. I would speak if he would listen which would be oh, couple of times a month. MR. BENDER: Excuse me. We are talking about 1951 to 1957? Q. You respected your father's advice didn't you? A. Oh, yes. Q. And you followed it whenever you could? A. Followed his advice? Yes, if he would give it. Q. Did you ever reject his advice? When did you reject it? A. He never gave me--I don't know what you mean by advice. Q. You obviously conferred with him, did you not? A. Yes. Q. And did he ever suggest to you that you look into or, investigate a security, or parcels of real property. A. No. No. Q. He never did? A. Oh, parcels of real property. I'm sorry, I thought you were talking about securities? Q. What about securities? A. No, he didn't suggest them to me. I would suggest them to him. Q. And what about parcels of real property? A. Oh, yes. Q. He would suggest parcels to you? A. Right.↩
6. Reg. 118, sec. 39.22(a)-21. Trust income taxable to the grantor as substantial owner thereof * * *. (e) Administrative control. (1) Income of a trust, whatever its duration, is taxable to the grantor where, under the terms of the trust or the circumstances attendant on its operation, administrative control is exercisable primarily for the benefit of the grantor rather than the beneficiaries of the trust. Administrative control is exercisable primarily for the benefit of the grantor where: * * * * * (ii) A power exercisable by the grantor, or any person not having a substantial adverse interest in its exercise, or both, whether or not in the capacity of trustee, enables the grantor to borrow the corpus or income, directly or indirectly, without adequate interest in any case, or without adequate security except where a trustee (other than the grantor or spouse living with the grantor) is authorized under a general lending power to make loans without security to the grantor and other persons and corporations upon the same terms and conditions; or (iii) The grantor has directly or indirectly borrowed the corpus or income and has not completely repaid the loan, including any interest, before the beginning of the taxable year; * * *. Sec. 675 [1954 Code]. The grantor shall be treated as the owner of any portion of a trust in respect of which-- * * * * * (2) POWER TO BORROW WITHOUT ADEQUATE INTEREST OR SECURITY.--A power exercisable by the grantor or a nonadverse party, or both, enables the grantor to borrow the corpus or income, directly or indirectly, without adequate interest or without adequate security except where a trustee (other than the grantor) is authorized under a general lending power to make loans to any person without regard to interest or security. (3) BORROWING OF THE TRUST FUNDS.--The grantor has directly or indirectly borrowed the corpus or income and has not completely repaid the loan, including any interest, before the beginning of the taxable year. The preceding sentence shall not apply to a loan which provides for adequate interest and adequate security, if such loan is made by a trustee other than the grantor and other than a related or subordinate trustee subservient to the grantor.
7. Req. 118, sec. 39.22(a)-21. Trust income taxable to the grantor as substantial owner thereof-- * * * (e) Administrative control. (1) Income of a trust, whatever its duration, is taxable to the grantor where, under the terms of the trust or the circumstances attendant on its operation, administrative control is exercisable primarily for the benefit of the grantor rather than the beneficiaries of the trust. Administrative control is exercisable primarily for the benefit of the grantor where: * * * (iv) Any one of the following powers of administration over the trust corpus or income is exercisable in a nonfiduciary capacity by the grantor, or any person not having a substantial adverse interest in its exercise, or both: * * * a power to reacquire the trust corpus by substituting other property of an equivalent value. Sec. 675 [1954 Code]. The grantor shall be treated as the owner of any portion of a trust in respect of which-- * * * (4) GENERAL POWERS OF ADMINISTRATION.--A power of administration is exercisable in a nonfiduciary capacity by any person without the approval or consent of any person in a fiduciary capacity. For purposes of this paragraph, the term "power of administration" means any one or more of the following powers: * * * (C) a power to reacquire the trust corpus by substituting other property of an equivalent value.↩
8. Sec. 675 I.R.C. 1954
The grantor shall be treated as the owner of any portion of a trust in respect of which-- * * * * * (4) General Powers of Administration.--A power of administration is exercisable in a nonfiduciary capacity by any person without the approval or consent of any person in a fiduciary capacity. For purposes of this paragraph the term "power of administration" means any one or more of the following powers; * * * (B) a power to control the investment of the trust funds either by directing investments or reinvestments, or by vetoing proposed investment or reinvestments, to the extent that the trust funds consist of stocks or securities of corporations in which the holdings of the grantor and the trust are significant from the viewpoint of voting control; * * *.↩
9. Reg. 118, secs. 39.22(a)-21. Trust income taxable to the grantor as substantial owner thereof.--* * * * * * * * (e) Administrative control.--* * * * * * * * (iv) Any one of the following powers of administration over the trust corpus or income is exercisable in a nonfiduciary capacity by the grantor, or any person not having a substantial adverse interest in its exercise, or both: a power to vote or direct the voting of stock or other securities, a power to control the investment of the trust either by directing investments or reinvestments or by vetoing proposed investments or reinvestments, and a power to reacquire the trust corpus by substituting other property of an equivalent value. (2) If a power is exercisable by a person as trustee, it is presumed that the power is exercisable in a fiduciary capacity primarily in the interests of the beneficiaries. Such presumption may be rebutted only by clear and convincing proof that the power is not exercisable primarily in the interests of the beneficiaries. * * * The corresponding provisions of Regulations 111 are similar.↩
10. Sec. 675 [I.R.C. 1954]. The grantor shall be treated as the owner of any portion of a trust in respect of which-- * * * * * (3) Borrowing of the Trust Funds.--The grantor has directly or indirectly borrowed the corpus or income and has not completely repaid the loan, including any interest, before the beginning of the taxable year. The preceding sentence shall not apply to a loan which provides for adequate interest and adequate security, if such loan is made by a trustee other than the grantor and other than a related or subordinate trustee subservient to the grantor.
11. Reg. 118, § 39.22(a)-21. * * * (e) Administrative control. (1) Income of a trust, whatever its duration, is taxable to the grantor where, under the terms of the trust or the circumstances attendant on its operation, administrative control is exercisable primarily for the benefit of the grantor rather than the beneficiaries of the trust. Administrative control is exercisable primarily for the benefit of the grantor where: * * * * * (iii) The grantor has directly or indirectly borrowed the corpus or income and has not completely repaid the loan, including any interest, before the beginning of the taxable year. The corresponding provisions of Regulations 111 are similar.↩
12. Sec. 642(c), I.R.C. 1954. Deduction for Amounts Paid or Permanently set Aside for a Charitable Purpose.-- In the case of an estate or trust (other than a trust meeting the specifications of subpart B) there shall be allowed as a deduction in computing its taxable income (in lieu of the deductions allowed by section 170(a) relating to deduction for charitable, etc., contributions and gifts) any amount of the gross income, without limitation, which pursuant to the terms of the governing instrument is, during the taxable year, paid or permanently set aside for a purpose specified in section 170(c), or is to be used exclusively for religious, charitable, scientific, literary, or educational purposes, * * * or for the establishment, acquisition, maintenance or operation of a public cemetery not operated for profit. For this purpose, to the extent that such amount consists of gain from the sale or exchange of capital assets held for more than 6 months, proper adjustment of the deduction otherwise allowable under this subsection shall be made for any deduction allowable to the estate or trust under section 1202 (relating to deduction for excess of capital gains over capital losses). In the case of a trust, the deduction allowed by this subsection shall be subject to section 681 (relating to unrelated business income and prohibited transactions). Sec. 162(a), I.R.C. 1939↩ is similar.
13. SEC. 681. LIMITATION ON CHARITABLE DEDUCTION. * * * * * (c) ACCUMULATED INCOME.--If the amounts permanently set aside, or to be used exclusively for the charitable and other purposes described in section 642(c) during the taxable year or any prior taxable year and not actually paid out by the end of the taxable year-- (1) are unreasonable in amount or duration in order to carry out such purposes of the trust; (2) are used to a substantial degree for purposes other than those prescribed in section 642(c); or (3) are invested in such a manner as to jeopardize the interests of the religious, charitable, scientific, etc., beneficiaries, the amount otherwise allowable under section 642(c) as a deduction shall be limited to the amount actually paid out during the taxable year and shall not exceed 20 percent of the taxable income of the trust (computed without the benefit of section 642(c)↩ but with the benefit of section 170(b)(1)(A)). * * * Paragraph (1) shall not apply to income attributable to property transferred to a trust before January 1, 1951, by the creator of such trust, if such trust was irrevocable on such date and if such income is required to be accumulated pursuant to the mandatory terms (as in effect on such date and at all times thereafter) of the instrument creating such trust. * * *
14. Income Tax Regulations § 1.681(c)-1(c)states, in part-- If the gain upon the sale or exchange of property held for the production of investment income, such as dividends, interest, and rents, is not within a reasonable time reinvested in property acquired and held in good faith for the production of investment income, the gain * * * will be considered income for the purposes of this section.↩
15. Purdon's Pennsylvania Statutes Anno. Title 20. Sec. 301.6
Income accumulations-when valid * * * * * (5) Charity. For any charitable purpose or purposes * * * * * 301.8 Disposition of invalid income accumulations. (a) Any income authorized but not directed to be accumulated unlawfully shall be distributed as if no such accumulation had been authorized. (b) Any income directed to be accumulated unlawfully shall be distributed in the absence of a valid alternative direction in the following order of preference; (1) To the person or persons, if any, who are entitled to the immediate enjoyment of the income from which such accumulations were directed; * * * * *↩